1    **WO**

2

3

4

5

6               **IN THE UNITED STATES DISTRICT COURT**

7                   **FOR THE DISTRICT OF ARIZONA**

8

9    SiteLock LLC,                          No. CV-19-02746-PHX-DWL

10              Plaintiff,                   **ORDER**

11   v.

12   GoDaddy.com LLC,

13              Defendant.

14

15        In 2013, Plaintiff SiteLock LLC ("SiteLock") and Defendant GoDaddy.com LLC

16   ("GoDaddy") entered into a contract (the "Reseller Agreement") under which GoDaddy

17   agreed to promote and sell SiteLock's website security services to GoDaddy's customers.

18   In this action, SiteLock accuses GoDaddy of various contractual breaches, as well as

19   Lanham Act and related state-law violations.

20        Now pending before the Court are four motions: (1) GoDaddy's motion for

21   summary judgment (Doc. 340); (2) SiteLock's motion for partial summary judgment (Doc.

22   341); (3) SiteLock's motion for sanctions (Doc. 348); and (4) GoDaddy's motion to

23   exclude certain opinions of Dr. Steven Kursh (Doc. 356).  For the following reasons, both

24   summary judgment motions are granted in part and denied in part, SiteLock's motion for

25   sanctions is granted, and GoDaddy's motion to exclude is denied.

26        . . .

27        . . .

28        . . .

**BACKGROUND**

I.      Factual Background

The facts summarized below, and detailed throughout this order, are taken from the parties' summary judgment submissions and other documents in the record.  The facts are uncontroverted unless otherwise noted.

GoDaddy "offers a wide array of website-related services, including domain registration, web hosting, and virtual private servers, to millions of customers around the world."  (Doc. 13 ¶ 2.)  SiteLock "offers website security services to customers, including small businesses," and "sells its services by offering annual or monthly subscriptions to its customers."  (Doc. 1 ¶ 1.)

As summarized in earlier orders, the gist of the complaint is that "SiteLock and GoDaddy entered into a contract under which GoDaddy agreed to market and sell SiteLock's website security services.  When a GoDaddy customer would purchase a SiteLock subscription and then take the additional step of activating that subscription, GoDaddy would remit a portion of the sale proceeds to SiteLock.  When a GoDaddy customer would purchase a SiteLock subscription but then fail to activate it, GoDaddy would not remit any of the sale proceeds to SiteLock.  One of the disputed issues in this case is whether GoDaddy was required by the parties' contract to remit payment to SiteLock in this latter circumstance—SiteLock says yes, GoDaddy says no."  (Doc. 248 at 4.)  In addition to this and other contract-based claims, the complaint asserts Lanham Act and state-law unfair competition claims premised on the allegation that GoDaddy misused SiteLock's trademark.  (Doc. 1 ¶¶ 72-85.)

II.     The Claims

In Count One of the complaint, entitled "Breach of Contract (Refusal to Remit Payment for Orders of SiteLock Subscriptions)," SiteLock alleges that the Reseller Agreement "requires GoDaddy to pay SiteLock each time a customer orders a subscription to SiteLock's services.  The Agreement does not condition GoDaddy's obligation to pay SiteLock on whether the customer subsequently activates or uses SiteLock's services.

GoDaddy materially breached the Agreement by failing to pay SiteLock for each order of a SiteLock subscription and by taking the other actions described [within the Complaint]." (*Id.* ¶¶ 48-49.)

In Count Two, entitled "Breach of Contract (Violation of Reporting Obligations)," SiteLock alleges that the Reseller Agreement "requires GoDaddy to 'provide tracking and reporting [to SiteLock] of all sign-ups related to this Agreement'" and that GoDaddy breached this requirement "by failing to provide tracking or reporting of sign-ups related to the Agreement."   (*Id.* ¶¶ 52, 54.)

In Count Three, entitled "Breach of Contract (Breach of Third Addendum)," SiteLock alleges that "[t]he Third Addendum [to the Reseller Agreement] provides that GoDaddy 'will enable activation of SiteLock Basic, Professional, and Premium as part of the setup process for [GoDaddy's] cPanel shared hosting products by November 1, 2016'" and that GoDaddy breached this requirement "by failing to enable activation of SiteLock's services as part of the setup process for GoDaddy's cPanel shared hosting products by November 1, 2016 (or thereafter)." (*Id.* ¶¶ 59-60.)

In Count Four, entitled "Breach of Contract (Promotion of Competing Service)," SiteLock alleges that the Reseller Agreement "requires GoDaddy to 'endeavor to promote [SiteLock's] services'" and that GoDaddy breached this requirement "by promoting GoDaddy's own competing website security service, Sucuri, and using SiteLock's trademark to redirect customers who clicked on a link for SiteLock's services to a page promoting Sucuri." (*Id.* ¶¶ 63-64.)

In Count Five, entitled "Unjust Enrichment," SiteLock alleges that "GoDaddy's practice of pocketing payments it received for SiteLock's services directly enriched GoDaddy at the expense of SiteLock.  GoDaddy's practice of pocketing payments it received for a service offered by another company was unjustified and unjust." (*Id.* ¶¶ 69-70.)

In Count Six, entitled "Violation of the Lanham Act," SiteLock alleges that "GoDaddy used SiteLock's trademark to market Sucuri, an inferior web security service

that competes directly with SiteLock and offers many of the same features as SiteLock. Specifically, GoDaddy redirected customers who clicked on links advertising 'SiteLock' on GoDaddy's website and in Google search results for GoDaddy to a website that marketed and offered Sucuri for sale. By redirecting customers who clicked on a link for SiteLock's services to a page promoting its own competing service (Sucuri), GoDaddy used SiteLock's trademark in a way that was likely to cause confusion, to cause mistake, and to deceive as to the affiliation, connection, or association of SiteLock with [Sucuri], and to deceive as to the origin, sponsorship, and approval of SiteLock's and [Sucuri's] services, in violation of the Lanham Act, 15 U.S.C. § 1125." (*Id.* ¶¶ 75, 77.)

In Count Seven, entitled "Unfair Competition under Arizona Common Law," SiteLock alleges that "[b]y redirecting customers who clicked on a link for SiteLock's services to a page promoting its own competing service (Sucuri), GoDaddy used SiteLock's trademark in a way that GoDaddy knew would confuse and mislead the public regarding SiteLock's services. GoDaddy's use of SiteLock's trademark to promote a competing and inferior service was an unfair business practice that harmed SiteLock's brand and unfairly capitalized on the goodwill associated with SiteLock's mark." (*Id.* ¶¶ 83-84.)

III.   Affirmative Defenses

GoDaddy's answer asserts twenty-seven affirmative defenses. (Doc. 13 at 11-15.) SiteLock now moves for partial summary judgment on the eighth, eleventh, and thirteenth affirmative defenses. (Doc. 341.)

In the eighth affirmative defense, entitled "Estoppel," GoDaddy asserts that SiteLock "is estopped from asserting the claims set forth in the Complaint because, among other reasons, it knowingly sent invoices and accepted payments based upon product activations, and not upon the alleged rights to payment asserted in the Complaint." (Doc. 13 at 12.)

In the eleventh affirmative defense, entitled "Set-off," GoDaddy asserts that SiteLock's "claims are barred in whole or in part by the doctrine of recoupment and/or set-

off.  [GoDaddy] is entitled to offset and recoup against any judgment that may be entered for [SiteLock] for all obligations owing to [GoDaddy], including, but not limited to, any unpaid account balances and/or any damages incurred in connection with any termination of contracts between [GoDaddy] and [SiteLock]."  (*Id.* at 13.)

In the thirteenth affirmative defense, entitled "Unjust Enrichment," GoDaddy asserts that "[a]ny award to [SiteLock] would constitute unjust enrichment."  (*Id.*)

IV.   Procedural Background

On April 30, 2019, SiteLock filed the complaint.  (Doc. 1.)

On July 8, 2019, GoDaddy filed its answer.  (Doc. 13.)

For over two years, the parties engaged in a "seemingly endless series of discovery disputes."  (Doc. 248 at 1.)

On July 26, 2021, GoDaddy filed a motion for summary judgment.  (Docs. 340, 342.)  That motion is now fully briefed.  (Docs. 370, 396.)

That same day, SiteLock filed a motion for partial summary judgment.  (Doc. 341.)  That motion is now fully briefed.  (Docs. 367, 395.)

On July 30, 2021, SiteLock filed a motion to "exclude GoDaddy's undisclosed recoupment theories."  (Doc. 348.)  That motion is now fully briefed.  (Docs. 368, 393.)

On August 16, 2021, GoDaddy filed a motion to exclude certain opinions of Dr. Kursh.  (Docs. 356, 357.)  That motion is now fully briefed.  (Docs. 382, 399.)

On February 15, 2021, the Court issued a tentative ruling addressing all four motions.  (Doc. 433.)

On February 24, 2022, the Court heard oral argument.

## ANALYSIS

I.   Cross-Motions For Summary Judgment

A.   **Legal Standard**

"The court shall grant summary judgment if [a] movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "A fact is 'material' only if it might affect the outcome of

the case, and a dispute is 'genuine' only if a reasonable trier of fact could resolve the issue in the non-movant's favor." *Fresno Motors, LLC v. Mercedes Benz USA, LLC*, 771 F.3d 1119, 1125 (9th Cir. 2014).  The court "must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inference in the nonmoving party's favor." *Rookaird v. BNSF Ry. Co.*, 908 F.3d 451, 459 (9th Cir. 2018).  "Summary judgment is improper where divergent ultimate inferences may reasonably be drawn from the undisputed facts." *Fresno Motors*, 771 F.3d at 1125.

A party moving for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  "[T]o carry its burden of production, the moving party must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000).  "If . . . [the] moving party carries its burden of production, the nonmoving party must produce evidence to support its claim or defense." *Id.* at 1103.  Summary judgment is appropriate against a party that "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex,* 477 U.S. at 322.

"[W]hen parties submit cross-motions for summary judgment, [e]ach motion must be considered on its own merits," but the Court must consider all evidence submitted in support of both cross-motions when separately reviewing the merits of each motion.  *Fair Hous. Council of Riverside Cty., Inc. v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001) (quotation marks omitted).

. . .

. . .

B.     **GoDaddy's Motion for Summary Judgment**

GoDaddy moves for summary judgment on all seven of SiteLock's claims while SiteLock moves for summary judgment on three of GoDaddy's affirmative defenses. Because GoDaddy need not establish any defenses for claims that have been dismissed, the Court will begin with GoDaddy's motion.  And because Count Six of the complaint (the Lanham Act claim) is the only claim over which this Court has original jurisdiction, and dismissal of that claim could potentially lead to dismissal of the entire action (if the Court were to decline to exercise supplemental jurisdiction over the remaining claims), the Court begins there.

1.    Count Six: Lanham Act Trademark Infringement

a.    **The Parties' Arguments**

In its disclosures pursuant to the District of Arizona's Mandatory Initial Discovery Pilot Project ("MIDP"), SiteLock identified its claim in Count Six as "a claim of trademark infringement under the Lanham Act, 15 U.S.C. § 1114" and described its theory of liability as follows: "GoDaddy wrongfully used SiteLock's trademark to promote GoDaddy's inferior, competing service, 'Sucuri' . . . .  By redirecting customers who clicked on a link for SiteLock's services to a page promoting its own competing service (Sucuri), GoDaddy used SiteLock's trademark in a way that was likely to cause confusion, to cause mistake, and to deceive as to the affiliation, connection, or association of SiteLock with [Sucuri], and to deceive as to the origin, sponsorship, and approval of SiteLock's and [Sucuri's] services.  This customer confusion harmed SiteLock by causing it to lose customers and sales revenue."  (Doc. 342-31 at 8.)

GoDaddy contends it is entitled to summary judgment on this claim due to the absence of any evidence of, or a viable theory relating to, damages.  (Doc. 342 at 14-17.) As an initial matter, GoDaddy asserts there is no evidence that SiteLock suffered actual damages (*i.e.,* a loss of goodwill or reputational harm) arising from the challenged conduct, as SiteLock's expert failed to provide an opinion as to either category of harm.  (*Id.* at 15.) According to GoDaddy, this only leaves the possibility of a disgorgement-of-profits claim,

which SiteLock cannot prevail on for three reasons: (1) there is no evidence that GoDaddy acted with the requisite mental state (*i.e.,* "willful"); (2) SiteLock has not "otherwise satisfie[d] any of the other equitable considerations required to support an award of profits"; and (3) SiteLock "is unable to establish that GoDaddy generated any profits as a result of" the challenged conduct because SiteLock's expert "improperly assume[d]" that every sale by GoDaddy of a Sucuri-related product over a seven-month period was attributable to the challenged conduct, and thus failed to exclude certain categories of sales (such as "online sales made to GoDaddy customers who never visited the single SiteLock Help webpage on which SiteLock's infringement claim is based") that were obviously not affected by any trademark violations.  (*Id.* at 15-17.)

In response, SiteLock begins by noting that GoDaddy does not challenge that (1) SiteLock has a valid, protectable trademark, and (2) GoDaddy's use of the mark was likely to cause confusion.  (Doc. 370 at 16.)  Next, as for the possibility of a damage award, SiteLock does not dispute that it lacks evidence of a loss of goodwill or reputational harm but contends that, under Ninth Circuit law, it may recover nominal damages in the absence of actual damages (and may survive summary judgment based on the availability of nominal damages).  (*Id.*)  As for the possibility of a disgorgement award, SiteLock argues that GoDaddy's objection to its disgorgement methodology is both legally flawed, because the burden is on GoDaddy to prove that the challenged Sucuri sales were *not* attributable to the infringing mark (which GoDaddy has not attempted to do), and factually flawed, because "the record shows that GoDaddy made at least 731 sales of the specific Sucuri product that GoDaddy offered to customers who clicked on the 'purchase SiteLock here' hyperlink, and that GoDaddy made at least $223,597 from these sales."  (*Id.* at 16-17.) Finally, SiteLock contends that even if it had not put forth sufficient evidence to recover nominal damages or obtain disgorgement, it would be entitled to other remedies under the Lanham Act, including attorneys' fees.  (*Id.* at 17.)

In reply, GoDaddy contends that SiteLock "tacitly admits . . . that it is not seeking actual damages."  (Doc. 396 at 10.)  As for nominal damages, GoDaddy asserts that

SiteLock cannot "rely[] on a brand new claim . . . that was never disclosed during the course of litigation." (*Id.* at 10-11.)  As for disgorgement, GoDaddy contends that SiteLock's legal argument about which party bears the burden of proof is unavailing because "controlling Ninth Circuit case law establish[es] that SiteLock bears the burden to establish which of GoDaddy's sales arose from the alleged infringing activity" and that SiteLock's factual argument is unavailing because "SiteLock admits that it is attempting to satisfy its burden of proof by lumping together alleged infringing and non-infringing sales alike." (*Id.*)  Finally, GoDaddy argues that SiteLock cannot avoid summary judgment by "characterizing the costs and fees available to prevailing parties for cases deemed 'exceptional' under the Lanham Act as 'damages.'" (*Id.* at 11.)

### b.  **Analysis**

"To prevail on a claim of trademark infringement under the Lanham Act, 15 U.S.C. § 1114, a party must prove: (1) that it has a protectible ownership interest in the mark; and (2) that the defendant's use of the mark is likely to cause consumer confusion." *Network Automation, Inc. v. Advanced Sys. Concepts, Inc.*, 638 F.3d 1137, 1144 (9th Cir. 2011) (citation and internal quotation marks omitted).  GoDaddy does not dispute, for summary judgment purposes, that SiteLock has sufficient evidence to satisfy both of these elements and only challenges SiteLock's entitlement to a remedy.

The remedies available to a Lanham Act plaintiff asserting a claim of trademark infringement under § 1114 are set forth in § 1117 of the statute.  *Rhoades v. Avon Prod., Inc.*, 504 F.3d 1151, 1158 n. 6 (9th Cir. 2007) ("[A] federal district court may . . . hear actions for trademark infringement, 15 U.S.C. § 1114, for which it may . . . award damages, 15 U.S.C. § 1117.").  Under § 1117(a), a prevailing party "shall be entitled, . . . subject to the principles of equity, to recover (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action." *Id.*   As noted, SiteLock contends it is entitled to all three categories of potential remedies while GoDaddy argues that summary judgment is warranted due to "the absence of evidence and viable damages theories." (Doc. 342 at 14, capitalization omitted.)

GoDaddy's request for summary judgment on Count Six is denied because SiteLock may be entitled to recover at least one of the categories of remedies identified in § 1117(a). Notably, GoDaddy does not dispute that, had SiteLock timely disclosed its intention to pursue nominal damages, the availability of such damages would be enough for SiteLock to survive summary judgment.[1]   Thus, the Court construes GoDaddy's argument as analogous to a Rule 37 request for sanctions—that is, an argument that SiteLock should be barred from pursuing nominal damages because SiteLock failed disclose its intention to pursue such damages or provide a computation of such damages.

Although GoDaddy does not identify the basis for the type of preclusion sanction it seeks here, the Court concludes that, regardless of whether the request arises under Rule 37(b)(2) or Rule 37(c)(1), a sanction is not warranted.  The decision whether to impose sanctions under Rule 37(b) is discretionary, *Nat'l Hockey League v. Metro. Hockey Club, Inc.*, 427 U.S. 639, 642 (1976), and governed by the principle that sanctions must be "just." *Ins. Corp. of Ir. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 707 (1982). Similarly, under Rule 37(c)(1), a disclosure violation may be excused if it "was substantially justified or is harmless."

In *GeoMetWatch Corp. v. Hall*, 2018 WL 6240991 (D. Utah 2018), the court addressed a similar issue.  There, the defendants sought to exclude "claims for nominal or statutory damages" under the Lanham Act on the ground that the plaintiff "did not provide

---

[1]     *See, e.g.*, *Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1145-46 (9th Cir. 1997) ("[T]he district court ruled that Defendants were entitled to summary judgment because Plaintiffs had failed to present sufficient evidence upon which a reasonable factfinder could conclude that Plaintiffs were injured as a result of Defendants' [Lanham Act violation].  This ruling was erroneous . . . [because] an inability to show actual damages does not alone preclude a recovery under section 1117. . . .  [T]he preferred approach allows the district court in its discretion to fashion relief, including monetary relief, based on the totality of the circumstances.") (citations and internal quotation marks omitted); *Guthrie Healthcare Sys. v. ContextMedia, Inc.*, 2014 WL 185222, *4-9 (S.D.N.Y. 2014) (denying motion for summary judgment, to the extent it sought the complete dismissal of a Lanham Act claim for trademark infringement based on a lack of damages, because "[n]ominal damages and costs . . . remain potentially available to plaintiff should it prevail on [Lanham Act] liability claims" and thus although "the question of whether monetary relief would be available if liability were proven as to the Lanham Act claims is clearly answered in the negative . . . questions of fact as to liability—and therefore nominal or other equitable forms of relief—remain").

the damages calculations required by Rules 26 and 37 of the Federal Rules of Civil Procedure." *Id.* at \*16.  The court rejected this request, concluding that it had "been unable to find any authority suggesting that a party is precluded from seeking nominal . . . damages for failing to include a 'computation' of such damages in its initial disclosures" and that "a request for nominal or statutory damages does not appear to qualify as 'information' that a party must disclose under Rule 26(a)." *Id.*

This Court, similarly, has not found any authority suggesting that a party must explicitly disclose its intention to seek nominal damages in an action.  Thus, SiteLock's failure to do likely did not violate the MIDP's, or Rule 26's, requirement to provide a computation of each category of damages claimed by the disclosing party.  After all, "[n]ominal damages . . . are damages 'in name only' and by nature minimal in amount." *Bayer v. Neiman Marcus Grp., Inc.*, 861 F.3d 853, 872 (9th Cir. 2017).

At a minimum, SiteLock's belief that it was not required to disclose this theory of damages in its MIDP and Rule 26 disclosures was substantially justified, given the absence of authority suggesting that such a disclosure requirement exists.  *See generally* 1 S. Gensler, Federal Rules of Civil Procedure, Rules and Commentary, Rule 37, at 1179-80 (2021) ("[M]any courts have stated that a party's failure to disclose is substantially justified under Rule 37(c) if, under the circumstances, a reasonable person would have believed that no disclosure was required.").  Additionally, any disclosure violation was harmless— because nominal damages cannot be meaningfully "computed," it is difficult to see how GoDaddy suffered any harm from SiteLock's failure to provide such a computation. Finally, because SiteLock's nominal damages theory does not expose GoDaddy to new forms of liability, excluding the theory would be "unjust" under Rule 37(b)(2)(A).

For these reasons, the Court declines to exclude SiteLock's nominal damages theory under Rule 37(b)(2)(A) or Rule 37(c)(1).  This conclusion, in turn, means that SiteLock's Lanham Act claim in Count Six cannot be categorically rejected at summary judgment based on the absence of available damages.  In light of this conclusion, it is unnecessary to address the parties' arguments regarding the potential availability of a disgorgement award

1  or whether SiteLock's claim for costs and attorneys' fees qualifies as independent reason

2  for denying summary judgment.[2]

3           **2.**          **Count Seven: Unfair Competition**

4        Because Count Six survives, the Court continues to possess supplemental

5  jurisdiction over SiteLock's remaining state-law claims pursuant to 28 U.S.C. § 1367(a).

6  One of those claims, in Count Seven, is a claim for unfair competition under Arizona law.

7  (Doc. 1 ¶¶ 82-85.)

8        Lanham Act and Arizona common-law unfair competition claims "share the same

9  analysis." *3 Ratones Ciegos v. Mucha Lucha Libre Taco Shop 1 LLC*, 2017 WL 4284570,

10  *2 (D. Ariz. 2017).   GoDaddy concedes this premise and seeks summary judgment on

11  Count Seven "for the same reasons" it seeks summary judgment on Count Six.  (Doc. 342

12  at 15 n.3.)   Because the Court has now concluded that Count Six survives summary

13  judgment, it follows that Count Seven survives summary judgment, too.

14           **3.**          **Counts One And Two: Breach Of Contract (Refusal To Remit**

15                    **Payment And Violation Of Reporting Obligations)**

16        GoDaddy seeks summary judgment on Counts One and Two for two reasons: *first*,

17  because SiteLock became aware of these  claims—which are subject to a four-year statute

18  of limitations under the Arizona Uniform Commercial Code ("UCC")—in 2014 but did

19  not file suit until 2019; and *second*, because SiteLock ratified GoDaddy's interpretation of

20  the disputed contract terms and/or waived its contract claims by continuing to contract with

21  GoDaddy for years after the dispute first arose.  (Doc. 342 at 2-8.)

22           **i.**     **Statute Of Limitations**

23              **a.**      **The Parties' Arguments**

24        GoDaddy argues that because Counts One and Two are breach-of-contract claims

25  arising from the Reseller Agreement, and the Reseller Agreement is a contract for the sale

26

---

27  [2]      The tentative ruling included a passage discussing whether the parties were talking
past each other on the issue of disgorgement.  After oral argument and upon further
28  consideration, the Court will not delve into this complex issue in light of the independent
sufficiency of the nominal damages analysis.

of goods (or, at least, a contract primarily for the sale of goods), "the Reseller Agreement is governed by the UCC and [Counts One and Two] are subject to the UCC's four-year statute of limitations." (Doc. 342 at 2-5.) GoDaddy further contends that SiteLock first became "aware of the alleged breaches underlying the First and Second Causes of Action no later than March 3, 2014." (*Id.* at 5-6.) Thus, GoDaddy argues that "SiteLock was required to file its claims by March 3, 2018. Instead, SiteLock filed suit on April 30, 2019. . . . As such, the claims are time-barred." (*Id.*)

In response, SiteLock argues that the UCC does not apply to the Reseller Agreement, which is properly considered a contract for services governed by a six-year statute of limitations under Arizona law, and that Counts One and Two were thus timely filed before the expiration of the limitations period. (Doc. 370 at 7-9.) Alternatively, SiteLock argues that GoDaddy should be estopped from asserting a statute-of-limitations defense because "GoDaddy repeatedly led SiteLock to believe that the parties would be able to resolve their dispute short of litigation and continue their relationship." (*Id.* at 9-10.) Finally, and again alternatively, SiteLock argues that even if the UCC applies and GoDaddy is not estopped, "most" of its claims (*i.e.*, any breach that accrued after April 30, 2015) are still timely. (*Id.* at 10.)

In reply, GoDaddy accuses SiteLock of ignoring the binding precedent establishing that the Reseller Agreement is a contract for goods under the UCC and argues that the cases cited by SiteLock are distinguishable. (Doc. 396 at 1-2.) GoDaddy also argues that SiteLock has "failed to meet its burden to establish entitlement to equitable estoppel" because SiteLock has not provided proof that GoDaddy acknowledged its payment obligations in writing, as required by A.R.S. § 12-508. (*Id.* at 3.) Finally, GoDaddy contends that SiteLock's "most claims are still timely" argument is foreclosed by SiteLock's own admissions. (*Id.* at 3-4.)

b.   Analysis

Although it presents a fairly close call, the Court agrees with SiteLock that the Reseller Agreement qualifies as a services contract, not a contract for goods. Under the

UCC, goods include "all things (including specially manufactured goods) which are movable at the time of identification to the contract for sale." A.R.S. § 47-2105(A). "If a transaction 'includes both goods and services, most courts seek to determine whether the predominant aspect and purpose of the contract is the sale of goods or the providing of services.'" *Sidi Spaces LLC v. Aluminum Trailer Co.*, 2020 WL 6799262, at *9 (D. Ariz. 2020). Determining the predominant purpose of a "mixed" contract "often involves resolving issues of fact, but whether a contract is predominantly one for goods or services is ultimately an issue of law." *Id.* "When faced with such mixed contracts, Arizona courts first determine the predomina[nt] purpose of the contract and then apply the UCC only if the sale of goods predominates." *Id.* (citations and internal quotation marks omitted).

Under the Reseller Agreement, software does not pass from SiteLock to GoDaddy. Rather, GoDaddy simply attempts to persuade customers to purchase a subscription to SiteLock's software products, which the customer may later activate. Neither party argues that GoDaddy was granted title to or used SiteLock's software. The Reseller Agreement does include a provision granting GoDaddy a license[3] to use SiteLock's intellectual property (Doc. 1-2 at 2), but this is tangential to and in service of the predominant purpose of the contract—that GoDaddy will serve as SiteLock's "nonexclusive, worldwide, authorized sales representative." (Doc. 1-2 at 2 ¶ 1.1. *See also id.* at 2 ["SiteLock wishes to have [GoDaddy] . . . sell and/or promote [SiteLock's software] to [GoDaddy's] customers . . . ."].)

This arrangement is much different from the contractual arrangements at issue in the cases cited by GoDaddy. In *Simulados Software, Ltd. v. Photon Infotech Priv., Ltd.*, 40 F. Supp. 3d 1191 (N.D. Cal. 2014), not only did the court ultimately find that the

---

[3]      Relatedly, GoDaddy asserts that "[t]he Reseller Agreement identifies the manner of payment as a licensing fee to be paid to GoDaddy for 'fee-based orders' of SiteLock's software products." (Doc. 342 at 4.) However, the cited exhibit states that "[f]or fee based orders, [GoDaddy] shall provide payment to SiteLock on a monthly basis according to the license schedule highlighted below." (Doc. 1-2 at 7.) In the broader context of the Reseller Agreement, this does not suggest that GoDaddy is paying a licensing fee in exchange for software it directly received but instead represents GoDaddy's agreement to remit payment to SiteLock for third-party "fee-based orders," whatever those may be.

underlying contract was a services contract, but court based its analysis on cases in which one party directly sold units of software to a contractual counterparty.[4]  Similarly, in *Kulesa v. PC Cleaner, Inc.*, 2012 WL 12886844 (C.D. Cal. 2012)—which GoDaddy identified during oral argument as the best case supporting its position—the defendant was a software developer that sold a license to use its software product ("PC Cleaner Pro") directly to consumers.  *Id.* at *1, 6-7.  Unlike here, there was no third-party company that served as a sales agent on behalf of the software developer, so the *Kulesa* court had no reason to evaluate the nature of that sort of contractual relationship.

In contrast, courts have concluded that contracts similar to the Reseller Agreement—that is, contracts in which one party effectively agrees to act as a software developer's commissioned sales representative—should be treated as contracts for services.[5]  In *Nexus Sols. Grp., Inc. v. Parametric Tech. Corp.*, 2005 WL 8165550 (D.

---

[4]      The cases discussed in *Simulados Software* are:  *RRX Indus., Inc. v. Lab-Con, Inc.*, 772 F.2d 543, 545 (9th Cir. 1985) ("TEKA agreed to supply RRX with a software system for use in its medical laboratories."); *Gross v. Symantec Corp.*, 2012 WL 3116158, *1 (N.D. Cal. 2012) ("Gross alleges the companies fraudulently induced him to buy security software through a free trial that was supposed to identify weaknesses in his computer's security."); *Olcott Int'l. & Co. v. Micro Data Base Sys., Inc.*, 793 N.E.2d 1063, 1068 (Ind. Ct. App. 2003) ("MDBS is a software company that develops database management modules, or components, that software application developers, such as Olcott, integrate into their own database programs for distribution to third parties.");  *Rottner v. AVG Techs. USA, Inc.*, 943 F. Supp. 2d 222, 224-25 (D. Mass. 2013) (after "Rottner's computer began malfunctioning," Rottner "purchased and installed the full version of the software" sold by the defendant); *Advent Sys. Ltd. v. Unisys Corp.*, 925 F.2d 670, 676 (3d Cir. 1991) (finding that the primary purpose of the contract was "individual purchases of software and hardware").

[5]      During oral argument, GoDaddy argued that SiteLock should be precluded from characterizing GoDaddy's role as that of a commissioned sales agent because "SiteLock's own witnesses [were] quite emphatic that it [the Reseller Agreement] is not [a] commission sales contract."  This semantic argument is unpersuasive because SiteLock and its witnesses only disputed whether GoDaddy received one particular *type* of commission (a revenue share) under the Reseller Agreement, not whether the flat fee that GoDaddy received under the Reseller Agreement was the functional equivalent of a commission. (Doc. 109 at 4-5 ["Two of the contracts      . . . involved completely different 'revenue-sharing' structures that are not comparable to the flat-fee structure of the Reseller Agreement."]; Doc. 341-2 at 58 ¶ 16 ["Under the SiteLock-HostPapa agreement, HostPapa was required to pay SiteLock 50% of all revenue that HostPapa collected for the sale of SiteLock products . . . [so] SiteLock was entitled to the 'upside' of any price that HostPapa charged above the minimum price.  In contrast, under the SiteLock-GoDaddy Reseller Agreement, GoDaddy was required to pay SiteLock a flat fee for each order, regardless of what price GoDaddy charged."]; Doc. 357-1 at 15 ["I do know that the GoDaddy agreement is not a revenue sharing agreement.  It's a – it's a wholesale price arrangement."].)

1   Idaho 2005), the parties entered into a "Value-Added Reseller Agreement" under which

2   the plaintiff agreed to sell the defendant's software in certain states in exchange for a

3   commission. *Id.* at *1.  In large part because "the [Reseller] Agreement did not contemplate

4   any sales of software between [plaintiff] and [defendant]," the court concluded that the

5   "[Reseller] Agreement is not a contract for the sale of goods under the UCC." *Id.* at *9.

6          Admittedly, *Nexus* is not on all fours with this case because the contract there only

7   granted the reseller "the authority to solicit orders" on behalf of the software developer,

8   which had "the sole and unfettered discretion to reject or accept such orders." *Nexus Sols*

9   *Grp., Inc. v. Parametric Tech Corp.*, 2006 WL 8446096, *3 (D. Idaho 2006) (denying

10  motion for reconsideration).  For these reasons, the reseller's "activities resembled more of

11  a sales agent than a distributor." *Id.* at *4.  In contrast, GoDaddy had the right to solicit

12  *and* complete sales on SiteLock's behalf.

13         Despite this difference, the Reseller Agreement was fundamentally an agreement

14  obligating GoDaddy to provide a service—sales and promotional activities—to SiteLock

15  in return for a commission on each sale made.  Critically, GoDaddy was not obligated to

16  (and did not) purchase anything from SiteLock—it simply agreed to act as SiteLock's sales

17  agent and promoter in return for what was functionally a commission.  Courts have

18  recognized that such distinctions are critical when assessing whether a contact is for the

19  sale of goods or services.  *See generally IB Agric., Inc. v. Monty's Plant Food Co.*, 2014

20  WL 4851774, *3 (W.D. Ky. 2014) ("Courts most often classify typical distributorship

21  agreements as contracts for the sale of goods . . . [such as] a contract for the sale of goods

22  [where] the distributor purchased and received products from the manufacturer and then

23  resold those products directly to the customers.  But, where the distributor's role is more

24  properly characterized as commissioned sales representative, the distributorship agreement

25  is a services contract.") (citations omitted).  This distinction is also meaningful under

26  Arizona law, which provides that "[a] 'sale' consists in the passing of title from the seller

27  to the buyer."  A.R.S. § 47-2106(A).  Here, title to SiteLock's software products never

28  passed from SiteLock to GoDaddy.

1      Given this backdrop, it is irrelevant that the item being promoted and sold by

2  GoDaddy (*i.e.,* SiteLock's software) might itself qualify as a good.  Courts have concluded

3  the similar contracts qualify as services contracts that are not covered by the UCC.  *See,*

4  *e.g.*, *ADA Sols., Inc. v. Meadors*, 98 F. Supp. 3d 240, 248, 254 (D. Mass. 2015), *reversed*

5  *on other grounds*, 665 F. App'x 3 (1st Cir. 2016) (holding that contract between a sales

6  agent (Meadors) and a tile manufacturer (CSP), under which the sales agent agreed to sell

7  the manufacturer's tiles to a third party (ADA) in return for a commission, was "itself [a

8  contract] for services," even though "it relates to the sale of goods by CSP to ADA,"

9  because the agent's "role is to negotiate the sale of goods, for which it is to be paid a

10  commission").[6]  Accordingly, GoDaddy is not entitled to summary judgment on Counts

11  One and Two under the theory that they were filed outside the UCC's four-year statute of

12  limitations.[7]

13              ii.     Ratification & Waiver

14                     a.     **The Parties' Arguments**

15      GoDaddy argues that "[b]y accepting payment pursuant to GoDaddy's

16  interpretation of the Reseller Agreement throughout the entirety of the contractual

17  _____

[6]      *See also Hess v. Biomet, Inc.*, 2019 WL 1282032, *9 (N.D. Ind. 2019) ("[M]any
18  cases state that the UCC applies to distributorship agreements.  However, those cases
overwhelmingly address agreements under which the manufacturer sells its products to the
19  distributor, which then resells the products.  The contracts here do not contemplate such an
arrangement.  [They] appoint the Distributors as the exclusive distributors of Biomet
20  products and entitle them to commissions on all sales within their territories, but the
contracts do not call for the Distributors to buy any products from Biomet. . . .  Though the
21  goal of that arrangement was of course to increase the sales of Biomet products, those sales
took place as part of separate transactions between Biomet and its customers, not the
22  Distributors.  Accordingly, the UCC and its four-year statute of limitations do not govern
the Distributors' claims.") (citations omitted); *Orthomet, Inc. v. A.B. Med., Inc.*, 1992 WL
23  474178, *6-7 (D. Minn. 1992) ("Orthomet retained defendants to perform a service, that is
to act as sales agents for Orthomet in a certain territory in Florida.  Orthomet expected
24  defendants to promote and procure the sales of its orthopaedic devices.  Defendants did
not, however, purchase those devices for themselves.  Instead, the ultimate customer, a
25  hospital or surgeon, purchased the implants directly from Orthomet.  Defendants received
sales commissions to compensate them for their service to Orthomet, generating those sales
26  to the ultimate customers. . . .  Orthomet primarily earned profits when its sales agents
generated sales of orthopaedic implants, not when those sales agents made the purchase of
27  an instrument set.  Based on the foregoing, the court concludes . . . the primary purpose of
the parties' relationship was for service not the sale of good.").

28  [7]      This conclusion makes it unnecessary to address SiteLock's alternative arguments
regarding estoppel and the timeliness of some of its claims.

relationship, SiteLock ratified GoDaddy's interpretation of the payment terms." (Doc. 342 at 6.)  GoDaddy asserts that "SiteLock admits it knew by March 3, 2014—a month before customers could purchase SiteLock products from GoDaddy—that GoDaddy would only pay licensing fees for activated products.  SiteLock chose to proceed anyway." (*Id.* at 6-7.)  GoDaddy also notes that the Reseller Agreement was renewed annually between 2013 and 2017, and although SiteLock executed three addenda, it did not change the disputed payment terms.  (*Id.* at 7.)  Finally, GoDaddy contends these facts also satisfy the requirements for waiver, which occurs when a party "acts in a manner that is 'clearly inconsistent with an intention to assert the right in question.'" (*Id.* at 7.)

In response, SiteLock argues that ratification is "primarily an agency-law doctrine . . . to prevent a party from denying the *enforceability* of a contract, and is not relevant here." (Doc. 370 at 10 n.5.)  As for waiver, SiteLock contends the doctrine is inapplicable because it "objected to GoDaddy's breaches for years.  These continuous objections foreclose any waiver argument.  In fact, *none* of GoDaddy's cases involved a situation where, as here, a party repeatedly objected to the other's breach.  GoDaddy's repeated assurances that it would eventually report and pay for *all* SiteLock subscriptions independently foreclose a waiver argument.  Simply put, because *GoDaddy* agreed with *SiteLock's* position, SiteLock could not have manifested a 'clear showing of intent to waive' that same position." (*Id.* at 11.)  SiteLock further contends that the executed addenda did not modify the "clear" payment provisions or otherwise waive SiteLock's rights.  (*Id.*)  Finally, SiteLock argues that, at a minimum, GoDaddy's "waiver arguments raise issues of fact for the jury." (*Id.* at 10, 12.)

GoDaddy replies that SiteLock "(a) waived strict compliance with its own purported interpretation of the payment provisions in the Reseller Agreement; and (b) failed to serve notice of its intent to enforce strict compliance with its view of the contract. . . .  Instead, SiteLock elected to 'push activations' (and accept payment on same) in lieu of requiring payment for every subscription sold regardless of activation status—a decision reached in consultation with SiteLock's most senior employees and board members. . . . [T]his

1    conduct alone supports finding waiver. . . . SiteLock's subsequent decision to repeatedly

2    yield in the face of GoDaddy's consistent rejection of the same automatic activation

3    provision SiteLock now seeks to impose now by litigation, is also a clear act of waiver,

4    and SiteLock's repeated proposal of such a provision during the contractual relationship

5    negates Mr. Serani's belated claim that such a provision was unnecessary." (Doc. 396 at

6    4-5.)  GoDaddy also disputes the notion that "GoDaddy orally agreed to SiteLock's

7    interpretation of the payment terms set forth in the Reseller Agreement after its execution"

8    and reasserts that ratification applies in this context. (*Id.* at 5.)

9                                    b.    **Analysis**

10           GoDaddy is not entitled to summary judgment on Counts One and Two based on

11   the doctrines of ratification and estoppel.

12           As for ratification, Arizona authorities suggest this doctrine is typically applied in

13   the context of an agency relationship. "Ratification is the affirmance by a person of a prior

14   act of another which did not bind that person, but which was done on his account." *Meritor*

15   *Sav. Bank v. Camelback Canyon Invs.*, 792 F. Supp. 697, 698 (D. Ariz. 1992). *See also*

16   Restatement (Second) of Agency § 82 (Am. L. Inst. 1958) ("Ratification is the affirmance

17   by a person of a prior act which did not bind him but which was done or professedly done

18   on his account, whereby the act, as to some or all persons, is given effect as if originally

19   authorized by him."); *Fid. & Deposit Co. of Md. v. Bondwriter Sw., Inc.*, 263 P.3d 633,

20   639 (Ariz. Ct. App. 2011) (noting that "Arizona courts generally follow the Restatement

21   of Agency" and applying § 82's definition).

22           GoDaddy cites *W. All. Bank v. Jefferson*, 2015 WL 7075171 (D. Ariz. 2015), which

23   notes that ratification arises in "various" contexts including agency law. *Id.* at *7.

24   However, *Western Alliance Bank* did not actually extend ratification beyond an agency

25   relationship and GoDaddy does not otherwise cite any authority[8] suggesting that Arizona

26   ───────────────
     [8]      GoDaddy argues that two of SiteLock's proffered cases, *Phx. W. Holding Corp. v.*
27   *Gleeson,* 500 P.2d 320 (Ariz. Ct. App. 1972) and *Fuqua Homes, Inc. v. Grosvenor*, 569
     P.2d 854 (Ariz. Ct. App. 1977), do not "support [the] proposition" that "the doctrine of
28   ratification should only be applied in the context of agency law." (Doc. 396 at 5.) Although
     these cases do not necessarily prohibit ratification from being applied outside the context
     of agency law, they do not suggest that ratification should be so applied. And *United States*

courts would apply the ratification doctrine absent an agency relationship. Given this backdrop, and in light of GoDaddy's seeming acknowledgment that its ratification and waiver claims rise and fall together (Doc. 342 at 7 ["The same facts satisfy the requirements for waiver."]), the Court turns to waiver.

Under Arizona law, conduct "inconsistent with demanding strict compliance with [a] contract . . . results in a waiver of the . . . contract provisions." *AGA S'holders, LLC v. CSK Auto, Inc.*, 589 F. Supp. 2d 1175, 1184-85 (D. Ariz. 2008). *See also Pima Farms Co. v. Fowler*, 258 P. 256, 258 (Ariz. 1927) ("[A] party to a contract having the option or right, because of a breach thereof by the other party, to terminate it, but who stands by and permits the other party to go ahead doing the things required of him, will be treated as having waived the breach.").

"Waiver of a right requires a clear showing of an intent to waive that right. Intent to waive . . . may be inferred from conduct . . . and the conduct alleged is particularly relevant to such a claim." *Servs. Holding Co. v. Transamerica Occidental Life Ins.*, 883 P.2d 435, 443-44 (Ariz. Ct. App. 1994). Put another way, a party waives a contract claim when it acts in a manner that is "clearly inconsistent with an intention to assert the right in question." *Russo v. Barger*, 366 P.3d 577, 580 (Ariz. Ct. App. 2016). "The courts of this state [Arizona] have repeatedly held that waiver may be inferred from conduct and is, therefore, a question of fact to be determined by the trier of fact." *Chaney Bldg. Co. v. Sunnyside Sch. Dist. No. 12*, 709 P.2d 904, 907 (Ariz. Ct. App. 1985).

As the above-cited cases make clear, the waiver inquiry under Arizona law is highly fact-intensive and should generally be decided by the jury. GoDaddy is incorrect to suggest

---

*v. Brown*, 763 F. Supp. 1518 (D. Ariz. 1991), which GoDaddy asserts "flatly contradicts" SiteLock's position (Doc. 396 at 5), only uses the word "ratification" when concluding that "[b]oth the doctrines of ratification and waiver apply here to prevent the government from avoiding the contract at this late date." *Id.* at 1530. To GoDaddy's credit, the court did observe that the "government reaffirmed the existence of the contract on many occasions after being notified of Mr. Brown's changed testimony." *Id.* at 1528-29. Even so, the court supported that assertion by describing a series of events in which *agents* of the government validated the existence of a contract. *Id.* At any rate, because *Brown* did not explain why it was applying both the ratification and waiver doctrines (or analyze the ratification doctrine at all), it does not support either side's position.

there are hard and fast "rules" governing waiver.  For instance, no Arizona case requires that a party "send a letter reserving its rights" or "seek a formal audit" or formulaically "stat[e] its intent to pursue legal action to enforce its interpretation of the contract." (Doc. 342 at 7-8; Doc. 396 at 4-5.)  Although the parties in *Nucor Corp. v. Emps. Ins. Co. of Wausau*, 975 F. Supp. 2d 1048 (D. Ariz. 2013), and *United Cal. Bank v. Prudential Ins. Co. of Am.*, 681 P.2d 390 (Ariz. Ct. App. 1983), happened to take such steps, neither opinion suggests that such steps are a prerequisite to avoiding a waiver defense.  To the contrary, they emphasize that "[w]aiver is a question of fact to be determined by the trier of fact."  975 F. Supp. 2d at 1056.  Indeed, in *Nucor*, the court found that neither side was entitled to summary judgment on the issue of waiver because the inferences arising from the facts could support either side's position.  *Id.*

Thus, SiteLock will survive summary judgment if it can identify admissible evidence that would allow a reasonable juror to conclude it didn't intend to waive its contract rights.  SiteLock has proffered such evidence, which shows that SiteLock informed GoDaddy of its payment concerns but chose to forestall litigation in favor of ongoing negotiations—which seemed fruitful at the time—to preserve an otherwise-profitable business relationship.  (*See, e.g.*, Doc. 371-18; Doc. 371-1 ¶¶ 29-81; Doc. 371-3 at 7-13.)[9]  A reasonable juror could hear this evidence and conclude that SiteLock did

---

[9]     GoDaddy objects to nearly every paragraph of Mr. Serani's declaration and portions of his deposition as being hearsay, violating the best-evidence rule, lacking foundation, going to the ultimate legal issue, and/or constituting expert testimony by a non-designated lay witness. (Doc. 396 at 11.)  As a general matter, evidentiary defects such as hearsay and lack of foundation are not fatal at summary judgment if the evidence may be presented at trial in an admissible form. *JL Beverage Co., LLC v. Jim Beam Brands Co.*, 828 F.3d 1098, 1110 (9th Cir. 2016).  Naturally, SiteLock has had no opportunity to explain how it might reframe evidence to present it at trial because GoDaddy's embryonic objections were set forth in a reply.  Even so, the Court need not address each objection because the undisputed portions of Mr. Serani's deposition testimony are alone sufficient to establish a genuine issue of material fact as to SiteLock's intent to waive its rights.  (Doc. 371-3 at 14 ["They [GoDaddy] were always working with us to solve the problem.  And we continued to work with them in good faith thinking we would be able to address it.  They never gave us an indication that we would not get paid, not just on a move forward basis, but also from a retro perspective, to make this right."].)  Admittedly, GoDaddy's "objection chart" is challenging to parse, and perhaps GoDaddy has—here or elsewhere in the extensive record—made evidentiary objections to this testimony.  Even if so, it is hard to imagine how Mr. Serani's testimony, which expresses Mr. Serani's perception of negotiations he managed personally, would be objectionable for any of the reasons raised by GoDaddy.

not intend to waive its rights.

4.   Count Three: Breach Of Contract (Third Addendum)

a.   **Background**

The Third Addendum to the Reseller Agreement contained the following clause:

IV. <u>In-App Application Setup</u>.   In consideration for the pricing outlined below, Company will enable activation of SiteLock Basic, Professional, and Premium as part of the setup process for Company's cPanel shared hosting products by November 1, 2016.

(Doc. 1-3 at 3.)   In Count Three of the complaint, SiteLock contends that GoDaddy breached this clause "by failing to enable activation of SiteLock's services as part of the setup process for GoDaddy's cPanel shared hosting products by November 1, 2016 (or thereafter)."   (Doc. 1 ¶¶ 59-60.)

b.   **The Parties' Arguments**

GoDaddy argues it is entitled to summary judgment on Count Three for two reasons: (1) Count Three is premised on the assumption that the disputed clause required the "automatic" activation of all SiteLock products, but the clause "does not contain the word 'automatic' . . . and is explicitly limited to only a subset of SiteLock products offered by GoDaddy—'cPanel sharing hosted products'—not every SiteLock product offered by GoDaddy"; and (2) SiteLock failed to disclose any computation of damages associated with Count Three and did not have its expert calculate the damages associated with Count Three.   (Doc. 342 at 8-10.)

SiteLock responds to GoDaddy's first argument by asserting that, because "GoDaddy's witnesses have admitted that" GoDaddy did not satisfy the requirements of the Third Addendum, it is "irrelevant" that the clause does not contain the word "automatic" and applies to only a subset of SiteLock products.   (Doc. 370 at 12-13.)   As for GoDaddy's second argument, SiteLock does not deny that it failed to disclose a computation of damages associated with Count Three in its MIDP disclosures but contends that its "expert quantified SiteLock's damages for un-activated (and unpaid for) SiteLock subscriptions for each month after November 1, 2016."   (*Id.* at 13.)

In reply, GoDaddy focuses solely on damages, arguing that the purported calculation in SiteLock's expert's report is insufficient because it "captures more than simply unactivated SiteLock subscriptions associated with GoDaddy's cPanel hosting product but rather includes every single unactivated SiteLock subscription sold by GoDaddy, regardless of the GoDaddy hosting product with which it was associated—and including, for example, WordPress products which had their own In-App plug-in." (Doc. 396 at 6-7.)

### c. **Analysis**

The Court agrees with GoDaddy that summary judgment is warranted on Count Three due to SiteLock's failure to proffer legally sufficient evidence of damages.

As an initial matter, SiteLock does not dispute that it failed to provide any damages computations with respect to Count Three in its MIDP disclosures. Not does SiteLock dispute that its damages expert failed to disclose any opinions with respect to Count Three in the body of his report. Instead, SiteLock simply argues that it is possible to derive a damages methodology for Count Three from one of the appendices that was attached to its expert's report.

The Court has serious doubt that this approach was sufficient to satisfy SiteLock's disclosure obligations under Rule 26 and the MIDP. Nevertheless, putting aside the disclosure issue, SiteLock's proffered evidence fails on the merits. Count Three is focused on GoDaddy's failure to automatically activate "CPanel shared hosting products." Neither party's briefing clearly explains what "cPanel" is. However, it seems undisputed that cPanel products only represent a portion of GoDaddy's overall sales of SiteLock products. (Doc. 342 at 9 [cPanel is a "subset of SiteLock products . . . not every SiteLock product offered by GoDaddy."]; Doc. 371-1 ¶ 92 [Serani: "My understanding . . . is that cPanel represents the vast majority of GoDaddy's sales of websites and SiteLock subscriptions."].)

Given that understanding, SiteLock has failed to proffer sufficient evidence of damages to survive summary judgment on Count Three. Under Arizona law, a breach-of-contract plaintiff has the burden of proving a contract, breach of the contract, and resulting

damages.  *Chartone, Inc. v. Bernini*, 83 P.3d 1103, 1111 (Ariz. Ct. App. 2004).  The plaintiff must provide "some basis" for estimating damages.  *Gilmore v. Cohen*, 386 P.2d 81, 82 (Ariz. 1963).

SiteLock asserts that its expert has "quantified SiteLock's damages for un-activated (and unpaid for) SiteLock subscriptions for each month after November 1, 2016."  (Doc. 370 at 13.)  In support, SiteLock points to the sealed Appendix C-1 to Dr. Kursh's report.  Without divulging corporate secrets, the Court can observe that Appendix C-1 appears to individually list 15,766 purchases of SiteLock products.  Those purchases appear to be categorized by the order month, the tier of service (Essential, Basic, Professional), whether the customer is new or returning, the full name of the product, the "PF_ID," whether the transaction was a sale or a refund, the subscription's length in months, the number of units sold, whether the transaction was free, whether the product was activated, when it was activated, the purchase price, the total dollar value of all subscriptions, the total dollar value of unactivated subscriptions, and the total upsell value of unactivated subscriptions.  Notably, the word "cPanel" does not appear in Appendix C-1.

This proffer is insufficient because both parties acknowledge that cPanel transactions account for some, but not all, of these transactions.  Nowhere does SiteLock explain how this Court, or a reasonable juror, could separate the cPanel transactions from the non-cPanel transactions contained within Appendix C-1.  Thus, GoDaddy is thus entitled to summary judgment on Count Three.

### 5.    Count Four: Breach of Contract (Endeavor to Promote)

#### a.    **The Parties' Arguments**

GoDaddy moves for summary judgment on Count Four for two reasons: (1) the "endeavor to promote" clause simply does not guarantee what SiteLock suggests it does; and (2) SiteLock's alleged damages are speculative, uncertain, and based on flawed assumptions.  (Doc. 342 at 10-14.)  As for the first argument, GoDaddy elaborates that "[n]either the Reseller Agreement, nor any known case law, defines the scope or obligations of language in a contract stating that one party will 'endeavor to promote'

another party's products.  The law is clear, however, that courts should avoid interpreting one contractual provision in a way that renders another provision meaningless.  The plain language of the Reseller Agreement—and the testimony of SiteLock's own witnesses—contradict any claim that GoDaddy was prohibited from 'promoting' a 'competing website security service,' or that GoDaddy was required to sell SiteLock products.  As a result, SiteLock's proposed interpretation of the 'endeavor to promote' language contained in the Reseller Agreement fails because it would read into the Reseller Agreement an exclusivity provision and mandatory sales obligation to which GoDaddy did not agree."  (*Id.* at 10-12.)  As for the second argument, GoDaddy elaborates that "an estimate ranging from $9 million to $22 million is neither precise, nor accurate," in part because "the damages estimate is based on a hypothetical sales forecast that, among other things, (a) ignores clear contractual language in the Reseller Agreement, and (b) assumes that for the duration of the arbitrary time period selected by counsel, which post-dates the termination of the Reseller Agreement and coincides with the introduction of additional website security products to GoDaddy's product line-up, GoDaddy would have nonetheless sold *more* SiteLock products than it ever had in the past."  (*Id.* at 12-14.)  Moreover, GoDaddy contends that "SiteLock failed to produce any evidence, expert or otherwise, establishing the costs and expenses associated with the hypothetical revenue to which it claims entitlement."  (*Id.*)

SiteLock responds that the Arizona Supreme Court has defined the scope of an "endeavor to promote" clause and that the "construction of an ambiguous clause" is, in any event, "a question for the jury."  (Doc. 370 at 13-14.)  SiteLock also disputes GoDaddy's arguments about the provision's scope and concludes that, at minimum, the provision "must prohibit GoDaddy from ceasing all promotional efforts, removing SiteLock from its website, stealing SiteLock's customers, and disparaging SiteLock."  (*Id.* at 14-15.)  Finally, SiteLock argues that its expert "calculated lost profits from GoDaddy's breach by measuring the growth in SiteLock's historical sales from the period before GoDaddy bought Sucuri, using that growth rate to project what SiteLock's sales would have been

had GoDaddy not stopped promoting SiteLock and stolen its customers, and then comparing those projections to SiteLock's actual sales during that period." (*Id.* at 15-16) That calculation is, according to SiteLock, a "reasonable method of computing lost profits." (*Id.*)

### b. **Analysis**

Under Arizona law, the interpretation of a contract is a matter of law, and a contract must be construed so that every part is given effect. *Phillips v. Flowing Wells Unified Sch. Dist. No. 8 of Pima Cty.*, 669 P.2d 969, 971 (Ariz. Ct. App. 1983). "The purpose of contract interpretation is to determine the parties' intent and enforce that intent. In order to determine what the parties intended, we first consider the plain meaning of the words in the context of the contract as a whole. Where the intent of the parties is expressed in clear and unambiguous language, there is no need or room for construction or interpretation and a court may not resort thereto." *Grosvenor Holdings, L.C. v. Figueroa*, 218 P.3d 1045, 1050 (Ariz. Ct. App. 2009). Under Arizona law, "[l]anguage in a contract is ambiguous only when it can reasonably be construed to have more than one meaning." *In re Est. of Lamparella*, 109 P.3d 959, 963 (Ariz. Ct. App. 2005). That is, language is not ambiguous just because it is vague or general, but because it lends itself to two or more contradictory meanings. *Cf. Taylor v. State Farm Mut. Auto. Ins.*, 854 P.2d 1134, 1140 (Ariz. 1993) ("[A] contract may be susceptible to multiple interpretations and therefore [be] truly ambiguous . . . .").

The Reseller Agreement required GoDaddy to "endeavor to promote [SiteLock's] Services." (Doc. 1-2 at 3.) The Third Addendum reiterated that GoDaddy had "[a]greed to endeavor to promote [SiteLock's] Service." (Doc. 1-3 at 2.) GoDaddy now asserts that the "endeavor to promote" agreement did not require it to sell SiteLock products, allow SiteLock to dictate its promotional activities, or prohibit it from promoting or selling its own security service (Sucuri). (Doc. 342 at 11-12.) SiteLock does not dispute these assertions. (Doc. 370 at 14.) But it is not as clear what GoDaddy believes the "endeavor to promote" clause *did* require it to do. Indeed, during oral argument, GoDaddy suggested

that it could have unilaterally chosen to stop promoting SiteLock on the second day of the parties' multi-year contractual relationship without violating the clause.

The Court finds that the "endeavor to promote" clause is not ambiguous and can be understood according to its clear language. Under Arizona's canons of contractual interpretation, the clause must require GoDaddy to do, or not do, *something*. *Cf. Phillips*, 669 P.2d at 970 ("The meaning urged by the appellee is unreasonable. It gives no effect to paragraph 6 . . . . A contract must be construed so that every part is given effect."). The plain meaning of the verb "endeavor" is "to attempt (something, such as the fulfillment of an obligation) by exertion of effort." *Endeavor*, Merriam-Webster, https://www.merriam-webster.com/dictionary/endeavor (last visited Feb. 15, 2022). The plain meaning of the verb "promote" is, in this context, "to contribute to the growth or prosperity of," "to help bring (something, such as an enterprise) into being," or "to present (merchandise) for buyer acceptance through advertising, publicity, or discounting." *Promote*, Merriam-Webster, https://www.merriam-webster.com/dictionary/promote (last visited Feb. 15, 2022). Thus, a reasonable definition of "endeavor to promote" in the context of the Reseller Agreement might be "to attempt to contribute to the growth or prosperity of SiteLock by exertion of effort."[10]

It is unnecessary at this juncture of the case to decide the full contours and scope of the "endeavor to promote" clause. It is clear to the Court that if GoDaddy permanently ceased its promotion of SiteLock products before terminating the Reseller Agreement, despite entering into multiple addenda over a period of years that reiterated its obligation

---

[10] The Court agrees with GoDaddy that SiteLock's proffered caselaw, which largely consists of cases analyzing "best efforts" requirements, is too factually distinct to be useful here. The "best efforts" clause seems to approach a term of art in commercial agreements. *Hunt Foods, Inc. v. Phillips*, 248 F.2d 23 (9th Cir. 1957) (interpreting an agreement that required a reseller to "use its corporate best efforts"); *Dialog4 Sys. Eng'g GmbH v. Cir. Rsch. Labs, Inc.*, 622 F. Supp. 2d 814, 821-22 (D. Ariz. 2009) (same); *Inter-Tel (Del.), Inc. v. Fulton Commc'ns Tel. Co.*, 2007 WL 1725349, *6 (D. Ariz. 2007) (same). In contrast, *A.R.A. Mfg. Co. v. Pierce*, 341 P.2d 928 (Ariz. 1959), interpreted a clause that required the defendant to "endeavor to encourage all of [its] customers in the State of Arizona to patronize" the plaintiff's business. *Id.* at 930. Although that contractual language remains too dissimilar to be directly on point, the Arizona Supreme Court's common-sense analysis aligns with the Court's approach to similar language here.

to "endeavor to promote" such products, and instead focused all of its attention on the promotion of a competing product (Sucuri), such conduct would violate its promise to "endeavor to promote" SiteLock products.[11]   And SiteLock has proffered evidence that GoDaddy made no effort to promote SiteLock products after March 2017.  (Doc. 371-10 at 25 ["I don't think we were promoting SiteLock at all because we were planning on a— transition.  So it wouldn't make sense to promote SiteLock at this stage."]; Doc. 371-12 at 8 [Q: "Can you think of . . . any SiteLock promotions that occurred after Sucuri launched?" A: "Not that I remember, no."].)   GoDaddy's response largely focuses on the $4,390,041.02 in revenue earned between March 2017 and December 2018 (Doc. 396 at 7), but the existence of such revenue does not foreclose the possibility that SiteLock prospered in spite of GoDaddy's lack of promotional efforts.

Because a reasonable juror could find that GoDaddy entirely stopped its promotional efforts and thus did not "endeavor to promote" SiteLock after the launch of Sucuri, the Court rejects GoDaddy's first argument as to why it is entitled to summary judgment on Count Four.

As for GoDaddy's second argument (damages), the Court has addressed GoDaddy's motion to exclude the damages opinions of Dr. Kursh in Part III below.  As discussed, the Court will not preclude Dr. Kursh from presenting his opinion as to "endeavor to promote" damages.  And because GoDaddy's damages-related summary judgment arguments are derivative of its challenges to Dr. Kursh, it follows that GoDaddy is not entitled to summary judgment on Count Four.

…

…

…

---

[11]   The tentative ruling stated that GoDaddy had forfeited the argument that it was not required to "keep trying incessantly and forever" to promote SiteLock because it had raised that argument for the first time in a reply brief.  For the reasons stated by GoDaddy's counsel at oral argument, the Court withdraws this forfeiture finding—this argument is a natural outgrowth of the arguments GoDaddy raised in its motion.  Nevertheless, the Court also concludes that the argument fails on the merits, for the reasons discussed in the body of this order.

1               6.      <u>Count Five: Unjust Enrichment</u>

2               a.     **The Parties' Arguments**

3        GoDaddy argues it is entitled to summary judgment on Count Five, SiteLock's

4 claim for unjust enrichment, for two reasons: (1) under Arizona law, "unjust enrichment

5 claims may not be brought where a 'specific contract governs [the] parties' relationship.

6 Here, although the parties disagree as to the interpretation of the Reseller Agreement and

7 its addenda, the *validity* of the contracts is undisputed"; and (2) the claim is untimely

8 because unjust enrichment claims are governed by a three- or four-year statute of

9 limitations under Arizona law and SiteLock has admitted that its claim accrued "no later

10 than March 3, 2014." (Doc. 342 at 14.)

11        In response, SiteLock asserts in a footnote that GoDaddy's first argument lacks

12 merit because "unjust enrichment is available as an alternative to breach of contract where

13 the plaintiff never received the benefit of the contractual bargain" and, "depending on the

14 facts proven at trial, SiteLock may be entitled to unjust enrichment as an alternative

15 remedy." (Doc. 370 at 12 n. 7.) This footnote does not address GoDaddy's statute-of-

16 limitations argument. (*Id.*)

17        In reply, GoDaddy contends that "the parties agree that when a valid contract

18 governs the parties' relationship, it bars an affirmative claim for unjust enrichment" and

19 also notes SiteLock's failure to address the statute-of-limitations issue. (Doc. 396 at 10.)

20              b.     **Analysis**

21        Under Arizona law, an unjust enrichment claim requires proof of "five elements:

22 (1) an enrichment, (2) an impoverishment, (3) a connection between the enrichment and

23 impoverishment, (4) the absence of justification for the enrichment and impoverishment,

24 and (5) the absence of a remedy provided by law." *Freeman v. Sorchych*, 245 P.3d 927,

25 936 (Ariz. Ct. App. 2011). "[I]f there is a specific contract which governs the relationship

26 of the parties, the doctrine of unjust enrichment has no application," but a plaintiff may

27 plead an unjust enrichment claim in the alternative where the validity of a relevant contract

28 is disputed. *Trustmark Ins. v. Bank One, Ariz.*, 48 P.3d 485, 491-93 (Ariz. Ct. App. 2002)

1  (citations and internal quotation marks omitted).  If there is a remedy provided by law for

2  the breach of contract claim, the unjust enrichment claim fails and the claim must be

3  dismissed.  *Id.*

4      *Physics, Materials & Applied Mathematics Rsch. LLC v. Yeak*, 2021 WL 2557398

5  (D. Ariz. 2021), is instructive.  There, the defendant was a researcher employed by the

6  plaintiff, a company that developed high-tech laser-based tools.  *Id.* at *1.  After the

7  defendant secretly started a new competing company, the plaintiff brought several claims,

8  including a claim for breach of the non-complete clause in the defendant's employment

9  contract and a claim for unjust enrichment.  *Id.* at *2.  The court dismissed the latter claim

10 because there was a contractual relationship between the parties, the plaintiff showed that

11 it had an adequate remedy provided by law (by bringing breach of contract claims), and

12 although the defendant disputed the applicability of "a single clause of the contract," he

13 did not dispute the overall validity of the contract.  *Id.* at *9.

14     So, too, here.[12]  SiteLock and GoDaddy have a contractual relationship, SiteLock

15 has an adequate remedy provided by law (because it is bringing breach of contract claims),

16 and although GoDaddy disputes the interpretation and effect of certain contractual

17 provisions, "the validity of the contracts is undisputed."  (Doc. 342 at 14; Doc. 341 at 17.)

18 Thus, GoDaddy is entitled to summary judgment on Count Five.

19     C.    **SiteLock's Motion for Partial Summary Judgment**

20     SiteLock moves for partial summary judgment as to three of GoDaddy's affirmative

21 defenses: set-off/recoupment, estoppel, and unjust enrichment.  (Doc. 341.)  Each is

22 addressed below.

23     …

24

25 [12]    SiteLock's cited authorities do not contradict *Yeak*.  In *Harmon, Inc. v. Optima
26 Const., Inc.*, 2010 WL 3023333 (D. Ariz. 2010), the court explicitly found "genuine issues
   of material fact as to whether the parties entered in to a binding settlement agreement."  *Id.*
   *4.  Thus, the validity of the contract was disputed.  Similarly, in *Arnold & Assocs., Inc. v.*
27 *Misys Healthcare Sys.*, 275 F. Supp. 2d 1013 (D. Ariz. 2003) the plaintiff's oral contract
   claim violated the statute of frauds and was thus unenforceable.  *Id.* at 1021-22.  Consistent
28 with *Yeak*, the court found that an unenforceable oral contract would not prevent the
   plaintiff from asserting an unjust enrichment claim.  *Id.* at 1030.

1          1.     Set-off/Recoupment

2          In its answer, GoDaddy stated that it would be pursuing an affirmative defense of

3   "recoupment and/or set-off."  (Doc. 13 at 13.)  Later, GoDaddy's expert clarified that this

4   affirmative defense is premised on four theories: (1) SiteLock violated the Most Favored

5   Nation ("MFN") clause in the Reseller Agreement by offering cheaper deals to other

6   companies; (2) GoDaddy overpaid SiteLock by paying for "free" SiteLock subscriptions

7   sold as part of a product bundle; (3) SiteLock did not apply the proper discounts to bundled

8   sales; and (4) SiteLock did not pay a commission to GoDaddy for "upsells."  (Doc. 319-4

9   at 8-21.)   SiteLock now argues that "each of these factual theories is foreclosed by the

10  parties' contracts or by undisputed record evidence."  (Doc. 341 at 7.)   Additionally,

11  SiteLock moves to preclude GoDaddy from pursuing some of these theories as a discovery

12  sanction based on late disclosure.  (Doc. 348.)  As discussed in Part II below, the Court

13  agrees with SiteLock that GoDaddy should be precluded from asserting its second and third

14  theories.  Thus, the analysis here is confined to the first and fourth theories.

15               a.     **MFN Clause**

16                    i.     The Parties' Arguments

17         GoDaddy's first theory is that it is entitled to a set-off or recoupment based "on

18  overpayments made by GoDaddy where SiteLock's invoice price did not reflect the 'lowest

19  rate offered by SiteLock or its affiliates' as required by a contractual provision referred to

20  by the parties as the 'MFN' clause."  (Doc. 367 at 51)

21         SiteLock argues that "no record evidence shows that SiteLock ever offered lower

22  prices to other reseller[s] for the same services that SiteLock sold through GoDaddy."

23  (Doc. 341 at 3.)  Although SiteLock concedes it has offered subscriptions with the "same

24  or similar names" to other customers, it contends that "packages with similar names do *not*

25  necessarily provide the same service."  (*Id.* at 4.)  SiteLock further contends that

26  "[u]ncontroverted evidence establishes that the packages SiteLock offered to GoDaddy in

27  the Reseller Agreement were different (and more valuable) than the services described in

28  the six other contracts identified by [GoDaddy's expert] Mr. George, both because the

GoDaddy packages included additional valuable features and because they were subject to more favorable economic terms for GoDaddy." (*Id.*)  Thus, SiteLock argues that "as a matter of straightforward contract interpretation, these contracts do not trigger the MFN clause." (*Id.* at 8.)

In response, GoDaddy argues that: (1) SiteLock's interpretation of the MFN clause is legally flawed because it is premised on a "commercial and economic terms" analysis that is foreclosed by the plain contractual language of "lowest rate" and would "render the MFN clause illusory"; and (2) there is, at any rate, a dispute of fact over whether the other contracts involved dissimilar products and terms.  (Doc. 367 at 1-5.)  According to GoDaddy, the evidence of this factual dispute includes SiteLock's agreement to offer a reduced rate to GoDaddy to match 1and1.com's rate; the testimony of SiteLock representative Tom Serani, who could identify only two differences between GoDaddy's package and the other packages, both of which were "not introduced by SiteLock nor made available to GoDaddy until late 2016"; and the testimony of former SiteLock employee Aaron Harvey, who admitted during a deposition that "although the names [of the software packages offered by different retailers] may have differed, the products were the same" (Doc. 367-28 at 12).

In reply, SiteLock reasserts it "offered these other resellers *different* services with *different* features on *different* economic terms.  The prices that SiteLock offered for these *different* services did not trigger the MFN clause." (Doc. 395 at 2.)  As for the supposedly conflicting evidence proffered by GoDaddy, SiteLock argues that its "prior conduct" of renegotiating terms with GoDaddy came before the signing of the Reseller Agreement in 2013 and thus "says nothing about the meaning of the MFN clause"; that its motion described 28 unique features, so even if the two features described by Serani are disregarded, the other contracts remain unique; and that Harvey "testified only that his descriptions of the 'high-level basics' of SiteLock's services were the 'same' across resellers—not that the specific features and functionality of these services were the same." (Doc. 395 at 2-4 & n.3.)  SiteLock also reiterates its position that, even if the other contracts

involved identical features, "it is undisputed that the services that SiteLock provided through the other resellers identified by GoDaddy were offered subject to far more onerous (and less valuable) economic and commercial terms . . . such as more lenient refund provisions and termination rights." (*Id.* at 4-6.)

ii.  <u>Analysis</u>

Exhibit A to the Reseller Agreement includes a table that sets forth "pricing packages." (Doc. 1-2 at 7.) The table identifies each "SiteLock Package" along with the amount owed to SiteLock ("Company Price") upon third-party purchase/activation[13] and the minimum amounts chargeable to the general public ("Minimum End User Customer Prices"). Exhibit A also includes the promise that "SiteLock agrees to promptly update [the] table above to the lowest rate offered by SiteLock or any of its affiliates." (*Id.* at 8.)

The parties seem to agree that the controversy is limited to the six resellers listed in SiteLock's motion for partial summary judgment. (Doc. 341 at 8-9 & n.2; Doc. 367 at 2.) Thus, to prevail on its motion, SiteLock must proffer evidence that at least one of the challenged contracts offered a package of software to the reseller that was distinct from the package offered to GoDaddy. *Tulalip Tribes of Wash. v. Washington*, 783 F.3d 1151, 1156-59 (9th Cir. 2015). *Cf. Nissan Fire & Marine Ins.*, 210 F.3d at 1102. If SiteLock meets this initial burden of production, GoDaddy must respond by proffering evidence that the software packages were, in fact, the same. *Id.* at 1103. If GoDaddy can carry that burden, there is a genuine dispute of material fact that precludes summary judgment.

As an initial matter, the parties disagree about the types of distinctions between software packages that could be relevant when evaluating SiteLock's compliance with the MFN clause. In a nutshell, SiteLock argues that a difference either in the mix of products included in a third-party package or in the "economic terms" associated with that package (*e.g.*, whether it was refundable) would be enough to render the MFN clause inapplicable, while GoDaddy argues the only potentially relevant difference is whether the third-party

---

[13]    The Court does not mean to unintentionally express an opinion about whether the terms of the Reseller Agreement contemplate payment upon purchase or activation, which is a core dispute in this case.

package included different products.

The Court finds it unnecessary to resolve that dispute at this stage of the case. Assuming (as SiteLock argues) that differences in both product mix and economic terms are potentially relevant, SiteLock has carried its initial burden by proffering evidence[14] that SiteLock sold packages of software to CenturyLink (Doc. 358-2 ¶¶ 30-37), eNom (*id.* ¶¶ 38-45), Tucows (*id.* ¶¶ 38-43, 46-49), HostPapa (*id.* ¶¶ 52-59), Softcom (*id.* ¶¶ 52-59), and GMO GlobalSign (*id.* ¶¶ 63-66), that were materially distinct from the packages sold to GoDaddy.

GoDaddy, in response, has produced evidence that Harvey, a former SiteLock employee, admitted during his deposition that "although the names [of the software packages offered by different retailers] may have differed, the products were the same." (Doc. 367-28 at 12.)  Although SiteLock identifies reasons why Harvey's statements on this point should not be construed as an admission that the products were the same (either in terms of features or economic terms), the Court concludes that the interpretation of Harvey's testimony presents an issue of fact that should be resolved by the jury.  Construed in the light most favorable to GoDaddy, Harvey's testimony qualifies as an admission of sameness that a reasonable juror could credit while discrediting SiteLock's evidence to the contrary.  Thus, GoDaddy has established a genuine issue of material fact that precludes summary judgment as to its MFN set-off/recoupment theory.

b.  **Upsell**

i.  <u>The Parties' Arguments</u>

In its MIDP disclosures, GoDaddy asserted that "SiteLock owes GoDaddy for all upsell payments that it withheld from GoDaddy . . . ."  (Doc. 220-2 at 101.)  GoDaddy's expert later clarified that the amount GoDaddy is seeking pursuant to this theory is "$423,572 for billings from November 2018 through December 2020."  (Doc. 319-4 at 8.)

---

[14]  GoDaddy argues that Dr. Kursh's report should be excluded and is otherwise inadmissible.  (Doc. 367 at 9.)  As discussed in Part III below, the Court disagrees.  The Court also finds that SiteLock has addressed GoDaddy's evidentiary objections.  (Doc. 395 at 3 n.1.)

In its summary judgment motion, SiteLock acknowledges that the "First Addendum to the Reseller Agreement permitted SiteLock to make direct sales (or 'upsells') to customers who originally purchased SiteLock from GoDaddy, and provided that, during the pendency of the contract, SiteLock would retain 70% of the revenue from these [upsells] and pay GoDaddy 30% of the revenue." (Doc. 341 at 13.)  However, according to SiteLock, the Reseller Agreement also provided that "all rights of the parties under this Agreement shall cease immediately" upon termination of the Agreement, and although some provisions had a "survival" clause, the First Addendum did not have such a clause. (*Id.*)  Thus, SiteLock contends that, because the Reseller Agreement terminated by no later than December 31, 2018, "SiteLock had no obligation to pay GoDaddy these commissions after the termination of those contracts."  (*Id.* at 13-14.)

In response, GoDaddy first contends that, because it provided a notice of termination of the Reseller Agreement on *March* 31, 2018, "any argument premised on a disputed termination date necessarily fails."  (Doc. 367 at 10-11.)  At any rate, GoDaddy asserts that revenue generated from upsells in November 2018 and December 2018 would remain outstanding because SiteLock remitted payments to GoDaddy only until October 2018.  (*Id.* at 11 n. 8.) GoDaddy also argues that SiteLock cannot simultaneously argue that it was no longer obligated to pay GoDaddy for upsells after the Reseller Agreement was terminated but could also continue to pursue those upsells, which "SiteLock was not otherwise permitted" to do.  (*Id.* at 11-12.)

In reply, SiteLock reasserts that all rights of the parties under the Reseller Agreement were terminated by, at the latest, December 2018.  (Doc. 395 at 9-10.)  SiteLock does not concede that GoDaddy is correct about the March 2018 termination date, but "even if it were correct, the parties agree that the contracts were no longer in effect after December 2018."  (*Id.*)  In a related vein, SiteLock argues that any dispute over November 2018 and December 2018 arrears does not affect "GoDaddy's lack of any entitlement to upsell commissions after the contract's termination in December 2018."  (*Id.*)  Finally, SiteLock states that "GoDaddy is wrong to suggest that SiteLock no longer had the

1  contractual right to make direct sales to customers originally introduced to SiteLock

2  through GoDaddy after the termination of the parties' contracts.  SiteLock did not need any

3  'contractual right' to sell services directly to these customers."  (*Id.*)

4                              ii.    Analysis

5          In the tentative ruling, the Court explained that it viewed the parties' briefing related

6  to GoDaddy's "upsell" set-off theory as confusing because each party was arguing in favor

7  of a termination date that seemed contrary to that party's interests.  The tentative ruling

8  concluded that SiteLock was not, at any rate, entitled to summary judgment under its theory

9  because a December 31, 2018 termination date would merely limit, but not entirely negate,

10  GoDaddy's theory of liability.   Finally, in a footnote, the Court acknowledged that

11  SiteLock could have moved for partial summary judgment as to any set-off/recoupment

12  claim for upsell commissions arising after December 31, 2018 but held that, because

13  SiteLock hadn't actually moved on that ground (or, at least, hadn't properly advanced such

14  a claim until its reply), no relief was warranted.

15          During oral argument, SiteLock attempted to show that its motion had, in fact, raised

16  a claim for partial summary judgment as to post-December 31, 2018 upsell commissions.

17  Upon further review, the Court acknowledges that this is a closer call than that tentative

18  ruling portrayed it to be.  Certain portions of SiteLock's motion can be viewed, in isolation,

19  as suggesting that SiteLock was only moving for partial summary judgment on any claim

20  for upsell commissions arising after December 31, 2018.  (Doc. 341 at 13, emphasis added

21  ["This recoupment theory fails as a matter of law because there is no genuine dispute that

22  SiteLock was not required to provide GoDaddy upsell commissions *after the termination

23  of the parties' contract*."]; *id.* at 14, emphasis added ["SiteLock had no obligation to pay

24  GoDaddy these commissions after the termination of those contracts. As a result, SiteLock

25  does not owe any commissions for upsells *made after December 2018*."].)  Nevertheless,

26  in other portions of the motion, SiteLock repeatedly suggested it was seeking summary

27  judgment as to the entirety of GoDaddy's affirmative defense of set-off/recoupment,

28  including the entirety of the upsell-based component of that defense.  (*Id.* at 1 ["[SiteLock]

- 36 -

respectfully moves for partial summary judgment on three affirmative defenses asserted by GoDaddy.com, LLC: (1) recoupment, (2) estoppel, and (3) unjust enrichment.   The undisputed facts established in discovery show that all three defenses fail as a matter of law."]; *id.* ["The Court should grant partial summary judgment in favor of SiteLock on GoDaddy's recoupment defense, because each of these four theories [including upsell] is legally foreclosed by the parties' contracts or contradicted by undisputed facts."]; *id.* at 13 [Heading: "GoDaddy's Upsell Recoupment Theory Fails as a Matter of Law."]; *id.* at 17 ["SiteLock respectfully requests that the Court grant partial summary judgment on GoDaddy's affirmative defenses of recoupment, estoppel, and unjust enrichment."].) Given these assertions, the Court stands by the conclusion in the tentative ruling that summary judgment must be denied because SiteLock did not properly seek partial summary judgment as to only a portion of GoDaddy's upsell theory (and because SiteLock, by its own logic, would not be entitled to summary judgment as to the entirety of that theory).  This outcome should not have much bearing on the overall outcome of this case, as both parties appear to agree—at least for summary judgment purposes—that any set-off/recoupment claim for post-December 31, 2018 upsell commissions would be meritless.

### 2.   Estoppel

#### a.   **The Parties' Arguments**

SiteLock argues that GoDaddy's affirmative defense of estoppel is simply a "repackaged" version of the fraud counterclaims related to "MFN pricing and upsell commissions" that GoDaddy previously (and unsuccessfully) attempted to assert.  (Doc. 341 at 14.)  With this understanding in mind, SiteLock moves for summary judgment on GoDaddy's estoppel defense for three reasons: (1) "GoDaddy cannot show how SiteLock's claims in this action are 'inconsistent' with its earlier representations such that it would be 'unconscionable' to permit SiteLock to assert those claims"; (2) "GoDaddy has offered no competent evidence that, at the time of contracting, SiteLock had no intention to perform its contractual obligations"; and (3) "there is no evidence that GoDaddy . . . 'chang[ed its] position for the worse' in reliance on SiteLock's purported representations." (*Id.* at 14-17.)

In response, GoDaddy accuses SiteLock of mischaracterizing its estoppel defense as being based solely on false promises of MFN pricing and upsell commissions, which overlooks that the defense is also based on SiteLock's practice of sending invoices and accepting payments based on product activations. (Doc. 367 at 12-13.) GoDaddy contends that, because SiteLock's motion does not address the full scope of the estoppel defense, the motion must be denied. (*Id.*) Next, GoDaddy argues that SiteLock's motion is procedurally deficient under Rule 56 because it "cites no supportive evidence at all." (*Id.* at 13.) Finally, on the merits, GoDaddy argues that summary judgment should be denied because (1) there are legitimate disputes of fact over whether SiteLock made false representations regarding the MFN and upsell clauses; (2) "intent to perform at the time of contracting" isn't an element of estoppel; and (3) there is ample evidence of detrimental reliance in the record, including GoDaddy's verified MIDP response. (*Id.* at 13-16.)

In reply, SiteLock does not dispute that it failed to address one aspect of GoDaddy's estoppel defense (*i.e.*, estoppel arising from SiteLock's practice of sending invoices and accepting payments based on product activations) but argues that, to the extent the defense "is based in part on SiteLock's purported violations of the MFN and upsell clauses," the evidence is insufficient. (Doc. 395 at 10-11.)

ii.    Analysis

Once again, SiteLock has sought summary judgment as to an entire defense even though its motion only addresses one aspect of that defense. In the preceding section of this order, the Court explained why this approach was fatal to SiteLock's request for summary judgment as to the entirety of GoDaddy's upsell theory of set-off/recoupment. For similar reasons, SiteLock is not entitled to summary judgment on GoDaddy's affirmative defense of estoppel.

GoDaddy clearly disclosed, in both its answer and its MIDP disclosures, that its estoppel defense is based in part on SiteLock's practice of sending invoices and accepting payments based on product activations. (Doc. 13 at 13 [Answer: "Plaintiff is estopped from asserting the claims set forth in the Complaint because, among other reasons, it

knowingly sent invoices and accepted payments based upon product activations, and not upon the alleged rights to payment asserted in the Complaint."]; Doc. 220-2 at 84 [MIDP disclosures: "From the inception of the parties' relationship, SiteLock was aware that it received payments for product activations only, and not for product sales. . . .  Throughout the parties' relationship, SiteLock repeatedly confirmed this fact in its monthly invoices to GoDaddy . . . .  At all times during the parties' relationship, GoDaddy provided payments to SiteLock for product activations, not product sales, in accordance with the Reseller Agreement and the invoices SiteLock sent GoDaddy."].)  Nevertheless, in the summary judgment motion, SiteLock asserts that the estoppel defense is based only on false statements related to "MFN pricing and upsell commissions" (Doc. 341 at 14) and then identifies various reasons why GoDaddy will be unable to proffer evidence that is sufficient to support an estoppel defense based on those particular theories.  But even assuming SiteLock is correct, it doesn't follow that GoDaddy also lacks sufficient evidence to mount an estoppel defense based on an invoices-and-payments theory.  Because SiteLock ignored that aspect of GoDaddy's estoppel defense, SiteLock failed to meet its initial burden under Rule 56.

### 3.  Unjust Enrichment

Although GoDaddy's answer does not elaborate on the nature of its affirmative defense of unjust enrichment (Doc. 13 at 13 ["Any award to Plaintiff would constitute unjust enrichment"]), GoDaddy provided the following explanation in its MIDP disclosures: "SiteLock owes GoDaddy for all upsell payments that it withheld from GoDaddy as well as the amounts owed to GoDaddy due to [SiteLock's] failure to provide MFN status, as well as its failure to update the Pricing Table in the parties' agreement, which unjustly enriched SiteLock by allowing it to receive licensing fees over and above the amount it was entitled to."  (Doc. 220-2 at 101.)

SiteLock moves for summary judgment on this affirmative defense because "there is no dispute that the Reseller Agreement was a valid agreement that governs the relationship of the parties," and thus unjust enrichment does not apply.  (Doc. 341 at 17.)

GoDaddy responds that although the existence of a valid contract forecloses SiteLock's own unjust enrichment claim, GoDaddy's unjust enrichment defense must survive because it only "seeks to prevent a windfall" to SiteLock in the event SiteLock prevails in this action.  (Doc. 367 at 16.).

SiteLock replies that GoDaddy is not marshalling the sort of "technical defense" to the Reseller Agreement that might support an unjust enrichment defense.  (Doc. 395 at 11.)

As discussed in Part I.B.6 above, "if there is a specific contract which governs the relationship of the parties," and the validity of the contract is not disputed, "the doctrine of unjust enrichment has no application."  *Trustmark Insurance*, 48 P.3d at 491-93.  Here, the parties' relationship is governed by a contract and the parties do not dispute the validity of that contract.  Additionally, GoDaddy's unjust enrichment affirmative defense, which turns on SiteLock's purported failure to abide by the MFN agreement and purported failure to pay GoDaddy for "upsold" subscriptions, is adequately remedied by GoDaddy's "MFN" and "upsell" set-off/recoupment theories.

Having obtained dismissal of SiteLock's unjust enrichment claim on redundancy grounds, it was GoDaddy's responsibility to explain why its unjust enrichment affirmative defense should not meet the same fate.  GoDaddy has failed to do so.  Its sole citation, *Ventures Edge Legal PLLC v. GoDaddy.com LLC*, 2017 WL 1075059 (D. Ariz. 2017), stands for the narrow proposition that "merely naming" unjust enrichment as an affirmative defense provides fair notice to a plaintiff at the pleading stage, even though unjust enrichment is not an "exemplar affirmative defense" under the Federal Rules of Civil Procedure.  *Id.* at *3-4.  *Ventures Legal* does not begin to explain why GoDaddy's claim should survive summary judgment.

For these reasons, the Court grants SiteLock's motion for partial summary judgment on GoDaddy's unjust enrichment affirmative defense.

…

…

…

- 40 -

II.     SiteLock's Motion for Sanctions

As noted, GoDaddy's expert stated in his report that GoDaddy's affirmative defense of recoupment/set-off is premised on four theories: (1) SiteLock violated the MFN clause in the Reseller Agreement by offering cheaper deals to other companies; (2) GoDaddy overpaid SiteLock by paying for "free" SiteLock subscriptions sold as part of a product bundle; (3) SiteLock did not apply the proper discounts to bundled sales; and (4) SiteLock did not pay a commission to GoDaddy for upsells.  (Doc. 319-4 at 8-21.)  The Court has already addressed the factual and legal sufficiency of the first and fourth theories in Part I.C above.

As for the second and third theories (which will be collectively referred to as the "bundling" theories), SiteLock moves to preclude GoDaddy from pursuing them as a discovery sanction based on late disclosure.  For the reasons discussed below, the Court agrees with SiteLock that a preclusion sanction is warranted.

A.     **Legal Standard**

SiteLock argues that its request for discovery sanctions is governed by Rule 37(b)(2), although it argues that sanctions would also be warranted under Rule 37(c)(1).  (Doc. 348 at 5.)  GoDaddy, in turn, agrees that "SiteLock's Motion is governed by Rules 37(b)(2) and 37(c)."  (Doc. 368 at 2.)

The Court agrees with the parties that SiteLock's request for sanctions is governed by Rule 37(b)(2).[15]  Because this case was filed in April 2019, it was (and remains) subject to the MIDP, which applies to most civil cases filed between May 1, 2017 and May 1, 2020.  *See* D. Ariz. G.O. 17-08.  Under the MIDP, the parties "are ordered to provide mandatory initial discovery responses before initiating any further discovery in this case. The responses are called for by the Court, not by discovery requests actually served by an opposing party."  *Id.* ¶ A.2.  "Each party's response must be based on the information then reasonably available to it," and a "party is not excused from providing its response because

---

[15]     The Court clarifies that, as with the previous sanctions request filed by GoDaddy, the outcome here would be the same regardless of whether Rule 37(b)(2) or Rule 37(c)(1) were deemed applicable.

1    it has not fully investigated the case." *Id.* ¶ A.3.  Additionally, "[t]he duty to provide

2    mandatory initial discovery responses . . . is a continuing duty, and each party must serve

3    supplemental responses when new or additional information is discovered or revealed."

4    *Id.* ¶ A.8.  As relevant here, the information that is subject to mandatory disclosure under

5    the MIDP includes, "[f]or each of your claims or defenses, . . . the facts relevant to it and

6    the legal theories upon which it is based." *Id.* ¶ B.4.  Also subject to mandatory disclosure

7    is "a computation of each category of damages claimed by you, and a description of the

8    documents or other evidentiary material on which it is based." *Id.* ¶ B.5.

9        Because the disclosures required by the MIDP "supersede the disclosures required

10   by Rule 26(a)(1) and are framed as court-ordered mandatory initial discovery pursuant to

11   the Court's inherent authority to manage cases," *id.* at 1, a violation of the MIDP's

12   disclosure obligations is sanctionable under Rule 37(b)(2). *Sali v. Corona Reg'l Med. Ctr.*,

13   884 F.3d 1218, 1222 (9th Cir. 2018) ("In the context of Rule 37(b) sanctions, we 'read

14   broadly' the term 'order'. . . [to] 'include any order relating to discovery.' ") (citations

15   omitted); *Nyerges v. Hillstone Rest. Grp. Inc.*, 2021 WL 3299625, *8-9 (D. Ariz. 2021)

16   (violation of MIDP disclosure obligations is sanctionable under Rule 37(b)(2)).  Rule

17   37(b)(2), in turn, provides that if a party "fails to obey an order to provide or permit

18   discovery . . .  the court . . . may issue further just orders," including "prohibiting the

19   disobedient party from supporting . . . designated claims or defenses, or from introducing

20   designated matters in evidence."  "The scope of sanctions for failure to comply with a

21   discovery order is committed to the sound discretion of the district court." *Payne v. Exxon

22   Corp.*, 121 F.3d 503, 510 (9th Cir. 1997).

23       **B.    The Parties' Arguments**

24       SiteLock argues that "GoDaddy's MIDP disclosures never identified 'the facts

25   relevant' to its two new recoupment theories regarding bundled SiteLock subscriptions, or

26   any 'computation' of damages for those theories."  (Doc. 348 at 4.)  SiteLock finds it

27   "critical" that although GoDaddy did amend its MIDP disclosures in November 2020 to

28   identify the amount of set-off being sought based on the MFN and upsell theories, it did

- 42 -

not suggest it was seeking any amount of set-off based on the bundling theories.  (*Id.*) SiteLock argues this omission was not substantially justified because GoDaddy "knew all of the facts relevant to its new recoupment theories before this case even began" and was not harmless because the omission prevented SiteLock from pursuing discovery about the bundling theories.  (*Id.* at 5-7.)

In response, GoDaddy first argues that, because SiteLock's motion seeks "an order sanctioning GoDaddy for failing to timely disclose that it is seeking two categories of recoupment damages" but "GoDaddy is not seeking damages . . . in this action," the motion is moot.  (Doc. 368 at 3-4.)  In the alternative, GoDaddy argues that it complied with its MIDP disclosure obligations because it "disclosed facts related to this affirmative defense in its initial MIDP disclosures by [by] specifically noting that its set-off defense captured . . . 'unpaid account balances.'"  (*Id.* at 4-5.)  GoDaddy describes the "additional facts set forth in GoDaddy's supplemental MIDP disclosures," apparently a reference to the bundling theories challenged by SiteLock, as "present[ing] a further basis for GoDaddy's set-off defense, rather than a limitation of that defense."  (*Id.*)  GoDaddy then, in a variety of ways, accuses SiteLock of failing to zealously pursue discovery and argues that it should not be blamed for SiteLock's strategic failures.  (*Id.* at 5-8.)  GoDaddy also states that it is "aware of no authority supporting the proposition that a set-off (or recoupment) affirmative defense necessitates the disclosure of a damages computation under either Rule 26 or the MIDP."  (*Id.* at 8-9.)  Finally, GoDaddy argues that any disclosure violation was substantially justified and/or harmless because SiteLock failed to zealously pursue discovery; because the "MIDP is not a substitute for discovery"; because the "information underlying the overpayment calculations at issue were roundly discussed during discovery" with at least one witness informing SiteLock that he "believed that GoDaddy had 'overpaid' SiteLock for 'free' products and who 'claimed as much during the course of litigation'"; because SiteLock "chose to wait . . . over four months [from receiving notice] to file this Motion"; because SiteLock has suggested it "already has the evidence it needs to defend against GoDaddy's requested set-off"; because "this litigation has already

established that the discovery identified in SiteLock's motion . . . does not exist"; and because "each of these topics . . . was exhaustively explored by SiteLock during discovery." (*Id.* at 9-16.)

SiteLock replies that it seeks the exclusion of the bundling recoupment *theories*, not the exclusion of a category of damages, and thus its motion is not moot. (Doc. 393 at 1-2.) SiteLock asserts that GoDaddy's late disclosure of the bundling theories violated the MIDP, that GoDaddy's disclosure of unrelated theories did not satisfy GoDaddy's disclosure obligations, and that SiteLock cannot be blamed for failing to explore GoDaddy's undisclosed theories when the MIDP requires proactive disclosure, regardless of the opposition's discovery requests. (*Id.* at 2-4.) Similarly, SiteLock argues that "a party cannot satisfy its MIDP obligations by dumping documents on another party and assuming that it will intuit the legal theories it will pursue based on those documents." (*Id.* at 5.) As for substantial justification and harmlessness, SiteLock criticizes GoDaddy's "attempts to shift the blame to SiteLock by arguing (incorrectly) that SiteLock did not take sufficient discovery on GoDaddy's recoupment defense"; disputes the notion that it was "apprised" of the bundling theories by a witness; reasserts examples of discovery it would have pursued with proper notice of the bundling theories; dismisses GoDaddy's suggestion that it would not have pursued discovery if given the opportunity, and contends that GoDaddy's timeliness argument was already disregarded by this Court. (*Id.* at 6-11.)

C.   **Analysis**

As explained below, SiteLock's motion is not moot, GoDaddy did not timely and adequately disclose the challenged bundling theories, and the disclosure violation was not substantially justified or harmless. Accordingly, SiteLock's request for sanctions is granted.

1.   Mootness

GoDaddy's mootness argument turns on SiteLock's arguably inartful use of the term "damages" throughout its motion. GoDaddy's position is that "damages" may stem from a claim or counterclaim, but not from an affirmative defense, and thus SiteLock's request

to preclude GoDaddy from seeking "damages" pursuant to the challenged recoupment/set-off theories necessarily fails.

This argument is unavailing. GoDaddy's recoupment defense, in its simplest form, asks the Court to reduce any damages that SiteLock might receive by the amount that SiteLock has already injured GoDaddy. *See, e.g.*, *W. J. Kroeger Co. v. Travels Indem. Co.*, 541 P.2d 385, 388 (Ariz. 1975) ("Recoupment is an equitable doctrine [in which] the claim of the defendant can be used to reduce or to eliminate a judgment."). There is a fair argument that it is accurate to describe financial compensation that seeks to make an injured party whole as being "damages," regardless of procedural posture. But even if there is a better term for GoDaddy's requested relief than "damages," SiteLock's motion is otherwise clear and the Court will not deny relief on hyper-technical semantic grounds.

## 2.    Adequacy And Timeliness Of Disclosure

As noted, the MIDP provides that each party must, "for each of your claims or defenses, state the facts relevant to it and the legal theories upon which it is based." GoDaddy's efforts to disclose its bundling-related theories of set-off/recoupment did not comply with the letter or spirit of this requirement.

A brief review of GoDaddy's disclosure efforts is in order. At the outset of this case, GoDaddy filed an answer that included an array of affirmative defenses, including a "set-off" defense that provided as follows:

> Plaintiff's claims are barred in whole or in part by the doctrine of recoupment and/or set-off. Defendant is entitled to offset and recoup against any judgment that may be entered for Plaintiff for all obligations owing to Defendant, including, but not limited to, any unpaid account balances and/or any damages incurred in connection with any termination of contracts between Defendant and Plaintiff.

(Doc. 13 at 13.) In other words, the answer identified two set-off/recoupment theories: (1) "unpaid account balances" and (2) damages arising from the termination of contracts.

GoDaddy's initial MIDP disclosures, served on August 9, 2019, stated that "any judgment SiteLock might obtain in this action would necessarily need to be offset by all obligations SiteLock owes GoDaddy. Such obligations include, but are not limited to, *the*

*licensing fees paid for customers who rejected or demanded a refund from GoDaddy for SiteLock's products*, any unpaid account balances, and damages incurred in connection with the termination of contracts between GoDaddy and SiteLock."  (Doc. 220-2 at 48.) As the italicized language shows, these disclosures placed SiteLock on notice that GoDaddy might be seeking a set-off/recoupment under a third potential theory (certain licensing fees) but provided no additional information about the nature of the "unpaid account balances" theory.  Additionally, GoDaddy did not attempt to quantify any of these theories in the section of its disclosures entitled "Computation of Damages."  (*Id.* at 50.)

In November 2020, GoDaddy amended its MIDP disclosures.  (*Id.* at 102.)  As relevant here, GoDaddy stated that "[t]o the extent it is required to set forth a calculation of the amount it seeks to set off by virtue of its Affirmative Defenses for set-off and unjust enrichment, GoDaddy incorporates by reference its Supplemental Responses set forth above describing, to the greatest extent possible based on known facts, the amounts, the basis, or method of calculation for those amounts that SiteLock owes for its fraudulent conduct, including its failure to pay GoDaddy pursuant to the terms of the agreement. Specifically, SiteLock owes GoDaddy for all upsell payments that it withheld from GoDaddy [*i.e.*, the upsell theory] as well as the amounts owed to GoDaddy due to its failure to provide MFN status, as well as its failure to update the Pricing Table in the parties' agreement [*i.e.*, the MFN theory]."  (*Id.* at 101.)  GoDaddy advised that these assertions were likely to be "supplemented after motion practice provides GoDaddy with responses sufficient for it to determine the precise amounts wrongfully withheld by SiteLock, and also by expert calculation of the amounts owed due to SiteLock's breach of the MFN clause."  (*Id.*)

In March 2021, roughly a month after the close of fact discovery, GoDaddy served the expert report of Jeffrey George.  (Doc. 319-4.)  In the "Summary of Opinions" portion of the report, George stated that he had "developed four opinions" and summarized each opinion in consecutively numbered paragraphs.  (*Id.* at 7-8.)  In two of those paragraphs, George quantified the amount of set-off/recoupment to which GoDaddy was entitled

pursuant to its "upsell" ($423,572) and MFN ($525,403) theories.  (*Id.*)  In the other two paragraphs, George stated that (1) GoDaddy was entitled to set-off/recoupment of between $542,380 and $2,631,121 based on a "free bundle" theory[16] and (2) GoDaddy was entitled to set-off/recoupment of between $885,557 and $1,213,318 based on a "paid bundle"[17] theory.  (*Id.*)

The Court agrees with SiteLock that GoDaddy violated its disclosure obligations under the MIDP by failing to disclose these bundling-related set-off/recoupment theories until after the close of fact discovery.  Nowhere does GoDaddy argue that it explicitly disclosed its bundling theories to SiteLock before the issuance of George's report.  The bulk of GoDaddy's argument presumes that, if SiteLock had been diligent, it might have come to realize through its own investigation that GoDaddy was asserting bundling theories.  But the MIDP was created to avoid the inefficiencies associated with this kind of easter-egg hunt.  GoDaddy had to provide fair notice of its intent to pursue the theories at issue.  *Ocean Garden Prods. Inc. v. Blessings Inc.*, 2018 WL 6133773 (D. Ariz. 2018) ("Defendants must provide Plaintiff with fair notice of the factual basis for each of the asserted defenses so as to allow Plaintiff an opportunity to conduct relevant discovery.")  GoDaddy failed to do so.  Although GoDaddy's initial MIDP disclosures suggested the set-off/recoupment defense would be based in part on "unpaid account balances,"

---

[16]    The "free bundle" theory is: "If it is determined that GoDaddy should only be required to pay SiteLock for sales of the product, with a 'sale' defined as a transaction where an end user paid at least $0.01 to GoDaddy for a SiteLock product, then it is my corresponding opinion that GoDaddy overpaid SiteLock by paying SiteLock for invoiced activations that were related to a non-sale (one for which no additional money was charged or received in relation to a SiteLock product).  Assuming this, my opinion is that GoDaddy has overpaid between $542,380 and $2,631,121 for the years 2014 to 2018, by paying SiteLock for activated SiteLock products for which GoDaddy did not receive any additional monetary compensation."  (Doc. 319-4 at 8.)

[17]    The "paid bundle" theory is: "Exhibit A of the Reseller Agreement states 'Company will have the right to offer an annual bundled version of the products mentioned below at an additional discount structure as follows'.  The GoDaddy Transaction Data identifies SiteLock subscriptions sold as either a standalone product or as part of a 'bundle.'  Based on a review of the SiteLock Invoices, it does not appear the bundle discounts identified in the Reseller Agreement were ever applied in the invoices issued by SiteLock to GoDaddy.  GoDaddy has overpaid between $885,557 and $1,213,318 for the years 2014 to 2018, for activated SiteLock subscriptions sold as part of a bundle, assuming that GoDaddy was entitled to receive the lower bundled prices reflected in the Reseller Agreement."  (Doc. 319-4 at 7.)

GoDaddy does not explain why such a vague reference could constitute fair notice of an intent to pursue theories related to bundling discounts and the Court cannot imagine how that would be the case.  Similarly, although GoDaddy's supplemental MIDP disclosures contained a generic reference to SiteLock's "fraudulent conduct, including its failure to pay GoDaddy pursuant to the terms of the agreement," the very next sentence clarified that they GoDaddy was "[s]pecifically" referring to its upsell and MFN theories—which, again, are much different than its bundling theories.

This is not, to be clear, a situation in which a disclosed theory logically implicates the existence of a peripheral undisclosed theory.  For example, this Court has found that a disclosed theory of comparative negligence necessarily implicates an undisclosed theory of negligence *per se*, based on the "case law from Arizona and other jurisdictions . . . establishing that negligence *per se* isn't a separate theory from general negligence." *Manion v. Ameri-Can Freight Sys. Inc.*, 2019 WL 8325752, *3 (D. Ariz. 2019).  By contrast, GoDaddy has failed to explain why its bundling theories could somehow be considered a natural extension of its disclosed MFN and upsell theories.

### 3. Substantially Justified Or Harmless

To the extent GoDaddy may avoid the imposition of sanctions by establishing that the disclosure violation was substantially justified or harmless,[18] GoDaddy has not met that burden.

The Court's analysis of substantial justification and harmlessness largely mirrors the analysis in its July 9, 2021 order, which imposed discovery sanctions against SiteLock based on late disclosure.  (Doc. 329.)  The delay was not substantially justified because GoDaddy "could have developed the challenged theory even before the case began . . . [as]

---

[18]    Although the text of Rule 37(b)(2), unlike the text of Rule 37(c)(1), does not specifically enumerate a "substantially justified or harmless" escape hatch for liability, *see, e.g.*, *Lair for Est. of Lair v. Reyes*, 2020 WL 9718813, *7 (S.D. Ill. 2020), the text of Rule 37(b)(2) does require that any sanction be "just."  The Court is unaware of any authority, from the Ninth Circuit or elsewhere, suggesting that a district court is barred from considering concepts of substantial justification and harmlessness when deciding whether to impose sanctions under Rule 37(b)(2) and concludes that it makes sense to include those considerations in the Rule 37(b)(2) analysis.

the theory itself has always been ripe for development and disclosure." (*Id.* at 20.) *See also Udd v. City of Phoenix*, 2021 WL 535526, *9 (D. Ariz. 2021). Nevertheless, GoDaddy didn't disclose the bundling theories until March 2021, which was one month after the close of discovery and nearly two years after the case began. (Doc. 368 at 16.) These sorts of theories, unlike a claim for nominal damages, are subject to disclosure.

GoDaddy's other arguments, which seek to blame SiteLock for its failure to pursue discovery related to the undisclosed bundling theories, lack merit for the reasons discussed in the preceding section of this order. In short, they amount to improper burden-shifting.

As for harmlessness, SiteLock has "identified specific categories of evidence it would have pursued via the discovery process had it been aware of [GoDaddy's] intent to pursue the" bundling theories. (Doc. 329 at 21; Doc. 348 at 6-7 [enumerating categories]; Doc. 393 [elaborating further].) "Thus, to even the playing field, the Court would be required to reopen fact discovery." (Doc. 329 at 21.) This is sufficient to show that GoDaddy's failure to timely disclose its bundling theories was not harmless.

Finally, there is no merit to GoDaddy's contention that SiteLock somehow forfeited the ability to seek relief, or implicitly conceded the harmlessness of the challenged discovery violations, by waiting too long to file a sanctions motion. Neither Rule 37(b)(2) nor Rule 37(c)(1) sets a particular deadline for seeking discovery sanctions. Without any formal deadline, the Court would need to see a truly gratuitous delay to find unreasonableness. Compared to six weeks, which the Court found to be reasonable in its July 9, 2021 order (Doc. 329 at 23), a four-month delay still pales in comparison to GoDaddy's citations of two-year and fifteen-month delays. *E.E.O.C. v. Am. Home Furnishings*, 220 F. App'x 704, 706 (9th Cir. 2007); *Silver State Intell. Techs., Inc. v. Garmin Int'l, Inc.*, 2015 WL 2152658, at *7 (D. Nev. 2015).

### 4.   Lesser Sanction

GoDaddy asks the Court to narrow its sanction to avoid prematurely limiting GoDaddy's ability to use the calculations set forth in the George report. (Doc. 368 at 17.) SiteLock describes this as "procedural gamesmanship." (Doc. 393 at 11.)

It is unclear whether the parties are meaningfully at odds here.  SiteLock has asked the Court to prevent GoDaddy from pursuing its bundling theories as part of an attempt to set-off SiteLock's damages.  The Court is granting that request.  The Court is *not* preventing GoDaddy from using the George report in every imaginable context.

At any rate, and in order to avoid unnecessary disputes, the Court clarifies that GoDaddy is forbidden from using its bundling theories, or any creative rebranding of them, as a basis for an affirmative defense.  If SiteLock feels that GoDaddy is sneaking an excluded theory into a new package, SiteLock can raise an appropriate objection.

III.     GoDaddy's Motion To Exclude

One of SiteLock's experts in this case is Dr. Steven Kursh.  In his primary report, Dr. Kursh explains that he was retained "to opine on two independent categories of questions."  (Doc. 308-9 ¶ 16.)  "The first category of questions pertains to the customs, standards, and practices in the industry for Service as a Software ('SaaS').  Specifically . . . [1] How did GoDaddy's payment and reporting practices in its business relationship with SiteLock compare to customs and practices regarding payment and reporting in the SaaS industry?" and [2] "How did GoDaddy's promotion of SiteLock during the parties' business relationship compare to customs, practices, and standards regarding promotion by a reseller in the SaaS industry?"  (*Id.* ¶ 17.)  On those issues, Dr. Kursh's ultimate opinions are [1] "GoDaddy's payment and reporting practices in its relationship with SiteLock were not consistent with the software industry and, specifically, SaaS customs, practices, and standards for payment and sales reporting in a reseller relationship"; and [2] "GoDaddy's actions with respect to SiteLock after March 2017 did not comport with the customs and practices of the software industry and, specifically, the customs, standards, and practices for marketing and promotion by a reseller."  (*Id.* ¶¶ 60-61.)  Meanwhile, "[t]he second, independent category of questions pertains to the calculation of damages in this case."  (*Id.* ¶ 18.)  When addressing those questions, Dr. Kursh "calculated damages using several different scenarios and assumptions provided by counsel."  (*Id.*)  Dr. Kursh's ultimate opinion, "using factual assumptions provided by counsel," is that "SiteLock's damages are

between $25,841,892 and $51,595,382, depending on the specific assumptions and scenarios employed." (*Id.* ¶ 62.)[19]

Additionally, after GoDaddy's expert, Mr. George, issued a report setting forth various calculations regarding GoDaddy's set-off/recoupment theories, Dr. Kursh issued a rebuttal report. (Doc. 358-2.) In the rebuttal report, Dr. Kursh offers various criticisms of George's calculations, assumptions, and methodologies.

GoDaddy has now moved to preclude Dr. Kursh from presenting certain opinions at trial. (Docs. 356, 357.) For the following reasons, GoDaddy's motion is denied.

## A.   **Legal Standard**

"The party offering expert testimony has the burden of establishing its admissibility." *Bldg. Indus. Ass'n of Washington v. Washington State Bldg. Code Council*, 683 F.3d 1144, 1154 (9th Cir. 2012). Rule 702 of the Federal Rules of Evidence governs the admissibility of expert testimony. It provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a)   the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b)   the testimony is based on sufficient facts or data;
>
> (c)   the testimony is the product of reliable principles and methods; and
>
> (d)   the expert has reliably applied the principles and methods to the facts of the case.

As for the threshold requirement that an expert witness be qualified "by knowledge, skill, experience, training, or education," "Rule 702 'contemplates a broad conception of expert qualifications.'" *Hangarter v. Provident Life & Acc. Ins. Co.*, 373 F.3d 998, 1015 (9th Cir. 2004) (citation and emphasis omitted). Years of relevant experience can establish

---

[19]   Dr. Kursh also issued a reply report following the issuance of the report of GoDaddy's expert, Mr. George. (Doc. 358-3.) In the reply report, Dr. Kursh explains why he "disagree[s] with the vast majority of the assertions in Mr. George's report" (*id.* ¶ 9); offers, "[i]n a few instances," revised damages calculations "to account for" George's criticisms (*id.* ¶ 10); and performs certain "alternative damages calculations based on [George's preferred] methodologies and assumptions" (*id.* ¶ 11).

the necessary "minimal foundation."  *Id.* at 1015-16 (finding that twenty-five years of working as an independent consultant and an expert witness in the insurance industry satisfied the "minimal foundation" necessary to provide expert testimony).  "Disputes as to the strength of [an expert's] credentials . . . go to the weight, not the admissibility, of his testimony." *Kennedy v. Collagen Corp.*, 161 F.3d 1226, 1231 (9th Cir. 1998).

A district court's decision to admit or exclude expert testimony is guided by a two-part test that focuses on the opinion's relevance and reliability.  *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993).  "The inquiry envisioned by Rule 702 is . . . a flexible one."  *Id.* at 594.  "The focus, of course, must be solely on principles and methodology, not on the conclusions that they generate."  *Id.* at 595.

Evidence is relevant if it "has any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.'"  *Id.* at 587 (quoting Fed. R. Evid. 401).  "The Rule's basic standard of relevance thus is a liberal one."  *Id.*

The basic standard of reliability is similarly broad.  "Shaky but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion."  *Primiano v. Cook*, 598 F.3d 558, 564 (9th Cir. 2010).  "Basically, the judge is supposed to screen the jury from unreliable nonsense opinions, but not exclude opinions merely because they are impeachable."  *Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*, 738 F.3d 960, 969 (9th Cir. 2013).  *See also* Fed. R. Evid. 702, advisory committee note to 2000 amendments ("[P]roponents do not have to demonstrate to the judge by a preponderance of the evidence that the assessments of their experts are correct, they only have to demonstrate by a preponderance of evidence that their opinions are reliable . . . .  The evidentiary requirement of reliability is lower than the merits standard of correctness.") (citation and internal quotation marks omitted).

Nevertheless, courts serve an important "gatekeeper" role when it comes to screening expert testimony.  *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 142 (1997).  "Unlike an ordinary witness, . . . an expert is permitted wide latitude to offer opinions, including

those that are not based on firsthand knowledge or observation." *Daubert*, 509 U.S. at 592. "Presumably, this relaxation of the usual requirement of firsthand knowledge . . . is premised on an assumption that the expert's opinion will have a reliable basis in the knowledge and experience of his discipline." *Id.* This "general 'gatekeeping' obligation . . . applies not only to testimony based on 'scientific' knowledge, but also to testimony based on 'technical' and 'other specialized' knowledge." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141 (1999).

The Court has "broad discretion," both in deciding whether the evidence is reliable and in deciding how to test for reliability. *United States v. Hankey*, 203 F.3d 1160, 1168 (9th Cir. 2000). In *Daubert*, the Supreme Court listed various factors that might be applicable, including whether the expert's technique or theory (1) can be tested; (2) has been peer reviewed or published; (3) has a known or potential basis for error; and (4) is generally accepted in the pertinent scientific community. 509 U.S. at 593-94. However, "[t]he *Daubert* factors were not intended to be exhaustive nor to apply in every case." *Hankey*, 203 F.3d at 1168. In particular, "[t]he *Daubert* factors . . . simply are not applicable to [testimony] whose reliability depends heavily on the knowledge and experience of the expert, rather than the methodology or theory behind it." *Id.* at 1169. *See also* R. Evid. 702, advisory committee note to 2000 amendments ("Some types of expert testimony will be more objectively verifiable, and subject to the expectations of falsifiability, peer review, and publication, than others. Some types of expert testimony will not rely on anything like a scientific method, and so will have to be evaluated by reference to other standard principles attendant to the particular area of expertise."). The bottom line is that "[t]he trial judge in all cases of proffered expert testimony must find that it is properly grounded, well-reasoned, and not speculative before it can be admitted. The expert's testimony must be grounded in an accepted body of learning or experience in the expert's field, and the expert must explain how the conclusion is so grounded." *See* Fed. R. Evid. 702, advisory committee note to 2000 amendments.

…

1

2

    **B.**    **Customs and Practices**

        i.    The Parties' Arguments

GoDaddy objects to both of Dr. Kursh's opinions related to GoDaddy's non-compliance with the customs and practices ("C&P") of the SaaS industry. (Doc. 357 at 3.)

First, GoDaddy argues that Dr. Kursh's C&P opinions are supported "[o]nly by Dr. Kursh's *ipse dixit*" and lack a discernable or reliable methodology. (*Id.* at 3-5.) Second, GoDaddy argues that Dr. Kursh impermissibly opines on the legal meaning of the Reseller Agreement rather than limiting himself to the meaning of his industry's "terms of art." (*Id.* at 5-7.) Third, GoDaddy argues that Dr. Kursh's C&P opinions are irrelevant because they are based on inapposite factual assumptions and contradict SiteLock's other concessions. (*Id.* at 8-9.)

SiteLock responds that Dr. Kursh did, in fact, identify "resources for his opinion on payment practices" and "industry literature for his opinion on reseller promotion" and that Dr. Kursh's overall methodology falls "well within the realm of reliable and admissible evidence." (Doc. 382 at 13-14.) SiteLock also argues that Dr. Kursh "expressly disclaims" any interpretation of the Reseller Agreement's meaning and "simply offers opinions about how reseller agreements generally work in the SaaS industry." (*Id.* at 15.) Finally, SiteLock asserts that GoDaddy's relevance arguments are "pure semantics," "dispute[s] on contract interpretation," and "disputes [on] Dr. Kursh's opinion," and thus do not qualify as a basis to exclude Dr. Kursh's testimony. (*Id.* at 15-16.)

GoDaddy replies that several aspects of Dr. Kursh's C&P opinions should be excluded because SiteLock failed to defend them. (Doc. 399 at 1.) GoDaddy also argues that "SiteLock's inability to establish a link between Dr. Kursh's personal experience and his ultimate opinions . . . provides ample grounds for exclusion under [FRE] 702." (*Id.* at 2.) Finally, GoDaddy reasserts that Dr. Kursh's opinions are "untethered from any disputed contractual term or clause in the Reseller Agreement." (*Id.* at 3-6.)

…

…

1          ii.     <u>Analysis</u>

2          GoDaddy's first argument is essentially that Dr. Kursh's C&P opinions are

3 unreliable because they lack a discernable or reliable methodology.

4          "The trial judge must have considerable leeway in deciding in a particular case how

5 to go about determining whether particular expert testimony is reliable." *Kumho Tire Co.*,

6 526 U.S. at 152. Here, Dr. Kursh's extensive experience in the SaaS industry provides a

7 sufficient foundation for the reliability of his C&P opinions and the methodology

8 underlying them. In his report, Dr. Kursh explains that he has "thirty years of applied and

9 practical experience in the computer, high technology, and business fields," including

10 serving as the founder and present of an enterprise software company (Doc. 308-9 ¶ 29);

11 that, in his capacity as the president and founder of that software company, he "was directly

12 involved in negotiating and implementing business relationships with other software

13 vendors where [his] company was a reseller of those software products" (*id.* ¶ 30); and that

14 since selling that company, he has focused on "academic research, teaching, and

15 consulting," which work has caused him to be "directly involved in negotiating, reviewing,

16 and executing (*i.e.,* implementing) hundreds of contracts covering software and e-

17 commerce licenses," some of which "have included provisions regarding payments

18 between the parties . . . and promotional/sales activities consistent with industry customs

19 and practices (*id.* ¶¶ 33-35). Dr. Kursh asserts that, based on these experiences in the SaaS

20 industry, he has become "very familiar with the variety of reseller relationships in the

21 marketplace," as well as "the way[s] in which the reseller and the SaaS company share[]

22 revenue" (*id.*¶¶ 89-90); that, "[i]n [his] experience, it is more common for resellers and

23 SaaS companies to enter into a 'revenue share' agreement whereby the reseller and SaaS

24 company 'share' the revenue received from each product the reseller sold" (*id.* ¶ 91); that,

25 in contrast, "it is not common for a reseller engaged in a revenue share agreement with a

26 SaaS company to make a sale, collect revenue, and not provide any of that revenue to its

27 SaaS partner," and indeed he is "not aware of any SaaS industry or, more broadly, any

28 software industry literature that contemplates a reseller relationship whereby payment

would depend on some subsequent act by the customer after the customer has paid for the software" (*id.* ¶ 93); and, thus, that "GoDaddy's practice of withholding payment until a customer activated SiteLock's product was contrary to industry custom and practice as to revenue share arrangements between resellers and software developers or SaaS companies" (*id.* ¶ 114).  Dr. Kursh offers similar opinions regarding GoDaddy's efforts to promote SiteLock's products after obtaining Sucuri, asserting that his experience has made him familiar with "several methods of promotion that are common in the SaaS industry," that he is "not aware of any evidence that GoDaddy intentionally pursued any of these promotional methods (or any other promotional methods) in the months following the Sucuri acquisition," and thus "that GoDaddy's promotion of SiteLock did not align with industry custom and practice."  (*Id.* ¶ 150.)

This sort of experienced-based testimony is admissible under Rule 702, *see generally Hankey*, 203 F.3d at 1168-69, and Dr. Kursh has expressly (and adequately) explained how his experience led him to the conclusions he has reached—in the case of his first opinion, because he has never before seen a company act in the manner that GoDaddy acted.  Thus, although it is true that "[e]xperts must follow some discernable methodology, and may not be a black box into which data is fed at one end and from which an answer emerges at the other," *GPNE Corp. v. Apple, Inc.*, 2014 WL 1494247, *4 (N.D. Cal. 2014) (citations and internal quotation marks omitted), that simply isn't the case here.

Nor is there any merit to GoDaddy's contention that Dr. Kursh's C&P opinions are "attorney argument dressed in the guise of 'custom and practice.'"  (Doc. 357 at 6.) Without a doubt, "[t]he interpretation of a contract is an issue of law," and "[e]xpert testimony is not proper for issues of law."  *Crow Tribe of Indians v. Racicot*, 87 F.3d 1039, 1045 (9th Cir. 1996).  GoDaddy has also identified cases in which Dr. Kursh was prevented from offering certain opinions about how a jury should interpret a contract.  *See, e.g.*, *Actuate Corp. v. Aon Corp.*, 2012 WL 2285187, *3-4 (N.D. Cal. 2012) (allowing Dr. Kursh to offer some opinions but noting that he would "likely be precluded from testimony about the particular contracts and conduct at issue in this action"); *Dolby Labs. Licensing Corp.*

- 56 -

*v. Adobe Inc.*, 2019 WL 6327210, *2-3 (N.D. Cal. 2019) (allowing Dr. Kursh to present some opinions but not others); *Fair Isaac Corp. v. Fed. Ins.*, 447 F. Supp. 3d 857, 872-74 (D. Minn. 2020) (precluding Dr. Kursh from opining that, because it was industry custom to "limit territorial scope in the license grant" and the parties' agreement did not contain such a limitation, it was apparent that "the parties' License Agreement does not contain territorial restrictions"). But here, the challenged C&P opinions do not purport to tell the jury how to interpret the contracts at issue. At most, they suggest that GoDaddy's proposed interpretation of certain terms would be contrary to industry custom and practice.

For this reason, GoDaddy's relevance objection is unavailing. "Arizona law supports . . . reliance on custom and usage . . . to assist in the interpretation of the contract, or to prove the usages and customs in relation to which the parties contracted, thus allowing the addition of consistent terms of performance or the definition of words used in the contract." *L.K. Comstock & Co., Inc. v. United Engineers & Constructors, Inc.*, 880 F.2d 219, 223 (9th Cir. 1989) (citations and internal quotation marks omitted). Thus, Dr. Kursh's challenged C&P opinions may be relevant and useful to the jury in understanding the meaning of the disputed contractual terms. Even if, as GoDaddy contends, those opinions are difficult to reconcile with some of the other positions SiteLock has taken in this case (Doc. 357 at 6-7), such potential for contradiction and impeachment goes to the weight the jury may assign to Dr. Kursh's opinions, not their relevance and admissibility.

C.   **Damages**

      i.   <u>The Parties' Arguments</u>

GoDaddy seeks to exclude Dr. Kursh's damages opinions concerning "SiteLock's entitlement to fees for unactivated SiteLock products and lost profits related to GoDaddy's alleged breach of its 'endeavor to promote' obligation [and] a purported calculation of GoDaddy's profits from sales of Sucuri products . . . ." (Doc. 357 at 9-10.) First, GoDaddy asserts that those opinions are unreliable because Dr. Kursh impermissibly relied on "assumptions provided by counsel" and "instruction[s]" or "request[s]" by SiteLock's counsel. (*Id.* at 10-12.) Second, GoDaddy argues that Dr. Kursh's opinion concerning the

damages associated with the "endeavor to promote" claim must be excluded because it is speculative, he did not consider "obvious alternate explanations" for the decline in SiteLock's sales, and because his "imprecise, speculative damages calculation . . . renders the methodology used to calculate damages unreliable." (*Id.* at 12-14.) Third, GoDaddy asserts that Dr. Kursh's calculation of Sucuri profits amounts to little more than "simple math calculations" that are not "a specialized form of knowledge that a jury lacks." (*Id.* at 14-15.)

In response, SiteLock asserts that Dr. Kursh's methodology is reasonable and reliable because it is based on the "before-and-after" method, which has been upheld by Arizona courts. (Doc. 382 at 4-5.) Next, SiteLock argues that GoDaddy's "obvious alternate expectations" argument is a repackaging of GoDaddy's disagreement with Dr. Kursh's assumptions, which is generally not a basis for the exclusion of expert testimony. (*Id.* at 5-8.) SiteLock also asserts that GoDaddy has confused the standard for exclusion of a causation expert, which Dr. Kursh is not, with the standard for exclusion of a damages expert. (*Id.* at 8.) Next, SiteLock argues that counsel's assistance does not render Dr. Kursh's opinions unreliable because Dr. Kursh "directed and controlled all of the grunt work performed by counsel" and "reviewed and checked all of SiteLock's counsel's grunt work before incorporating it into his report." (*Id.* at 10-11.) Finally, SiteLock disputes the notion that Dr. Kursh "destroyed" documents, recharacterizing his behavior as "occasionally perform[ing] 'manual checks' of numbers using the Excel equivalent of scratch paper, and . . . he did not always keep these back-of-the-napkin checks. But Dr. Kursh's report discloses all of the facts and data he considered, the assumptions he relied on, the formulas he used to calculate damages." (*Id.* at 12.)

In reply, GoDaddy argues that SiteLock has failed to carry its burden of proving the admissibility of Dr. Kursh's damages calculations. (Doc. 399 at 6-7.) GoDaddy also argues that Dr. Kursh's "endeavor to promote" damage calculations depend on a faulty assumption: that, under the Reseller Agreement, GoDaddy was required to promote SiteLock "as it had in the past." (*Id.* at 7.) GoDaddy asserts that even SiteLock has

1  abandoned this theory, and this alone warrants exclusion.  (*Id.*)  Finally, GoDaddy reasserts

2  that Dr. Kursh's opinion is unreliable and speculative because it relies on a variety of

3  "incredible" assumptions.  (*Id.* at 8-10.)

4          ii.     Analysis

5          GoDaddy's objections to Dr. Kursh's damages opinions are unpersuasive.  First, Dr.

6  Kursh's "reliance on assumptions provided by counsel . . . is not a bar to [his] testimony.

7  As [Dr. Kursh] is serving as a damages expert for [SiteLock], it would be incongruous for

8  [Dr. Kursh] to assume a set of facts in conflict with [SiteLock's] case."  *United States v.*

9  *Pac. Health Corp.*, 2018 WL 1026361, *4 (C.D. Cal. 2018) (citations and internal

10  quotation marks omitted).  SiteLock reasonably asked Dr. Kursh to assume facts that align

11  with its view of the controversy.  (*See, e.g.*, Doc. 308-9 ¶ 176 ["I was asked to assume that

12  GoDaddy's failure to report a SiteLock subscription effectively deprived SiteLock of the

13  ability to make a direct sale to the customer who owned the domain."].)[20]  Similarly, the

14  challenged "instructions" are in keeping with Dr. Kursh's role as an expert who was hired

15  to respond to SiteLock's inquiries.  (*See, e.g.*, Doc. 308-9 ¶ 161 ["At the instruction of

16  counsel, I reviewed GoDaddy's SiteLock Data PDF to determine the number of standalone

17  subscriptions that GoDaddy did not report to SiteLock or pay for."].)  Finally, Dr. Kursh's

18  reliance on SiteLock's counsel to perform "grunt work" is not cause for exclusion.  "Courts

19  have generally found that as long as the substance of the opinion expressed in a report is

20  from the expert, the attorney's involvement in preparing the report does not render it

21  inadmissible."  *Pat. Category Corp. v. Target Corp.*, 2008 WL 11336468, *2 (C.D. Cal.

22  2008).  Here, Dr. Kursh testified that he "designed the methodology" for his calculations,

23  "developed the formulas," and "review[ed]" and "checked" the work that SiteLock's

24  counsel produced.  (Doc. 383-5 at 13, 14, 17, 23 ["[T]he analogy [I] gave earlier about

25  laying brick by brick, that I designed the house.  I laid bricks as well.  I also checked to

26

27  [20]     Compare this to Mr. George's analogous testimony that "Counsel has asked us to
assume that a 'sale' per the Reseller Agreement is defined in the same manner as GoDaddy
28  defines the term 'sale,' which we understand to be a financial transaction where a customer
gave money to GoDaddy for a SiteLock product."  (Doc. 319-4 at 9.)

make sure the bricks are built correctly.  So in response to the, quote, grunt work, it's bringing in a lot of data.  And it's also, very importantly, checking what you do."].)

None of these assumptions or instructions raise the concerns that prompted exclusion in *Therasense, Inc. v. Becton, Dickinson & Co.*, 2008 WL 2323856 (N.D. Cal. 2008).  There, as quoted by GoDaddy, the court observed that "[o]ne of the worst abuses in civil litigation is the attempted spoon-feeding of client-prepared and lawyer-orchestrated 'facts' to a hired expert who then 'relies' on the information to express an opinion."  *Id.* at *1.  However, the expert's opinion in that case rested on experiments conducted entirely by the plaintiff's employees, which the expert did not "participate in, observe, or supervise."  *Id.* at *3.  The defendant was not permitted to question the employees who participated in the experiments and the results of the experiment only surfaced "after the close of fact discovery."  *Id.* For these reasons, the court determined that the expert lacked foundation to use the experimental results in his testimony.  *Id.*  The challenged rudimentary mathematical calculations performed by SiteLock's counsel but supervised by Dr. Kursh do not remotely rise to this level.

Next, Dr. Kursh's "endeavor to promote" damages opinion is not subject to exclusion because, as a damages expert, he was only required to make *reasonable* assumptions about causation.  *See, e.g.*, *Airhawk Int'l, LLC v. Ontel Prods. Corp.*, 2020 WL 10321726, *9 (S.D. Cal. 2020).  Dr. Kursh clarified in his rebuttal report that, despite his best efforts, he was unable to identify any factors other than GoDaddy's alleged misconduct that might have led to the "steep decline" in SiteLock's revenues.  (Doc. 358-3 ¶ 114 ["I closely reviewed documents and testimony concerning the GoDaddy-SiteLock relationship to determine whether any other events might have contributed to the steep decline in SiteLock's revenues through GoDaddy after May 2017.  This review did not reveal any other factors that might have materially contributed to this decline, and [GoDaddy's expert] identifies none."].)   The Court acknowledges that, during oral argument, GoDaddy's counsel identified an array of reasons why Dr. Kursh's assumptions related to his endeavor-to-promote damage calculations may be subject to challenge.

1    Although a relatively close call, the Court concludes that these sorts of challenges are best

2    explored through cross-examination and doe not provide a basis for precluding Dr. Kursh

3    from providing his endeavor-to-promote damage opinions in the first instance.  After all,

4    "[o]bjections to assumptions for a lost profit analysis are generally issues for the jury in

5    weighing evidence."  *ICTSI Oregon, Inc. v. Int'l Longshore & Warehouse Union*, 442 F.

6    Supp. 3d 1329, 1361 (D. Or. 2020).  *See also Humetrix, Inc. v. Gemplus S.C.A.*, 268 F.3d

7    910, 919 (9th Cir. 2001) (suggesting that "criticisms of an expert's method of calculation

8    [are] a matter for the jury's consideration in weighing that evidence" unless the method is

9    "inherently improbable") (citation omitted).  It was not unreasonable for Dr. Kursh to

10    assume that, had GoDaddy not ceased its promotional activities, SiteLock's sales would

11    have continued to grow at a comparable rate over the short period at issue.[21]  Although it

12    is of course possible that SiteLock's profits wouldn't have continued to grow, GoDaddy

13    will have the opportunity to make that case before the jury.

14        Finally, Dr. Kursh's Sucuri opinions are not subject to exclusion.  As an initial

15    matter, it is simply not true, as GoDaddy asserts, that "SiteLock failed to oppose

16    GoDaddy's Motion with respect to the admissibility of . . . Dr. Kursh's purported

17    calculation of Sucuri's profits, as set forth in Paragraphs 224-228 of his Initial Report."

18    (Doc. 399 at 1.)  SiteLock opposed GoDaddy's motion as to Dr. Kursh's calculation of

19    Sucuri profits in footnote 7 of its response brief (Doc. 382 at 9 n. 7) and explained the basis

20    for Dr. Kursh's gross profit margin calculation throughout its brief.

21        On the merits, Dr. Kursh's assumption of an 85% gross profit margin appears to be

22    reasonable—GoDaddy's own expert believes that SiteLock's "company-wide" profit

23

24    ------

[21]    Compare Dr. Kursh's extension of the *status quo ex ante* with expert opinions that

25    were excluded because of their "incredible" assumptions: for instance, an expert who argued that demand for a company's products would remain the same for a decade, without

26    accounting for the recent 2008 financial crisis.  *Fail-Safe, LLC v. AO Smith Corp.*, 774 F. Supp. 2d 870, 891 (E.D. Wisc. 2010).  Also consider an expert whose testimony required

27    the presumption that a "publication could instantaneously achieve full penetration into dozens of geographic zones in which no sales effort had even begun [by the time] the contract term was already well over half completed." *Target Mkt. Pub., Inc. v. ADVO, Inc.*,

28    136 F.3d 1139, 1144 (7th Cir. 1998).  These cases reflect that while an expert may dabble in some degree of magical realism when making a projection, he may not veer into fantasy.

1    margin would be closer to 90%.  (Doc. 319-5 at 30.)  As for GoDaddy's contention that

2    multiplying revenue by 85% is a "simple math calculation" that does not require expert

3    testimony, the Court doesn't necessarily disagree but still concludes that Dr. Kursh's

4    calculations may be useful to the jury.

        D.    **Rebuttal Opinions**

              i.    <u>The Parties' Arguments</u>

7          As noted, after GoDaddy's expert, Mr. George, issued a report concerning

8    GoDaddy's set-off/recoupment theories, Dr. Kursh issued a rebuttal report.  (Doc. 358-2.)

9          GoDaddy moves to exclude the opinions expressed in the rebuttal report on the

10   ground that they are not true rebuttal but instead "entirely new opinions, far outside the

11   scope of Mr. George's calculations, concerning factual bases of GoDaddy's affirmative

12   defenses."  (Doc. 357 at 15.)  GoDaddy identifies the challenged opinions as: (1) "products

13   that SiteLock sold through resellers other than GoDaddy were, in fact, different than the

14   subscriptions that SiteLock sold through GoDaddy," (2) "the economic arrangements of

15   the agreements between SiteLock and other resellers . . . were materially different than the

16   agreements between SiteLock and GoDaddy," and (3) "GoDaddy customers never

17   obtained a SiteLock product for free."  (*Id.* at 15-17.)

18         SiteLock responds that, under the case management order, "responsive expert

19   reports are not limited to 'rebutting' the other party's expert," but in any event, "Dr.

20   Kursh's opinions directly rebut Mr. George's calculations by 'challenging the

21   assumptions' underlying them."  (Doc. 382 at 217.)

22         In reply, GoDaddy "stands on the arguments and authorities set forth in its Motion"

23   and submits that "since the filing of the Motion," Mr. Serani's declaration has provided

24   "further evidence supporting the unreliability of the opinions offered by Dr. Kursh in his

25   Rebuttal Report."  (Doc. 399 at 10-11.)

              ii.    <u>Analysis</u>

27         In a nutshell, GoDaddy objects to Dr. Kursh's rebuttal opinions directed at Mr.

28   George's set-off/recoupment calculations.  First, Dr. Kursh disputes Mr. George's premise

1   that SiteLock did, in fact, sell identical products to other resellers and explains why those

2   software packages were distinct.  (Doc. 358-2 ¶¶ 10-69.)  Second, Dr. Kursh disputes Mr.

3   George's assumption that including a SiteLock subscription in a bundle sold to GoDaddy

4   customers renders the SiteLock subscription "free" and explains why such an assumption

5   contravenes his understanding of the SaaS promotional system.  (*Id.* ¶¶ 70-81.)[22]

6       "Challenging the assumptions of an expert witness' report is a permissible topic of

7   rebuttal testimony. . . .  [Q]uestioning methodology, and opining on methods and facts [the

8   initial] experts did not consider are precisely the type of rebuttal testimony [that] court[s]

9   would expect."  *Smilovits v. First Solar, Inc.*, 2019 WL 6875492, *13 (D. Ariz. 2019)

10  (citation and internal quotation marks omitted).  Dr. Kursh's rebuttal opinions directly

11  attack the assumptions that Mr. George made throughout his report.  As a result, the Court

12  will not exclude those opinions.[23]

13      E.   **Factual Narratives**

14          i.   The Parties' Arguments

15      GoDaddy asks the Court to exclude "Dr. Kursh's improper factual narratives

16  including those set forth in his Initial Report at Paragraphs 114-143."  (Doc. 357 at 17.)

17      SiteLock responds that "Dr. Kursh's descriptions of GoDaddy's payment practices

18  and promotion of SiteLock (before and after acquiring Sucuri) will assist the jury in

19  understanding Dr. Kursh's opinions that these practices did not comport with SaaS industry

20  customs.  Unlike the experts in GoDaddy's cited cases . . . Dr. Kursh does not discuss the

21  record evidence 'solely for the purpose of constructing a factual narrative.'"  (Doc. 382 at

22  16.)

23      GoDaddy does not reply.

24      …

25      …

---

26  [22]   Dr. Kursh also disputes Mr. George's assumption that SiteLock failed to apply a
27  20% discount for multi-year offerings (Doc. 358-2 ¶¶ 82-90), but that issue is moot now
    that GoDaddy has been precluded from advancing its bundling theories at trial.

28  [23]   Even if Serani's declaration conflicts with Dr. Kursh's opinion, such conflict is
    better resolved via cross-examination than via a motion to exclude.

ii.   <u>Analysis</u>

It is true that "[a]n expert cannot be presented to the jury solely for the purpose of constructing a factual narrative based upon record evidence." *In re Fosamax Prods. Liab. Litig.,* 645 F. Supp. 2d 164, 192 (S.D.N.Y. 2009).  But here, constructing a factual narrative was not the "sole purpose," or even the primary purpose, of the challenged portions of Dr. Kursh's report.  Dr. Kursh set forth relevant portions of the record that will help the jury understand his opinions.  *Cf. In re Ethicon, Inc.*,  2014 WL 186872, *16 (S.D.W.V. 2014).  Thus, the Court will not exclude Dr. Kursh's factual narrative.

Accordingly,

**IT IS ORDERED** that:

1.   GoDaddy's motion for summary judgment (Doc. 340) is **granted in part** and **denied in part**.

2.   SiteLock's motion for partial summary judgment (Doc. 341) is **granted in part** and **denied in part**.

3.   SiteLock's motion for sanctions (Doc. 348) is **granted**.

4.   GoDaddy's motion to exclude (Doc. 356) is **denied.**

Dated this 2nd day of March, 2022.

Dominic W. Lanza
United States District Judge