**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| SiteLock LLC, | No. CV-19-02746-PHX-DWL |
| Plaintiff, | **ORDER** |
| v. | |
| GoDaddy.com LLC, | |
| Defendant. | |

Pending before the Court are (1) GoDaddy's motion to dismiss for lack of subject-matter jurisdiction (Doc. 579); (2) SiteLock's motion to enforce the Court's October 31, 2022 order and to set a trial date (Doc. 597); and (3) GoDaddy's motion to compel (Doc. 598).

For the following reasons, GoDaddy's motion to dismiss is denied and the other two motions are granted in part and denied in part.

## RELEVANT BACKGROUND

The history of this case, which has been pending for over four years, is familiar to the parties and laid out in previous orders. (*See, e.g.*, Doc. 435.) In a nutshell, in 2013, SiteLock and GoDaddy entered into a contract (the "Reseller Agreement")[1] under which GoDaddy agreed to market and sell SiteLock's website security services to GoDaddy's customers. In this action, SiteLock accuses GoDaddy of various contractual breaches, as

---

[1]    SiteLock and GoDaddy also executed several addenda to the Reseller Agreement. (*See, e.g.*, Doc. 1-3.) For purposes of this order, the Court uses the term "Reseller Agreement" to refer collectively to the initial agreement and related addenda.

well as Lanham Act and state-law violations.  (*See generally* Doc. 562.)

In April 2018 (a year before this litigation began), SiteLock's parent company, Innovative Business Services, LLC ("IBS"), entered into a securities purchase agreement (the "SPA") with SiteLock Intermediate Holdings, LLC ("SIH").  (Doc. 607-1 [SPA]; Doc. 583-4 at 4 ["SiteLock is a subsidiary of IBS."].)  SIH, in turn, was affiliated with an investment fund known as "ABRY."[2]  Pursuant to the SPA, SIH acquired "all of the equity" of IBS.  (Doc. 594-1 ¶ 2; Doc. 607-1.)  Immediately following the transaction, SiteLock was a "wholly-owned, indirect subsidiary" of SIH and "remained a wholly-owned, direct subsidiary" of IBS.  (Doc. 594-1 ¶ 2.)[3]  Neill Feather and Thomas Serani both signed the SPA as "Members" (*i.e.*, "holders of options to purchase membership interests" of IBS listed in Annex II) on behalf of Unitedweb Holdings, LLC ("Unitedweb Holdings").  (Doc. 607-1 at 6, 59-60.)[4]  At relevant times, Serani was SiteLock's "Chief Channel Officer"; in this role, Serani "was responsible for managing SiteLock's relationship with GoDaddy throughout the entirety of that contractual relationship."  (Doc. 371-1 ¶ 1.)  Feather is the "co-founder and former Chief Innovation Officer" of SiteLock.  (Doc. 595 ¶ 1.  *See also* Doc. 66 ¶ 1 [Feather averring, as of June 19, 2020: "I am the co-founder and Chief Innovation Officer of SiteLock"].  *But see* Doc. 583-4 at 5 [Feather testifying "I was the president of SiteLock and IBS"].)

On April 30, 2019, SiteLock initiated this action against GoDaddy.  (Doc. 1.)

At some point during discovery, SiteLock produced the schedules to the SPA (the

---

[2]     It appears two entities existed: "ABRY Partners, LLC and ABRY Partners II, LLC." (Doc. 594 at 2 n.1.)  GoDaddy asserts that SiteLock assigned legal claims to "Abry Partners, LLC . . . when Abry acquired SiteLock."  (Doc. 579 at 1.)  However, SiteLock describes the 2018 SPA transaction as between IBS (SiteLock's parent company) and SIH ("an entity affiliated with funds managed by ABRY Partners II, LLC").  (Doc. 594 at 1-2.)  In the SPA itself, in the "Notices" section of Annex III, SIH's address begins with "c/o ABRY Partners II, LLC."  (Doc. 607-1 at 81.)  The deposition testimony from Feather refers only to "ABRY."  (Doc. 367-11 at 13, 15.)  In its response, SiteLock collectively refers to both ABRY Partners, LLC and ABRY Partners II, LLC as "ABRY."  (Doc. 594 at 2 n.1.)  For ease of reference, the Court will do the same.

[3]     In April 2019, when the lawsuit was filed, SiteLock identified itself as a subsidiary of SIH, but not of IBS.  (Doc. 2 at 2.)

[4]     Unitedweb Holdings owned the majority of shares of IBS at the time the SPA was executed.  (Doc. 79-2 at 10, 51.)

"SPA Schedules") but not the SPA itself.  (Doc. 491.)

On February 5, 2021, GoDaddy deposed Feather as SiteLock's Rule 30(b)(6) representative.  (Doc. 367-11 at 1.)   During the deposition, the following exchange occurred:

> GoDaddy:   Did SiteLock assign its claims against GoDaddy to ABRY as part of ABRY's acquisition of SiteLock?
>
> SiteLock:   Objection.  Calls for legal conclusion.  Calls for speculation.
>
> Feather:   SiteLock assigned all of its rights under its contracts to ABRY at the time of acquisition.  When they acquired the business, they acquired the contracts as well.

(*Id.* at 13.)  After the transcript of the deposition became available, SiteLock did not submit any corrections pursuant to Rule 30(e).

On March 22, 2022, the Court set a trial date of November 1, 2022.  (Doc. 444.)

In the weeks leading up to the trial date, the parties exchanged drafts of the proposed final pretrial order.  (Doc. 543 at 1.)  During this process, GoDaddy raised (for the first time) the issue of subject-matter jurisdiction, asserting that SiteLock "may" lack standing based on Feather's deposition testimony.  (Doc. 551 at 3; Doc. 589 at 12.)  In broad strokes, GoDaddy argues that because SiteLock assigned the legal claims asserted in this action to ABRY, SiteLock lacks standing to sue GoDaddy in this action.  (Doc. 562 at 3; Doc. 579.)

On October 10, 2022, in an attempt to refute this claim, SiteLock produced a redacted copy of the SPA.  (Doc. 588 at 8.)

On October 12, 2022, the Court held a status conference.  (Doc. 545.)  During the status conference, GoDaddy's counsel stated: "[I]n our draft, we established that SiteLock likely does not even have standing and they have not even addressed that which is a minimum for this case to go forward.  And so I respectfully suggest that the Court set an order to show cause that SiteLock demonstrate standing with admissible evidence . . . ."  (Doc. 589 at 9.)  GoDaddy then suggested "put[ting] the case off for two months . . . [to] allow the parties to address all of these issues."  (*Id.* at 10.)  In response, SiteLock's counsel stated: "I will say that [GoDaddy's counsel] is wrong that we [did] not respond to their

standing argument which is completely meritless. They don't even actually make a standing argument. They say there may not be standing because of this testimony that is just taken out of context and we actually submitted the document that shows that SiteLock did not assign any claims away . . . . [GoDaddy] had a statement at the front of the [draft] pretrial order that said SiteLock may not have standing because one of our witnesses was asked . . . [if] SiteLock[,] . . . when it was bought by ABRY, did it assign its contract rights? And the witness, who is not lawyer[,] . . . said, yes, they had [as]signed contract rights. That's wrong. . . . We then . . . explained that is not the case and we gave as an exhibit the [SPA] which. . . does not assign contracts. . . . [O]bviously the nonlawyer misspoke and the true fact is that the contracts were not assigned." (*Id.* at 12-13.)[5] Ultimately, the Court declined to delay trial, noting the long history of disputes in this case. (*Id.* at 24.) As for GoDaddy's request for "an order to show cause on standing," the Court invited GoDaddy to file a formal motion to dismiss if GoDaddy deemed it appropriate. (*Id.* at 27 ["I don't have anything before me right now. All I have is a case where a plaintiff has asserted contract and tort claims and[,] . . . typically, standing exists in that scenario. So if you've got your reasons to doubt standing, I just need it to be brought before me. I don't think it's appropriate for me, instead, to issue an order to show cause on it under these circumstances."].)

On October 13, 2022, the parties filed a 305-page joint proposed final pretrial order, which included the following statements:

> GoDaddy respectfully submits this Court may not have subject matter jurisdiction over this matter due to SiteLock's lack of standing. . . . SiteLock's former CEO, Neill Feather, testified as SiteLock's corporate designee under Federal Rule of Civil Procedure 30(b)(6) . . . that "SiteLock assigned all of its rights under its contracts to . . . [ABRY] at the time of acquisition," including any rights to the claims SiteLock has asserted against GoDaddy in this action. . . . [ABRY] was the only entity present at the parties' May 6, 2021 mediation – an event that occurred after Sectigo

---

[5]     The Court then asked: "Did you file a correction to the transcript after the deposition?" (Doc. 589 at 13.) SiteLock's counsel responded: "I didn't realize at the time, Your Honor, that it was wrong. They never raised this until the pretrial order and so we objected [at the deposition] to the question as . . . calling for speculation and calling for a legal conclusion . . . . [I]t's . . . . just factually wrong, Your Honor. There is standing. SiteLock does own the contracts. It still owns the contracts." (*Id.*)

announced its acquisition of SiteLock. . . .  These facts appear to call into question SiteLock's standing to assert the claims at issue, and thus go directly to subject matter jurisdiction. . . .

SiteLock submits that GoDaddy's speculation that SiteLock might lack standing to bring its claims, raised for the first time on the eve of trial, is incorrect.  SiteLock does have standing.  SiteLock is the counterparty to the contracts with GoDaddy and so has standing to sue GoDaddy in that capacity and as a victim of GoDaddy's unfair competition and violation of the Lanham Act.  SiteLock did not assign its claims or its contracts to ABRY.  The purchase agreement for the sale of SiteLock to ABRY . . . contains no assignment of the contracts or claims at issue, which remain at SiteLock.  GoDaddy's questions to Mr. Feather (which SiteLock objected to as seeking a legal conclusion and calling for speculation) do not change the plain language of the purchase agreement, which makes clear that no such assignment occurred.  SiteLock therefore has standing to bring this lawsuit.

(Doc. 551 at 3-4.)

On October 18, 2022, the Court held the final pretrial conference.  (Doc. 561.)  As relevant here, SiteLock's counsel noted that GoDaddy had not filed a motion to dismiss based on a lack of subject-matter jurisdiction.  (Doc. 584 at 140.)  In response, GoDaddy's counsel argued that filing a motion was unnecessary because the proposed pretrial order included "the parties' respective position statements on the issue of standing" and "it was undisputed that this was a live issue for the Court to determine."  (*Id.* at 140-41.)  In response, the Court again invited GoDaddy to file a motion on the issue if GoDaddy deemed it prudent.  (*Id.* at 142.)

On October 24, 2022, GoDaddy moved for Rule 37 sanctions, arguing that the just-produced SPA was responsive to several requests for production ("RFPs") that GoDaddy had served on SiteLock during discovery.  (Docs. 566-68.)  As a remedy, GoDaddy asked the Court to either dismiss SiteLock's trademark claims and establish March 31, 2018 as the termination date of the Reseller Agreement or, alternatively, to continue trial, reopen discovery (to allow GoDaddy to obtain an unredacted copy of the SPA "as well as other documents SiteLock has withheld concerning its negotiations with [ABRY] related to SiteLock's claims in this action" and "to depose SiteLock and its witnesses on these issues"), and "permit GoDaddy to file a supplemental motion for summary judgment based on SiteLock's dispositive admissions in the [SPA]."  (Doc. 566

at 1-2.)

The next day, the Court held a telephonic status conference on GoDaddy's sanctions motion.  (Docs. 572, 588.)  During the conference, SiteLock asserted that the SPA was neither responsive to any of GoDaddy's RFPs nor relevant to the case and that SiteLock had voluntarily produced the SPA "to basically nip [the standing] issue in the bud."  (Doc. 588 at 7-8.)[6]  Ultimately, the Court concluded that GoDaddy's sanctions motion was not "so deficient on its face" as to justify immediate denial and set an expedited briefing schedule.  (*Id.* at  14-15.)

On October 28, 2022, SiteLock filed a response opposing GoDaddy's sanctions motion.  (Doc. 578.)  Among other things, SiteLock noted that, although SiteLock was sold to SIH pursuant to the SPA in 2018, the sale was between IBS and SIH and SiteLock itself "is not a signatory to the SPA."  (*Id.* at 2.)  SiteLock also asserted that the SPA "contains no assignment of the contracts or claims at issue" in this case and, more generally, SiteLock "did not assign its claims or its contracts to ABRY."  (*Id.* at 4-5, citation omitted.)[7]

On October 29, 2022, three days before trial, GoDaddy filed a motion to dismiss for lack of subject-matter jurisdiction.  (Docs. 579-81.)  The motion is now fully briefed. (Docs. 594, 596.)

On October 31, 2022, the Court held a hearing to address several pending motions. (Docs. 587, 593.)  As for GoDaddy's sanctions motion, the Court found that "SiteLock should have produced the SPA earlier, and that the failure to do so was a discovery violation."  (Doc. 593 at 98.)  The Court further found that the violation was neither substantially justified nor harmless.  (*Id.* at 102-06.)  However, the Court also determined the GoDaddy was "overstating the importance of the new information" in the SPA and, thus, the Court was inclined to deny GoDaddy's request to continue trial and instead simply

---

[6]     In contrast, SiteLock argued that the SPA Schedules were responsive and relevant because they "describe [some of] SiteLock's claims against GoDaddy, . . . claim that GoDaddy breached the promotional obligations under the contract[,] . . . [and] describe GoDaddy's purported partial termination of the agreement, and with the trademark aspect as well."  (Doc. 588 at 7.)

[7]     On October 30, 2022, GoDaddy filed a reply supporting its motion for sanctions. (Doc. 582.)

order SiteLock to produce an unredacted copy of the SPA and authorize GoDaddy "to depose Feather and/or Serani to explore the topics raised in the late-disclosed materials" while postponing Feather's and Serani's trial testimony until after their depositions.  (*Id.* at 105-08.)  However, upon hearing the Court's proposed remedy, SiteLock stated that it would prefer a trial continuance to the alternative of postponing Feather's and Serani's trial testimony.  (*Id.* at 108-09.)  Accordingly, the Court vacated the November 1, 2022 trial date and ordered the parties "to meet and confer regarding the timing of the depositions, any request by GoDaddy for further undisclosed documents related to the SPA, and the mechanics of rescheduling the trial date."  (Doc. 587 at 2.)

Afterward, the parties engaged in various discussions about whether and to what extent GoDaddy is entitled to additional discovery but were unable to agree on several issues.  (*See, e.g.*, Docs. 600, 600-1 through 600-6.)

On February 2, 2023, SiteLock filed a motion to enforce the Court's October 31, 2022 order and set a trial date.  (Doc. 597.)  That motion is now fully briefed.  (Docs. 604, 612.)  The same day, GoDaddy filed a motion to compel SiteLock to produce undisclosed documents related to the SPA.  (Docs. 598-600.)  That motion is now fully briefed.  (Docs. 610, 611.)

## DISCUSSION

I.   <u>GoDaddy's Motion To Dismiss</u>

### A.   **Legal Standard**

"[S]tanding is an essential and unchanging part of the case-or-controversy requirement of Article III."  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).  "[T]he irreducible constitutional minimum of standing contains three elements": (1) a concrete and particularized injury in fact; (2) a causal connection between the injury and the challenged conduct; and (3) a likelihood that the injury would be redressed by a favorable decision.  *Id.* at 560-61.

A motion to dismiss for lack of subject-matter jurisdiction under Rule 12(b)(1) "may challenge the plaintiff's jurisdictional allegations in one of two ways.  A 'facial' attack

accepts the truth of the plaintiff's allegations but asserts that they are insufficient on their face to invoke federal jurisdiction." *Leite v. Crane Co.*, 749 F.3d 1117, 1121 (9th Cir. 2014) (citation omitted). "A 'factual' attack, by contrast, contests the truth of the plaintiff's factual allegations, usually by introducing evidence outside the pleadings." *Id.* Here, GoDaddy brings a factual attack as to SiteLock's standing. (Docs. 579-80.) Thus, SiteLock "must support [its] jurisdictional allegations with 'competent proof,' under the same evidentiary standard that governs in the summary judgment context." *Leite*, 749 F.3d at 1121 (internal citation omitted). "The plaintiff bears the burden of proving by a preponderance of the evidence that each of the requirements for subject-matter jurisdiction has been met." *Id.* Generally, "if the existence of jurisdiction turns on disputed factual issues, the district court may resolve those factual disputes itself." *Id.* at 1121-22.

B.     **The Parties' Arguments**

GoDaddy argues that SiteLock lacks standing because it assigned, to ABRY, all of the legal claims asserted in this action. (Doc. 580 at 1.) GoDaddy's assignment theory relies on two pieces of evidence: (1) Feather's deposition testimony; and (2) the fact that a "high-level" ABRY executive, Caitlin Yanchek, was SiteLock's sole "client representative" at the parties' May 6, 2021 mediation. (*Id.* at 3.) As for the former, GoDaddy argues that the SPA itself (which does not discuss any assignment) "does not contradict Mr. Feather's testimony" and "is not enough for SiteLock to meet its burden at this stage of the proceedings. . . . Such is particularly true here, as an assignment between SiteLock and [ABRY] could take many forms, including but not limited to an oral agreement, letter, or a series of separate assignments or transfers through related entities." (*Id.* at 8. *See also id.* at 9-10 [listing various ways in which GoDaddy believes SiteLock was "evasive" during discovery].) GoDaddy also argues that because SiteLock "renounce[s] the [SPA] as having anything to do with SiteLock," "it is impossible for that same agreement to form the basis of SiteLock's Article III standing." (*Id.* at 9.) "Conversely, if SiteLock *is* IBS or SIH, then they have no Lanham Act claim, which is the sole claim that gives rise to federal question jurisdiction in the first place." (*Id.* at 10,

citation omitted.)

In response, SiteLock argues it has standing because "GoDaddy harmed SiteLock by breaching its contract with SiteLock, unfairly competing with SiteLock, and infringing SiteLock's federally-registered trademark" and "SiteLock's injuries are fairly traceable to GoDaddy's conduct and will be remedied by money damages." (Doc. 594 at 1. *See also id.* at 2-3 ["This case is about all the ways that GoDaddy, after professing to be SiteLock's business partner and promising to 'endeavor to promote' SiteLock's services, betrayed and harmed SiteLock . . . between 2014 and 2018."].)  As for GoDaddy's assignment theory, SiteLock asserts it "did not assign its claims or contracts with GoDaddy to [ABRY] or any other entity." (*Id.* at 1.)  For context, SiteLock explains that, in April 2018, SIH acquired all of the equity in IBS, SiteLock's parent company.  (*Id.* at 3.)  This transaction was memorialized in the SPA.  (*Id.*)  "The deal was structured as an acquisition of equity, not an acquisition of assets" and "did not involve any assignment of SiteLock, LLC's contracts with GoDaddy or legal claims against GoDaddy." (*Id.*)  As for Feather's deposition answer, SiteLock contends that Feather was offering his "understanding as a businessman" that SIH "effectively acquired SiteLock's assets (and contracts) by acquiring its equity" and "did not mean to suggest that, as a legal matter, SiteLock had assigned its claims or contracts to any ABRY entity." (*Id.* at 1-2.)[8]  In an attempt to affirmatively prove there was no assignment, SiteLock submits two declarations.  The first is from Feather, who avows that he does not "believe . . . that there was any formal or contractual 'assignment' of contracts or claims from SiteLock to ABRY (or any other third party)" and that "[t]o [his] knowledge, at least until the time [he] left SiteLock in February 2021, SiteLock owned all of the contracts and claims relevant to this lawsuit." (Doc. 595 ¶¶ 3-4.)  The second is from Jason Juall, a lawyer who assisted in preparing the SPA, who avows that "[t]he 2018 SPA did not assign SiteLock, LLC's claims against GoDaddy, or its contracts with GoDaddy, to [ABRY] or any other entity—rather, those claims and contracts remained at

---

[8]    SiteLock also notes that, at the deposition, "SiteLock's counsel objected to the question as calling for a legal conclusion and calling for speculation." (Doc. 594 at 1.)

1    SiteLock, LLC, as is customary in a transaction structured as a purchase of equity of a

2    parent company." (Doc. 594-1 ¶ 3.) As for Yanchek's presence at the mediation, SiteLock

3    asserts that Yanchek attended "attended the mediation because she was an officer and

4    director of SiteLock Group Holdings, LLC, which has an interest in this case pursuant to a

5    February 2021 litigation funding agreement between SiteLock Group Holdings, LLC and

6    Sectigo" and argues that "Yanchek's attendance at the mediation . . . does not support

7    GoDaddy's speculation that SiteLock had assigned its claims to ABRY." (Doc. 594 at 2.)[9]

8    SiteLock also challenges GoDaddy's discovery-related accusations and contends that, in

9    any event, SiteLock "has now produced all transaction documents associated with the 2018

10   SPA (including an index of all such transaction documents), which make clear that no

11   assignment occurred." (*Id.* at 14-15.)

12          In reply, GoDaddy reiterates that SiteLock bears the burden of proving standing and

13   accuses SiteLock of "attempt[ing] to shift its burden onto GoDaddy," which "is particularly

14   outrageous given SiteLock's decision to withhold relevant, critical documents while

15   gaslighting GoDaddy with accusations that it was speculative and unfounded for GoDaddy

16   to seek those same documents." (Doc. 596 at 1.) According to GoDaddy, because

17   "Feather's Declaration is flatly contradicted by his prior testimony under oath as

18   SiteLock's Rule 30(b)(6) corporate designate, it amounts to nothing more than a

19   'conclusory assertion[s]' as to the non-existence of an assignment, and as a result, it is not

20   'competent evidence.'" (*Id.* at 5, citation omitted.) GoDaddy also contends that Feather's

21   declaration is "untimely" because he did not sign it until the day after the filing deadline.

22   (*Id.*) As for Juall's declaration, GoDaddy contends it is "hearsay," impermissibly vague,

23   an "inadmissible expert opinion," and "does not mean much of anything, even if it were

24   deemed admissible." (*Id.* at 5-6.) GoDaddy then reiterates its position that either the SPA

25   applies to SiteLock (and "SiteLock is bound by the representations and warranties set forth

26

27   ─────────────────────

28   [9]      For context, at some point before the May 2021 mediation, SiteLock Group
     Holdings, LLC ("SGH"), an "entity owned by funds managed by ABRY," sold its equity
     interest in SIH to Sectigo, Inc. ("Sectigo"). (Doc. 594 at 2.)

1    therein") or SiteLock cannot use it to establish standing.  (*Id.* at 7.)[10]

2          **C.   Analysis**

3          Unless it assigned those claims to a third party, SiteLock would have standing to

4    pursue the contract and tort claims asserted in this action.  GoDaddy does not argue

5    otherwise.  Thus, the standing challenge turns on whether, as a factual matter, "SiteLock

6    assigned the purported claims it is pursuing in this action" to ABRY.  (Doc. 579 at 1.)[11]

7    As noted, SiteLock seeks to establish that no such assignment occurred, despite Feather's

8    deposition testimony to the contrary, by submitting declarations from Feather and Juall.

9    GoDaddy raises various objections to those declarations in its reply.  Thus, it is necessary

10   to begin by resolving GoDaddy's objections.

11         In his declaration, Feather asserts that his deposition testimony was inaccurate,

12   simply reflected his "understanding from a business perspective that when SiteLock was

13   acquired, the purchaser effectively acquired all of SiteLock's contracts as well," and was

14   "not mean[t] to suggest . . . that there was any formal or contractual 'assignment' of

15   contracts or claims from SiteLock to ABRY (or any other third party)."  (Doc. 595 ¶ 3.)

16   _____

17   [10]     In a footnote in its reply, GoDaddy also accuses SiteLock of failing to comply with
     its obligations under Rule 7.1 of the Federal Rules of Civil Procedure and LRCiv 7.1.1,
18   "presumably to conceal the identity of the party controlling this litigation."  (Doc. 596 at 8
     n.5.)  GoDaddy does not request any relief associated with this accusation and, in any event,
19   "[t]he district court need not consider arguments raised for the first time in a reply brief."
     *Zamani v. Carnes*, 491 F.3d 990, 997 (9th Cir. 2007).  But even if properly raised, the
20   Court notes that SiteLock repeatedly refers to IBS as its "*former* owner." (*See, e.g.*, Doc.
     518 at 2, emphasis added.)  The fact that SiteLock was owned by IBS for some period
21   following the April 2018 SPA does not establish that SiteLock was owned by IBS when
     the lawsuit was filed in April 2019.

22   [11]     The law in this area may not be as settled as GoDaddy portrays it to be.  (Doc. 580
     at 8 n.1.)  To be sure, some courts have held that "once a claim has been assigned, the
23   assignor lacks standing to sue on that claim" because "[a] party who has assigned a claim
     away does not have [a] personal stake."  *DW Aina Le'a Dev., LLC v. Hawaii*, 2022 WL
24   1665311, *14 (D. Haw. 2022).  *See also IOW, LLC v. Breus*, 425 F. Supp. 3d 1175, 1185
     (D. Ariz. 2019).  But not all courts agree.  *See, e.g., Fund Liquidation Holdings LLC v.*
25   *Bank of Am. Corp.*, 991 F.3d 370, 381 (2d Cir. 2021), *cert. denied*, 142 S. Ct. 757 (2022)
     (holding that a pre-suit assignment of claims "does not pose a constitutional roadblock" to
26   Article III standing); *Nastasi & Assocs., Inc. v. Bloomberg, L.P.*, 2021 WL 3541153, *1
     (S.D.N.Y. 2021) ("[P]re-suit assignments do not raise constitutional standing issues and
27   should be analyzed under Rule 17 instead.").  The Court finds it unnecessary to delve
     further into this complicated issue because, even assuming that GoDaddy's legal position
28   is correct (*i.e.*, an assignment of claims necessarily negates standing), GoDaddy's request
     for dismissal fails on the facts—as discussed herein, there was no assignment.

Feather also avers that he has no personal knowledge of "any oral or written assignment of any contracts or claims from SiteLock to ABRY or any of its subsidiaries or affiliates" and states that, to his knowledge, at least until the time he left SiteLock in February 2021, "SiteLock owned all of the contracts and claims relevant to this lawsuit." (*Id.* ¶ 4.)

GoDaddy contends that Feather's declaration is "hearsay," "conclusory," and "procedurally improper." (Doc. 596 at 3, 5.) These objections are unavailing. It is not clear to the Court how Feather's statements in the declaration could qualify as "hearsay" and GoDaddy provides no explanation. (*Id.* at 2-3.) Nor is Feather's declaration overly conclusory—indeed, it provides more detail than his deposition testimony (upon which GoDaddy heavily relies). As for its procedural propriety, GoDaddy argues Feather's declaration should be disregarded because it was filed one day after the filing deadline. (*Id.* at 5.) To the extent the Court could, in its discretion, disregard Feather's declaration based on the one-day delay, the Court declines to do so.[12]

On the merits, GoDaddy contends that Feather's declaration lacks evidentiary value because it conflicts with his deposition testimony and urges the Court to invoke the sham affidavit doctrine. (Doc. 596 at 4 ["[J]ust as SiteLock is not permitted to change Mr. Feather's testimony through errata, they also cannot change it through an attorney-crafted declaration."].) Under the sham affidavit doctrine, "a party cannot create an issue of fact by an affidavit contradicting his prior deposition testimony." *Van Asdale v. Int'l Game Tech.*, 577 F.3d 989, 998 (9th Cir. 2009) (citation omitted). However, to invoke the doctrine, the Court must find that "the contradiction was actually a 'sham'" and the inconsistency between the deposition testimony and the subsequent declaration must be "clear and unambiguous." *Id.* at 998-99 (citation omitted). The first condition is not satisfied here. In his declaration, Feather provides a reasonable explanation for why his deposition testimony was inaccurate. (Doc. 595 ¶ 3.) Moreover, as discussed in more detail later in this order, Feather's declaration is supported by other record evidence (such

---

[12] Although GoDaddy spends nearly a page remarking on SiteLock's untimeliness in filing the Feather declaration, it does not suggest the one-day delay was at all disruptive to the case, which has been pending for four years.

as the SPA itself and the Juall declaration).  Thus, the Court does not find that, as a factual matter, Feather's declaration is a sham.  *See also Raygarr LLC v. Emps. Mut. Cas. Co.*, 2020 WL 919443, *11 (D. Ariz. 2020) ("The Court declines to disregard Garrison's affidavit as a sham; the affidavit does not contradict Garrison's deposition testimony but, rather, sets forth a reasonable explanation of the basis for and thought process behind that testimony.").  Thus, even if Feather's declaration and deposition testimony could be viewed as contradictory, the declaration is a permissible vehicle for explaining the discrepancy.

This situation is easily distinguishable from *Martinez v. Env't Oil Recovery, Inc.*, 2022 WL 98003 (E.D. Tex. 2022), upon which GoDaddy relies.  There, the plaintiff originally testified that "he could not remember the number, make, or model of defendant's pickup trucks" but later submitted a declaration describing the vehicles, without any explanation for the contradiction.  *Id.* at *2.  Here, Feather has credibly explained why his earlier answer was based on a mistaken understanding of a legal term of art (*i.e.*, when an assignment occurs).  Notably, Feather was asked only one question about assignment (*see generally* Doc. 367-11)—the fact that he was not questioned at length, and his counsel made a contemporaneous objection on the ground that the question was ambiguous and called for a legal conclusion, makes it more probable that the mistaken testimony was attributable to confusion.  *See, e.g.*, *Walden v. Md. Cas. Co.*, 2017 WL 5894532, *2 (D. Mont. 2017) ("Courts analyzing the rule look to whether subsequent testimony 'flatly contradicts' previous testimony, or whether the inconsistencies are attributable to confusion."); *Popovic v. Spinogatti*, 2016 WL 2893426, *6 (D. Ariz. 2016) (the deponent's unclear responses and the fact that he was not examined at length on the issue weighed against finding that the contradiction between his statements was clear and unambiguous).  Accordingly, the Court will not exclude Feather's declaration under the sham affidavit doctrine.  *See also Yeager v. Bowlin*, 693 F.3d 1076, 1080 (9th Cir. 2012) ("[T]he sham affidavit rule should be applied with caution because it is in tension with the principle that the court is not to make credibility determinations when granting or denying summary judgment.") (cleaned up); *Messick v. Horizon Indus. Inc.*, 62 F.3d 1227, 1231 (9th Cir.

1995) ("[T]he non-moving party is not precluded from elaborating upon, explaining or clarifying prior testimony elicited by opposing counsel on deposition; minor inconsistencies that result from an honest discrepancy, a mistake, or newly discovered evidence afford no basis for excluding an opposition affidavit.").   In a related vein, although Feather provided the deposition testimony in the capacity of a Rule 30(b)(6) representative, the Ninth Circuit has cautioned against excluding evidence that conflicts with a Rule 30(b)(6) deposition where it can be "deemed as clarifying or simply providing full context for the Rule 30(b)(6) deposition."  *Snapp v. United Transp. Union*, 889 F.3d 1088, 1103 (9th Cir. 2018).  *See also id.* at 1104 ("The Rule 30(b)(6) testimony also is not binding against the organization in the sense that the testimony can be corrected, explained and supplemented, and the entity is not 'irrevocably' bound to what the fairly prepared and candid designated deponent happens to remember during the testimony.") (citation omitted).

Finally, SiteLock's failure to correct Feather's deposition testimony pursuant to Rule 30(e) does not alter the analysis.  SiteLock's counsel explained that he did not correct the transcript after Feather's deposition because he "didn't realize at the time . . . that it was wrong."  (Doc. 589 at 13.)  Given that Feather was only asked one question on the issue, to which SiteLock objected, it was reasonable for SiteLock's counsel to interpret Feather's response as describing the substance of the transaction rather than testifying about SiteLock's assignment of legal claims.   Tellingly, GoDaddy itself did not immediately move to dismiss based on Feather's deposition testimony but instead waited until the eve of trial—18 months after the deposition—to raise its standing-related concerns.  The timing of GoDaddy's motion does not, of course, result in forfeiture or waiver, because subject-matter jurisdiction can never be waived, but it does underscore the reasonableness of SiteLock's counsel's determination that it was unnecessary to pursue a formal correction under Rule 30(e).

Turning to the other declaration, Juall is a "partner at the law firm DLA Piper LLP (US)" who "assisted in preparing" the SPA.  (Doc. 594-1 ¶¶ 1-2.)  Juall avers that the SPA

1    "did not assign SiteLock, LLC's claims against GoDaddy, or its contracts with GoDaddy,

2    to ABRY Partners II, LLC, ABRY Partners, LLC, or any other entity" and that, to his

3    knowledge, "there are no other agreements, written or oral, that assign SiteLock, LLC's

4    claims against GoDaddy, or its contracts with GoDaddy to ABRY Partners II, LLC, ABRY

5    Partners, LLC, or any other entity." (*Id.* ¶ 3.) Juall also explains that, "[g]iven [his] role

6    in representing private equity funds managed by ABRY Partners II, LLC in connection

7    with the 2018 SPA, [he] would expect to have been aware of, and/or involved in, any such

8    assignment if it had occurred." (*Id.*) Finally, Juall asserts that Yanchek is "an officer and

9    director of SiteLock Group Holdings, LLC. SiteLock Group Holdings, LLC was the parent

10   company of [SIH] until February 2021. In February 2021, SiteLock Group Holdings, LLC

11   sold all equity in [SIH] to Sectigo." (*Id.* ¶ 4.)

12         GoDaddy contends, without explanation, that Juall's declaration is "hearsay." (Doc.

13   596 at 5-6.)[13] However, in his declaration, Juall represents that his assertions are based on

14   his personal knowledge and explains how he gained such knowledge (*i.e.*, as a lawyer

15   involved in the 2018 acquisition). (Doc. 594-1 ¶¶ 1-3.) Next, GoDaddy argues that the

16   declaration does not provide enough "detail as to the nature or extent of Mr. Juall's

17   involvement" in the SPA and thus Juall's "assertion that he is not aware of any assignment

18   of rights by SiteLock . . . does not mean much of anything." (Doc. 596 at 5-6.) This

19   argument is unavailing. Although the Court might agree that more information about

20   Juall's role in the transaction would be helpful if a significant question existed as to whether

21   an assignment occurred during the 2018 acquisition, that is not the case here. GoDaddy's

22   assignment theory is premised on a two-sentence response by Feather during a deposition,

23   which Feather himself has explained was in error and which SiteLock has rebutted with

24

25   ───────────────
     [13]     GoDaddy also argues that Juall has provided an inadmissible "expert opinion" about
26   what is customary in such transactions. (Doc. 596 at 6.) This argument seems to arise
     from Juall's explanation that the "SPA did not assign SiteLock, LLC's claims against
27   GoDaddy, or its contracts with GoDaddy, to [ABRY] or any other entity – rather, those
     claims and contracts remained at SiteLock, LLC, as is customary in a transaction structured
28   as a purchase of equity of a parent company." (Doc. 594-1 ¶ 3.) The Court finds it
     unnecessary to decide whether this reference to customary deal parameters was permissible
     because it has played no role in the Court's analysis here.

multiple pieces of evidence.  Accordingly, the Court is not persuaded that more information about Juall's participation in the 2018 acquisition is necessary and disagrees with GoDaddy's contention that, without such additional information, Juall's declaration lacks evidentiary value.

In addition to relying on the Feather and Juall declarations, SiteLock contends that "[t]he plain language of the 2018 SPA (and accompanying transaction documents) refutes any suggestion that SiteLock assigned its claims or contracts against GoDaddy to ABRY or anyone else.  Nothing in the 2018 SPA purports to assign SiteLock's claims against GoDaddy or contracts with GoDaddy to ABRY, an ABRY-affiliate, or any other entity." (Doc. 594 at 9-10.)  GoDaddy does not dispute this description of the SPA but provides a number of reasons it believes the SPA is not dispositive.  In large part, GoDaddy focuses on SiteLock's corporate identity, pointing to statements that SiteLock made in relation to the SPA discovery dispute.  (Doc. 580 at 2-3.  *See also* Doc. 584 at 90-91.)  Specifically, SiteLock argued (and continues to argue) that the SPA was not relevant to this litigation at least in part because SiteLock was not a party to it.  (*See, e.g.*, Doc. 578 at 2, 6, 13; Doc. 588 at 12-13; Doc. 594 at 15; Doc. 612 at 6.)  This position is based on SiteLock's assertion that SiteLock is not the same entity as IBS or SIH.  (*See, e.g.*, Doc. 578 at 13; Doc. 594 at 15 & n.20; Doc. 610 at 7; Doc. 612 at 5-6.)  GoDaddy focuses heavily on this assertion, arguing that if SiteLock is not the same entity as IBS or SIH, then SiteLock cannot rely on the SPA "to prove standing."  (Doc. 580 at 3.)  In other words, according to GoDaddy, *either* SiteLock is legally indistinguishable from IBS (and thus bound by "unequivocal admissions [in the SPA] that SiteLock has no trademark claims and that the Reseller Agreement between SiteLock and GoDaddy terminated in March 2018") or SiteLock cannot use the SPA to "establish standing."  (*Id.* at 4-5.)

GoDaddy's line of reasoning relies on a false premise.  SiteLock is not relying on the SPA to "*establish* standing."  It is undisputed that, but for an assignment, SiteLock would have standing to bring its claims in this action.  To demonstrate that the alleged assignment did not occur—that is, to accomplish the often tricky task of proving a

negative—SiteLock provides the Feather declaration and the Juall declaration, both of which affirmatively state that there was no assignment.  SiteLock relies on the SPA simply to show that it is consistent with those representations (because it makes no mention of an assignment).  If the SPA were SiteLock's sole piece of evidence on the assignment issue, the analysis might be different—as GoDaddy notes, it is theoretically possible that an assignment could have been memorialized in some other document (or even accomplished orally).  But the SPA is not SiteLock's sole piece of evidence.  For those reasons, GoDaddy's argument for dismissal—that "[i]f the Court were to credit SiteLock's argument, and hold that the [SPA] does not apply to SiteLock, the Court would have to dismiss this case for lack of standing" (Doc. 580 at 5)—is, at best, a misunderstanding of the issues.

For these reasons, SiteLock has shown, by a preponderance of the evidence, that it did not assign to ABRY the claims asserted in this action.  SiteLock provides sworn declarations from Feather and Juall, both of whom avow that the 2018 SPA did not involve an assignment and that they are, more broadly, unaware of any assignment.  These representations are consistent with the SPA, which does not discuss any assignment.  The only potentially contradictory evidence is Feather's deposition testimony, but SiteLock has now persuasively demonstrated why that testimony should be viewed as the product of a good-faith mistake.

Nor does Yanchek's attendance at the mediation suggest (much less establish) that SiteLock assigned its claims to ABRY.  There are plenty of reasons a parent (or grandparent) company might want to be represented at a subsidiary's mediation with another company.  Indeed, SiteLock has provided evidence that, even after the sale to Sectigo, SGH's interest in the matter continued pursuant to a litigation funding agreement, which Sectigo and SGH executed concurrently with Sectigo's purchase of SIH.  (Doc. 594-2 ¶¶ 2-3.)

As for the various discovery-related accusations, although the Court agrees with GoDaddy that SiteLock should have produced the SPA sooner, that finding was already

the subject of significant discussion during the October 31, 2022 hearing. Also, the extent to which further discovery related to the SPA is appropriate is addressed in Part II of this order. Thus, the Court declines to rehash these issues here.

Finally, the alternative forms of relief sought by GoDaddy (*e.g.*, the opportunity to depose Juall) are denied. This conclusion is supported by the weakness of GoDaddy's assignment theory and the fact that GoDaddy has known since February 5, 2021—which was well before discovery concluded—about the information upon which its assignment theory is based.

II.    Discovery Requests

Also pending before the Court are (1) SiteLock's motion to enforce the Court's October 31, 2022 order and set a trial date (Doc. 597) and (2) GoDaddy's motion to compel SiteLock to produce certain documents related to the SPA (Doc. 598). Because both motions arise from the Court's rulings at the October 31, 2022 hearing, it is helpful to begin there.

A.    **Additional Background**

1.    GoDaddy's Motion For Sanctions

As discussed in the Relevant Background, in a draft of the joint proposed pretrial order, GoDaddy suggested that SiteLock "may" lack standing in this action because "SiteLock assigned all of its rights under its contracts" to ABRY in 2018. (Doc. 551 at 3.) To refute this theory, SiteLock produced a redacted copy of the SPA. GoDaddy then moved for sanctions, arguing that SiteLock's failure to produce the SPA earlier in the litigation was a discovery violation. (Docs. 566-67.)

For context, two documents exist: the SPA and the SPA Schedules. The SPA Schedules, which SiteLock produced during discovery, include several references to SiteLock's relationship with and claims against GoDaddy. (*See, e.g.*, Doc. 607-2 at 14 [Schedule 3.9(d): "SiteLock, LLC received a notice from GoDaddy.com, LLC to terminate the Reseller Agreement by and between SiteLock, LLC and GoDaddy.com, LLC dated November 4, 2013, First Addendum to Reseller Agreement dated May 1, 2014, Second

Addendum to Reseller Agreement dated October 31, 2014, and to terminate Section II of the Third Addendum to Reseller Agreement dated July 11, 2016 (collectively referred to as the 'GoDaddy Agreement'); provided, however, such notice included the survival of certain provisions contained therein."].)

Meanwhile, although the SPA itself does not mention GoDaddy by name, it does explain the meaning of the Schedules.  For example, Schedule 3.9(r), entitled "Contracts," merely provides: "Reference is made to the termination of certain provisions of the GoDaddy Agreement."  (Doc. 607-2 at 14-15.)  Section 3.9(r) of the SPA clarifies that Schedule 3.9(r) is a list of instances where IBS or a subsidiary "suffered any Material Adverse Effect."  (Doc. 607-1 at 18-19.)  Perhaps most important, Section 3.16.3 of the SPA states that, except as provided in Schedule 3.16.3(b), "to the knowledge of the [IBS], no Person is infringing on misappropriating, or using on an unauthorized basis any [IBS] Owned Intellectual Property and no Person is considering or threatening such a Claim." (*Id.* at 24.)  Schedule 3.16.3, in turn, does not include a section (b), let alone disclose in section (b) any instances of trademark infringement by GoDaddy or contemplated lawsuits against GoDaddy involving trademark infringement.  (Doc. 607-2 at 32.)

In its motion for sanctions, GoDaddy argued that the SPA was responsive to several of its RFPs and should have been produced during discovery.  (Doc. 567 at 3-6.) Specifically, GoDaddy asserted that the SPA contained representations and warranties by SiteLock that "squarely contradict[] SiteLock's allegations in this action."  (*Id.* at 9 ["The [SPA] is thus an unequivocal admission that SiteLock's trademark claims fail as a matter of law . . . ."]; *id.* ["[T]he [SPA] confirms (again) that the Reseller Agreement terminated in March 2018."]; *id.* at 13 [arguing the SPA contain "admissions and representations that are dispositive of SiteLock's claims, in whole or in part"].)[14]  As relief, GoDaddy asked the Court to dismiss SiteLock's Lanham Act and unfair competition claims, to preclude SiteLock from asserting trademark misuse as part of its contract claims, and to establish March 31, 2018 at the termination date of the Reseller Agreement.  (Doc. 566 at 2-3.)  In

---

[14]      GoDaddy also filed a reply, reiterating many of these arguments.  (Doc. 582.)

1    the alternative, GoDaddy requested a continuance of the trial to allow GoDaddy to conduct

2    additional discovery and file a supplemental motion for summary judgment.  (*Id.* at 3.)

3    In response, SiteLock argued the SPA was not responsive to GoDaddy's RFPs,

4    focusing in large part on the fact that SiteLock was "not a signatory to the SPA," which

5    was between IBS and SIH.  (Doc. 578 at 2.  *See also id.* at 13 [describing IBS and ABRY

6    as "third parties"].)  SiteLock also argued that, in any event, the statements in the SPA

7    would not "foreclose" SiteLock's claims in this action.  (*See, e.g.*, *id.* at 11 ["[E]ven if

8    Section 3.16 could be understood to be a statement that no party was infringing on

9    SiteLock's trademark, that would not 'foreclose' SiteLock's trademark claim.  At most,

10   this statement might suggest SiteLock did not yet appreciate the full legal ramifications of

11   GoDaddy's misconduct in April 2018."].)

12                    2.    October 31, 2022 Hearing

13   On October 31, 2022, the Court held a hearing to address, among other things,

14   GoDaddy's motion for sanctions.  (Doc. 587.)  During the hearing, GoDaddy reiterated

15   that the SPA is relevant to SiteLock's trademark claims and the Reseller Agreement's

16   termination date and argued that the representations in the SPA (and SPA Schedules) are

17   binding on SiteLock because Feather and Serani both signed the agreement and "adopted

18   all of [the] representations and warranties" therein.  (Doc. 593 at 68-72.)  In a related vein,

19   GoDaddy argues that IBS is not "truly a non-party" and that "the evidence doesn't support"

20   "viewing [IBS and SiteLock] as totally distinct companies such that the representations in

21   [the SPA] don't apply or bind SiteLock."  (*Id.* at 68.)  The Court then asked: "Is that some

22   sort of . . . piercing the corporate veil theory, that IBS does not deserve to be a distinct

23   entity such that its statements are binding on its [subsidiaries]?"  (*Id.*)  GoDaddy's counsel

24   responded: "I think so, Your Honor," but, when prompted by the Court, was unable to

25   identify a case for that proposition.  (*Id.* at 68-71.)  As for prejudice, GoDaddy argued that

26   if the SPA had been timely disclosed, "there would have been an opportunity to seek

27   additional discovery," including an unredacted copy of the SPA and "other annexes" to the

28   SPA.  (*Id.* at 68-70 [arguing that the SPA is "proof positive" that SiteLock's production

                                              - 20 -

was not complete and asserting "to the extent that there are other documents between [ABRY] and SiteLock or IBS and [SIH], those would also be responsive"].)

In response, and after some discussion with the Court, SiteLock ultimately conceded that the SPA *Schedules* were responsive to RFP 2 (which requested "[a]ll documents relating to the termination of any contractual provision at issue in this litigation")[15] and that the SPA itself "provides context for the schedules." (*Id.* at 75-78 [explaining the search process for responsive documents].)  However, SiteLock downplayed the importance of the SPA, arguing that even assuming SiteLock "had not conceptualized the trademark violation as a federal Lanham Act claim" in April 2018, that lack of conceptualization is "not an admission that GoDaddy didn't . . . use[] SiteLock's trademark to promote a competing service . . . ."  (*Id.* at 85-86.)  As for whether the failure to disclose the SPA "opens a can of worms that there's other documents out there related to the due diligence" in the 2018 deal, SiteLock stated: "[W]e searched for and produced documents, communication[s] between SiteLock and [ABRY] . . . about this case with GoDaddy, which is what the RFPs called for."  (*Id.* at 89.)  SiteLock also represented that it "confirmed with the deal counsel that anything that they had received from the data room had been produced.  And it was. . . .  [T]hose documents were given to the purchaser . . . from the seller.  Not from SiteLock directly. . . .  [B]ut the bottom line is, those documents have all been produced."  (*Id.* at 89-90.)

After considering the parties' moving papers and oral arguments, the Court found that "SiteLock should have produced the SPA earlier, and that the failure to do so was a discovery violation," both because the SPA was responsive to RFP 2 and because the SPA was arguably subject to production pursuant to the Mandatory Initial Discovery Pilot Project ("MIDP").  (*Id.* at 98-102.)  The Court also concluded that SiteLock's failure to produce the document was not substantially justified.  (*Id.* at 103.)  As for harmlessness, the Court "agree[d] with GoDaddy that when the SPA is read in conjunction with the

---

[15]     According to SiteLock, it produced the SPA Schedules in response to RFP 57, which sought "documents related to SiteLock's efforts to find a buyer that referenced GoDaddy." (Doc. 593 at 76-77.)

schedules, it raises an inference that IBS didn't believe that SiteLock had a Lanham Act claim as of April 5th, 2018. And this inference was not something that arose solely from the schedules." (*Id.* at 103.) However, the Court also stated: "[I]t's not clear . . . that this was very important new information in the overall scheme of things. . . . As we've discussed, GoDaddy has not identified any authority suggesting that this statement would somehow have a preclusive admission effect that could give rise to a summary judgment motion       . . . . The entity that made the statement, IBS, is not the same entity as the plaintiff in this case. . . . And this is simply a statement that on a particular date IBS was unaware of the existence of a potential claim. There are all sorts of reasons why a parent could be unaware of a subsidiary's potential claim on one date, yet the claim turns out to be a winner." (*Id.* at 104-05 ["I just don't see this as the type of smoking gun that GoDaddy sets it out to be."].)[16]

Next, the Court addressed sanctions:

> On the one hand, SiteLock has nobody to blame but itself for the current predicament. It went out of its way for whatever reason to only turn over part of a document without the other part that had new information that was unfavorable to its position. . . .
>
> On the other hand, GoDaddy, in my view, is overstating the importance of the new information, and as a result the relief they're seeking would result in a windfall.
>
> I have little trouble concluding that the dismissal of the Lanham claim would be an unwarranted, overbroad discovery [sanction], for all the reasons I've just stated. The closer call is whether there's some more immediate form of relief that I could grant here. . . . I've tried to really put my thumb on the scale . . . in GoDaddy's favor here.
>
> One of the requests is that I continue the trial for six months so that I can reopen discovery and allow successive summary judgment briefing. . . . [S]ubject to having an open mind to anything that's filed later, this just doesn't seem anywhere near a dispositive admission that could lead to summary judgment. So, really, we're talking about, should more discovery be granted, and do I need to put off the trial to allow that discovery? I am just very loathe to continue the trial. This case is very old. It is time for it to be tried. I know the parties have already put tremendous resources into

_____

[16]       As for the Reseller Agreement's termination date, the Court "was less persuaded that there were discovery issues . . . in that . . . there's a stronger argument that the information that was in the SPA was cumulative of what was in the schedules that were previously disclosed. . . . [T]o me the Lanham Act issue is the one that was the most concerning." (*Id.* at 113.)

preparing for trial that is starting tomorrow. . . .  I, of course, don't want to do anything that is unfairly prejudicial to GoDaddy by making them litigate without full knowledge of facts.

[T]he best imperfect . . . solution I can come up with is allowing depositions of Feather and Serani, but keeping the trial date as it is. . . .  To the extent that means that that interrupts SiteLock's order of proof, I'm not that sympathetic . . . .  If SiteLock's view is that this is so disruptive they would rather have the continuance, I'm happy to hear that now.

(*Id.* at 105-08.)

SiteLock's counsel then stated: "Your Honor, we do believe that, I'm afraid. Mr. Serani and Mr. Feather are essentially the substance of our case. . . .  And so in light of Your Honor's ruling, we would request some very short, as short as possible, continuance." (*Id.* at 108-09.)

GoDaddy agreed to SiteLock's continuance suggestion.  (*Id.* at 109-10.)  Thus, the Court vacated the trial date, ordered the parties "to meet and confer about getting these depositions done sooner rather than later," and further ordered the parties to "come forward with a proposal about when you would like this case to be tried and when you're available for it to be tried." (*Id.* at 109-11.)  As for GoDaddy's document requests, the Court ordered SiteLock to turn over an unredacted version of the SPA.  (*Id.* at 111.)  The Court also stated that, "[t]o the extent there are other documents out there beyond the unredacted SPA" to which GoDaddy felt entitled, the parties should "meet and confer about it and figure out precisely what additional documents you think you're entitled to" and, if they were unable to agree, to file something with the Court.  (*Id.* at 111-12.)  The same day, the Court issued a minute order memorializing these rulings.  (Doc. 587.)

### 3.   Post-Hearing Events

On November 9, 2022, GoDaddy sent SiteLock a letter containing additional discovery requests.  (Doc. 600 ¶ 3.)  Specifically, GoDaddy "respectfully demand[ed]" that SiteLock produce the following:

1.   All drafts or redlined versions of the SPA exchanged between, on the one hand, SiteLock, IBS, Unitedweb Holdings, LLC, Unitedweb, Inc. or their deal counsel and, on the other hand, [ABRY], SIH, or their deal counsel.

2.      All due diligence materials related to the SPA, including, but not limited to, documents "uploaded to the 'data room' used to collect materials during due diligence on the transaction."

3.      All correspondence between, on the one hand, SiteLock, IBS, Unitedweb Holdings, LLC, Unitedweb, Inc., or their deal counsel and, on the other hand, [ABRY], SIH, or their deal counsel, concerning the transaction that ultimately culminated in the SPA, including, but not limited to, preliminary deal discussions prior to the exchange of drafts of the SPA.

4.      All internal SiteLock correspondence, meaning correspondence involving SiteLock, IBS, Unitedweb Holdings, LLC, and/or Unitedweb, Inc., excluding privileged communications, concerning the transaction that ultimately culminated in the SPA.

5.      All documents that Mr. Feather and/or Mr. Serani relied upon in making the representations and warranties set forth in the SPA and the Disclosure Schedules thereto.

6.      Mr. Feather's operative employment agreement with SiteLock and/or IBS (or any similar agreement) in effect prior to [ABRY's] acquisition of SiteLock.

7.      Mr. Serani's operative employment agreement with SiteLock and/or IBS (or any similar agreement) in effect prior to [ABRY's] acquisition of SiteLock, including, but not limited to, the "compensation agreement submitted under separate file" referenced in Schedule 3.20.2(a).

(Doc. 600-2 at 1-2, internal citation omitted.)   GoDaddy also stated: "[T]o the extent SiteLock claims it does not have possession, custody, or control of any of the documents discussed above, GoDaddy intends to serve subpoenas as necessary, including, but not limited to, subpoenas on deal counsel, [ABRY], IBS, SIH, Unitedweb Holdings, LLC, and Unitedweb, Inc."   (*Id.* at 2.  *See also id.* at 3 ["We reserve the right to subpoena Ms. Yanchek and Mr. St. Jean for depositions based on SiteLock's new revelations."].)

On November 18, 2022, SiteLock produced an unredacted copy of the SPA.  (Doc. 600-1 at 4.)

On November 24 2022, SiteLock further responded to GoDaddy's requests.  (Doc. 600-3.)  First, SiteLock agreed to produce "(1) a set of the documents contained in the transaction binder for the SPA (along with an index identifying these documents), (2) the seven emails concerning GoDaddy that were uploaded to the data room and provided to [SiteLock] by deal counsel for ABRY, as described in [counsel's] October 28, 2022

- 24 -

declaration, and (3) employment agreements for Mr. Serani and Mr. Feather that we have been able to locate based on a reasonable search." (*Id.* at 1, internal citation omitted. *See also id.* at 5 ["[W]e are producing Mr. Feather's employment agreement with ABRY with this letter. We are in the process of determining whether Mr. Feather had an employment agreement with IBS prior to his employment agreement with ABRY. . . . [W]e are producing Mr. Serani's employment agreement with IBS with this letter."].) SiteLock also produced a "Securities Purchase Agreement dated February 12, 2021, under which [SGH] agreed to sell [SIH] to Sectigo, Inc." (the "Sectigo SPA") and "certain other documents included in the [Sectigo SPA] transaction binder (along with an index identifying the documents in the transaction binder) or otherwise associated with this sale." (*Id.* at 1-2. *But see id.* at 2 ["We do not believe that these documents are relevant to any party's claim or defense or responsive to any of GoDaddy's RFPs. In addition, these documents were created after the end of document discovery, after the final date for supplementation of MIDP responses, and after the date limitations that both parties placed on their respective RFP responses. Nevertheless, we are producing these documents in the interests of full transparency and to avoid another late-breaking argument from GoDaddy that additional document discovery is necessary before trial. Because certain of these documents (or portions thereof) are protected work product, we have also produced a supplemental privilege log reflecting these portions."].) SiteLock then addressed each request specifically, objecting on grounds such as relevance, breadth, responsiveness, and control; SiteLock also asserted it had produced documents that fell under some of the requested categories in response to RFPs 69 and 70. (*Id.* at 2-5.) SiteLock further objected to GoDaddy's stated intent to serve subpoenas on third parties and disputed GoDaddy's "suggestion . . . that SiteLock in any way misrepresented the relevance of Mr. St. Jean or Ms. Yanchek of ABRY." (*Id.* at 5. *See also id.* at 5-6 [asserting that neither St. Jean nor Yanchek has "unique, first-hand knowledge of facts relevant to this case" and the fact that both individuals are referenced in the SPA does not somehow give them such knowledge].)

On December 16, 2022, after admonishing SiteLock for its "tone," GoDaddy asked

SiteLock several clarifying questions about the produced materials and challenged the redactions in the Sectigo SPA and SiteLock's failure to produce the "litigation funding agreement" (the "LFA") between Sectigo and SGH (which was listed in SiteLock's privilege log).   (Doc. 600-4 at 1-2.)   GoDaddy also responded to SiteLock's request-specific objections, arguing, in broad strokes, that all of the requested materials were relevant, responsive to RFPs 2, 6, 8, 13, 57-60, and 65-70 (or, at a minimum, subject to disclosure under the MIDP), and "plainly within SiteLock's control." (*Id.* at 2-7.)[17] However, GoDaddy also agreed to narrow several of its requests to focus on "the subject[] matters reflected in Sections 1.1, 2.6, 3.9, 3.10, 3.12, 3.15, 3.16.3, 3.20.1, 3.24.1, and 3.24.2 of the SPA" and SPA Schedules.   (*Id.* at 4-7.)   Finally, GoDaddy reiterated its intent to "move ahead with third party subpoenas once SiteLock fulfills its obligations of producing all responsive documents called for by GoDaddy's supplemental discovery requests." (*Id.* at 8.)

On January 9, 2023, SiteLock responded.  (Doc. 600-5.)  After answering several of GoDaddy's clarifying questions, SiteLock stated: "Your December 16 letter . . . , for the first time, requests all documents that are merely 'referenced' in the SPA.  That request is vague and overbroad. . . .  Accordingly, SiteLock has not produced all documents that are merely 'referenced' in the SPA and its annexes. . . .  SiteLock has produced all documents that were part of the SPA's transaction binder, as well an index to the transaction binder which confirms that all documents that were part of the binder have been produced." (*Id.* at 1-2.)  However, SiteLock also offered to consider a more specific request if GoDaddy believed a certain document referenced in the SPA should be produced.  (*Id.* at 2.)  SiteLock then responded to GoDaddy's arguments about relevance, responsiveness, control, and work product.  (*Id.* at 2-5.)  Finally, SiteLock expressed that it would like to schedule the supplemental depositions of Feather and Serani and identify a new trial date.  (*Id.* at 6.)

On January 19, 2023, the parties met and conferred about the discovery dispute.

---

[17]     GoDaddy also observed that SiteLock had not stated, in its letter, that "SiteLock produced all such relevant responsive materials" and, based on SiteLock's failure to make such a statement, accused SiteLock of "still concealing documents."  (Doc. 600-4 at 4-5.)

(Doc. 600 ¶¶ 10-11.  *See also* Doc. 600-6 [transcript of meeting].)  In relevant part, GoDaddy's counsel asked whether SiteLock had searched for the requested documents. (Doc. 600-6 at 8-10.)  SiteLock's counsel expressed that SiteLock had tried to obtain documents from several entities,[18] all of which stated they would not produce them voluntarily.  (*Id.* at 8-9.)  SiteLock's counsel also represented that SiteLock had not (at least since the October 31, 2022 hearing) conducted any searches to determine whether SiteLock, itself, possessed the requested materials.  (*Id.* at 10-12.  *See also id.* at 12-13 [arguing it would be "burdensome" to conduct such searches].)  Ultimately, the parties agreed they were at an impasse.  (*Id.* at 15-16.)

### B.   **Legal Standard**

Under Rule 37(a)(3)(B), "[a] party seeking discovery may move for an order compelling an answer, designation, production, or inspection" when the non-moving party "fails to produce documents . . . as requested under Rule 34."

"Rule 34 governs requests and responses or objections for accessing documents and other information within the 'possession custody or control' of other parties."  *Murillo v. Arizona*, 2023 WL 2540245, *2 (D. Ariz. 2023).  "The purpose of Rule 34 is to make relevant and nonprivileged documents and objects in the possession of one party available to the other."  *Clark v. Vega Wholesale Inc.*, 181 F.R.D. 470, 471 (D. Nev. 1998) (citation omitted).  Rule 26(b), in turn, defines the "Scope and Limits" of discovery.  Under Rule 26(b)(1),

> Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit.

*Id.*  "[T]he party seeking to compel discovery has the initial burden of establishing that its

---

[18]     The transcript describes the entities as "Avery and Avery Entities."  (Doc. 600-6 at 9.)  Context suggests this was an error in transcription and the parties were discussing ABRY.  (*See also id.* [discussing IBS, "NetWeb Holdings," "NetWeb Incorporated," and "Avery Holdings"].)

request satisfies the relevancy requirements of Rule 26(b)." *Doe v. Swift Transp. Co.*, 2015 WL 4307800, *1 (D. Ariz. 2015).  This "is a relatively low bar."  *Cont'l Circuits LLC v. Intel Corp.*, 435 F. Supp. 3d 1014, 1018 (D. Ariz. 2020).  *See also* Fed. R. Civ. P. 26(b)(1) ("Information within this scope of discovery need not be admissible in evidence to be discoverable.").  If the movant meets its burden of establishing relevancy, "the party opposing discovery has the burden to demonstrate that discovery should not be allowed due to burden or cost and must explain and support its objections with competent evidence." *Doe*, 2015 WL 4307800 at *1.

Rule 26(b)(1) also requires that discovery be proportional to the needs of the case. *In re Bard IVC Filters Prod. Liab. Litig.*, 317 F.R.D. 562, 564 (D. Ariz. 2016) ("The 2015 amendments also added proportionality as a requirement for permissible discovery. Relevancy alone is no longer sufficient . . . .").  "The parties and the court have a collective responsibility to consider the proportionality of all discovery and consider it in resolving discovery disputes."  Fed. R. Civ. P. 26, advisory committee notes on the 2015 amendments.   In other words, Rule 26 "does not place the burden of proving proportionality on the party seeking discovery." *In re Bard IVC Filters*, 317 F.R.D. at 564. *See also id.* (noting that the proportionality inquiry "requires input from both sides").

C.     **The Parties' Arguments**

Based on the events described in Part II.A, SiteLock moves to enforce the Court's October 31, 2022 order and set a trial date.  (Doc. 597 at 1.)  GoDaddy moves to compel the production of "undisclosed documents related to the SPA."  (Docs. 598-99.)  The two motions substantially overlap, both in terms of the issues addressed and the relief requested. For clarity and efficiency, the Court has attempted to summarize the arguments by subject-matter, integrating all of the parties' submissions into one, cohesive analysis.

The parties dispute whether and to what extent GoDaddy is entitled to the documents it requests, which fall into two categories: (1) documents related to the SPA; and (2) documents related to Sectigo.  As for the first category, GoDaddy requests the following:

1.    Drafts or redlined versions of the SPA exchanged between, on the one hand, SiteLock, IBS, Unitedweb Holdings, LLC, Unitedweb, Inc. or their deal counsel and, on the other hand, [ABRY], SIH, or their deal counsel.

2.    Due diligence materials related to the SPA, including, but not limited to, documents 'uploaded to the 'data room' used to collect materials during due diligence on the transaction,' that concern or relate to Sections 1.1, 2.6, 3.9, 3.10, 3.12, 3.15, 3.16.3, 3.20.1, 3.24.1, and 3.24.2 of the SPA and the Disclosure Schedules thereto.

3.    Correspondence between, on the one hand, SiteLock, IBS, Unitedweb Holdings, LLC, Unitedweb, Inc., or their deal counsel and, on the other hand, [ABRY], SIH, or their deal counsel, concerning the transaction that ultimately culminated in the SPA, including, but not limited to, preliminary deal discussions prior to the exchange of drafts of the SPA, but limited to correspondence that concerns or relates to the subject matters reflected in Sections 1.1, 2.6, 3.9, 3.10, 3.12, 3.15, 3.16.3, 3.20.1, 3.24.1, and 3.24.2 of the SPA and the Disclosure Schedules thereto.

4.    Internal SiteLock correspondence, meaning correspondence involving SiteLock, IBS, Unitedweb Holdings, LLC, and/or Unitedweb, Inc., excluding privileged communications, concerning the transaction that ultimately culminated in the SPA, but limited to correspondence that concerns or relates to the subject matters reflected in Sections 1.1, 2.6, 3.9, 3.10, 3.12, 3.15, 3.16.3, 3.20.1, 3.24.1, and 3.24.2 of the SPA and the Disclosure Schedules thereto.

5.    Documents that Feather or Serani relied upon in making the representations and warranties set forth in Sections 1.1, 2.6, 3.9, 3.10, 3.12, 3.15, 3.16.3, 3.20.1, 3.24.1, and 3.24.2 of the SPA and the Disclosure Schedules thereto.

(Doc. 599 at 3-4, internal citations omitted.)   SiteLock opposes the five SPA-related document requests as seeking discovery that is irrelevant, disproportionate, and, at least to some extent, outside of SiteLock's custody and control.  (Doc. 597 at 6-10.  *See also* Doc. 610 at 2-11.)   GoDaddy argues the SPA-related documents are relevant for the same reasons as the SPA and responsive to various RFPs (Doc. 599 at 5-8; Doc. 604 at 3-8) and further argues that SiteLock has not demonstrated any undue burden associated with producing the requested documents (*id.* at 9-10).   As for custody and control, GoDaddy contends that the Court should reject SiteLock's arguments because SiteLock has not searched for the documents (Doc. 599 at 8) and argues that SiteLock, for a variety of reasons, has legal control over the documents sought.  (*See, e.g.*, *id.* at 9 [invoking the "alter ego" doctrine]; *id.* at 11 [arguing that IBS acted as SiteLock's "agent" with respect to "key

- 29 -

contracts"]; *id.* at 12 [arguing that "SIH is controlling this litigation"]; Doc. 604 at 13-14 [arguing that IBS is effectively the same entity as SiteLock]; *id.* at 14 [noting that SiteLock has not provided a declaration avowing that it lacks legal control over the requested documents].)

As for the second category of discovery sought (*i.e.*, documents related to Sectigo), GoDaddy moves to compel SiteLock to produce the LFA and an unredacted version of the Sectigo SPA. (Doc. 598 at 1.) SiteLock opposes these requests on two grounds: relevance and the work product doctrine. (Doc. 597 at 10-12; Doc. 610 at 11-16.) GoDaddy argues that SiteLock's privilege log is inadequate and, in any event, the work product doctrine does not apply. (Doc. 599 at 12-14, 16-17; Doc. 604 at 14-16.) As for the LFA, GoDaddy further argues that, even if the document is protected work product, SiteLock waived that protection by relying on the LFA to establish standing and, in a related vein, GoDaddy has a "substantial need" for it. (Doc. 599 at 14-16.)[19]

Finally, SiteLock asks the Court to "compel[] GoDaddy to provide its availability for the two four-hour depositions" of Feather and Serani and "set[] a new date for trial." (Doc. 597 at 1.) Specifically, SiteLock requests a trial date between March 20, 2023 and

---

[19]     GoDaddy also accuses SiteLock of "withholding more relevant documents," asserting that "SiteLock attached to [its opposition to GoDaddy's sanctions motion] yet another relevant, undisclosed document." (Doc. 599 at 6-7.) The document in question is an email chain between Serani, Feather, and someone at GoDaddy. (Doc. 578-2.) SiteLock's counsel avers that after GoDaddy filed its sanctions motion (Doc. 566), SiteLock's counsel reached out to ABRY's deal counsel "to confirm that any 'pleadings, correspondence and other documents relating to' SiteLock's claims against GoDaddy that were provided to the Purchaser under Section 3.12 were also produced in this litigation." (Doc. 578-1 ¶ 4.) ABRY's counsel "voluntarily provided SiteLock with seven PDF documents reflecting GoDaddy-related emails that were uploaded to the 'data room' during due diligence on the 2018 SPA." (Doc. 610 at 7 n.5.) Although "SiteLock had already produced versions of each of these emails in discovery" (Doc. 578-1 ¶ 5), "in an abundance of caution," SiteLock again provided GoDaddy with the emails. (Doc. 610 at 7-8 n.5.) The "relevant, undisclosed document" that GoDaddy alleges SiteLock failed to produce during discovery is one of the seven PDFs. (*Id.*) At the top of that document, there is a note stating: "Notice of stoppage on reporting" (Doc. 578-2), which did not appear on the version of the email that SiteLock produced during discovery (Doc. 610 at 8 n.5). In its reply, GoDaddy asserts that SiteLock "concealed" the document during discovery by producing "a different version of it in discovery *without this key language.*" (Doc. 611 at 3.) However, GoDaddy does not explain, nor can the Court ascertain, the significance of the "Notice of stoppage of reporting" text. In any event, GoDaddy does not request any relief related to SiteLock's failure to produce the newly disclosed version of the email during discovery.

1   July 14, 2023.  (*Id.* at 12-13.)  Alternatively, SiteLock asks the Court to "order GoDaddy

2   to provide its availability for trial and then set a new trial date that works for the Court and

3   the parties."  (*Id.* at 13.)  In response, GoDaddy asserts it "is not available for trial from

4   March through September" of 2023.  (Doc. 604 at 17.)  In reply, SiteLock argues that the

5   Court should either "order GoDaddy to provide its availability for trial within the next six

6   months" or, "at the very least, substantiate its claims that it is unavailable for trial before

7   October 2023."  (Doc. 612 at 1.)

8           D.    **Analysis**

9                 1.    Meet And Confer Efforts

10          Rule 37(a)(1) provides that a motion to compel must "include a certification that the

11   movant has in good faith conferred or attempted to confer with the person or party failing

12   to make the disclosure or discovery in an effort to obtain it without court action."  *See also*

13   LRCiv 7.2(j) ("No discovery motion will be considered or decided unless a statement of

14   moving counsel is attached thereto certifying that after personal consultation and sincere

15   efforts to do so, counsel have been unable to satisfactorily resolve the matter.").

16          Along with its motion to compel, GoDaddy provides a "Certification of Counsel"

17   and supporting statement describing the parties' meet-and-confer efforts about GoDaddy's

18   production requests.  (Docs. 601, 602.  *See also* Docs. 600-1 through 600-5

19   [correspondence]; Doc. 600-6 [transcript of phone conversation].)  SiteLock does not

20   challenge the sufficiency of GoDaddy's meet-and-confer efforts.  (*See generally* Doc. 610.)

21          In contrast, SiteLock did not include a meet-and-confer certification with its motion.

22   Thus, GoDaddy contends that SiteLock's motion "must . . . be denied for its failure to meet

23   and confer—in violation of this Court's Orders and the Local Rules."  (Doc. 604 at 2.)

24   More specifically, GoDaddy faults SiteLock for "only referenc[ing] deposition and trial

25   scheduling once, in a January 9, 2023 letter" and "never mention[ing] these issues during

26   the parties' meet and confer call."  (*Id.*)  SiteLock replies: "The parties exchanged four

27   letters on these exact disputes between November 2022 and January 2023.  The parties then

28   met-and-conferred telephonically on January 19, 2023.  In these discussions, GoDaddy (1)

demanded broad document discovery into drafting materials related to the 2018 SPA, (2) demanded that SiteLock produce documents in the possession of third parties (and threatened to subpoena these third parties if SiteLock did not comply), (3) repeatedly stated that it would not schedule supplemental depositions until SiteLock capitulated to GoDaddy's demands, and (4) refused to provide its availability for trial, despite SiteLock's request." (Doc. 612 at 10-11, internal citations omitted.)

For several reasons, the Court declines GoDaddy's invitation to deny SiteLock's motion for failure to meet-and-confer. First, although Local Rule 7.2(j) requires that parties certify the adequacy of their meet-and-confer efforts as to discovery motions, it is not clear that SiteLock's motion—which seeks a Court order preemptively making certain discovery-related findings but also setting a trial date and compelling GoDaddy to provide its availability for Feather's and Serani's depositions—falls into this category. And, to the extent SiteLock's motion *is* discovery-related, the record indicates the parties did meet-and-confer on those issues. (Docs. 600-1 through 600-6.) It also appears that SiteLock asked GoDaddy to provide its availability for the depositions and a new trial date in written correspondence (Doc. 600-5 at 6); in response, GoDaddy stated that it would work with SiteLock to schedule the depositions "[o]nce the outstanding document issues are resolved" (Doc. 612-2 at 2). Given the unresolved discovery-related disputes, it was reasonable of SiteLock to assume that the parties were also at an impasse about the depositions and trial date. Finally, although the meet-and-confer requirement serves an important purpose as a general matter, in this instance, given the significant overlap between GoDaddy's and SiteLock's motions, it seems unlikely that further conferral efforts about the scheduling issues would be productive without further guidance from the Court. Thus, judicial economy weighs in favor of resolving both motions on the merits.[20] *See also*

---

[20] The parties provide competing descriptions of the meet-and-confer efforts that preceded their respective motions, with each side blaming the other for the parties' inability to resolve these issues cooperatively and efficiently. (*See, e.g.*, Doc. 604 at 2 & n.3; Doc. 612 at 1-2.) The Court declines to address those arguments here except to note that, given the contentious history of this litigation, the Court is not particularly sympathetic to either side's complaints.

*Rogers v. Giurbino*, 288 F.R.D. 469, 477 (S.D. Cal. 2012) ("[C]ourts can still decide a motion on the merits despite a failure to meet and confer.").

2. Documents Related To The SPA

As discussed, GoDaddy seeks an order compelling SiteLock to produce (1) drafts of the SPA, (2) due diligence materials related to certain provisions of the SPA, (3) certain external correspondence related to the subject matter of those provisions; (4) internal correspondence involving SiteLock, IBS, Unitedweb Holdings, and/or Unitedweb that concerns the subject matter of those provisions; and (5) documents upon which Feather and/or Serani relied in making the representations and warranties in those provisions. (Doc. 599 at 3-4.)

SiteLock objects to these requests as seeking information that is irrelevant and disproportional to the needs of the case and beyond the scope of the Court's October 31, 2022 order. (Doc. 579 at 6-8; Doc. 610 at 2-6.) SiteLock also contends that, at least to some extent, the requests seek documents outside of SiteLock's possession, custody, or control. (Doc. 579 at 8-10; Doc. 610 at 6-11.)

a. **Relevance And Proportionality**

To determine relevance in this context, the Court looks to both Rule 26(b) and the scope of the October 31, 2022 order granting GoDaddy's request for discovery sanctions. GoDaddy bears the initial burden with respect to relevance. *Doe*, 2015 WL 4307800 at *1; Doc. 587 at 2 ["The parties are to meet and confer regarding . . . any request by GoDaddy for further undisclosed documents related to the SPA]; Doc. 593 at 111-12.)

To recap, during the October 31, 2022 hearing, the Court determined that the SPA was responsive to GoDaddy's RFP 2 as a "document[] relating to the termination of any contractual provision at issue in this litigation" and was also arguably subject to disclosure pursuant to the MIDP. (Doc. 593 at 98-102.) As for relevance, the Court found that the SPA contained information about whether the Reseller Agreement had been terminated by GoDaddy in March 2018, representations about pending or threatened legal claims affecting SiteLock, and representations about potential trademark infringement. (*Id.*) The

Court further determined that some of the relevant information in the SPA was not apparent from the SPA Schedules alone.  (*Id.* at 103-04.)

GoDaddy contends that the Court's determination that the SPA is relevant establishes that the drafts, due diligence materials, and correspondence are relevant as well.  (Doc. 599 at 5-6.)  More specifically, GoDaddy contends that "the SPA contains warranties (adopted by Feather and Serani) that, *inter alia*, (1) no one infringed on SiteLock's trademark, and (2) the Reseller Agreement terminated before April 2018," which "bear directly on SiteLock's claims."  (*Id.* at 6.  *See also id.* ["SiteLock intends to call Feather and Serani as their star witnesses at trial to, presumably, contradict their representations in the SPA. . . .  This certainly makes drafts of, and communications related to, those representations relevant, especially when they may reveal why those representations were made and upon what information."].)

SiteLock argues that although the Court determined that the *executed* SPA was relevant, "because it contains signed statements from SiteLock's parent company (IBS) about its knowledge of trademark infringement . . . and the termination of SiteLock's contracts," "[t]he same cannot be said of drafts, correspondence, and due diligence materials related to the 2018 SPA, which do not contain such authoritative statements."  (Doc. 597 at 6.  *See also id.* at 6-7 [arguing the SPA's integration clause means "these documents are not even relevant to the interpretation of the 2018 SPA itself"]; Doc. 610 at 3 ["The Court's holding that the 2018 SPA 'me[t] Rule 26's low bar for relevance in the discovery context' does not automatically mean that every document related to the drafting of the 2018 SPA is now relevant and discoverable.  And the Court's reasoning—that the 2018 SPA contained authoritative statements from SiteLock's parent company about trademark and termination issues—has no application to drafting materials that are not even relevant to interpreting the fully integrated 2018 SPA."].)

SiteLock misstates the Court's reasoning, which did not turn on the fact that the SPA was signed and executed.  Even if unexecuted, the SPA would have been responsive to RFP 2 as a document relating to the termination of the Reseller Agreement.  Further, the

Court found the SPA was relevant because it contained information regarding the Reseller Agreement's termination date, SiteLock's claims against GoDaddy, and whether any entity was infringing SiteLock's trademarks.  (Doc. 593 at 98-102.)  To the extent the Court expressed doubts about whether the representations in the SPA were binding on SiteLock, those comments formed part of the harmlessness inquiry and went to the document's evidentiary weight, not its relevance.  (*Id.* at 103-06.)  Even if expressed in drafts, any comments touching upon the same subjects would remain relevant.

In a related vein, SiteLock argues the requested documents are not responsive to any of GoDaddy's RFPs.  (Doc. 597 at 6-7; Doc. 610 at 4-5.)  Even assuming that is true, SiteLock's discovery violation gave rise to the current need for supplemental discovery—thus, to the extent the documents' relevance only became clear after the SPA was produced, faulting GoDaddy for failing to formally request those documents during discovery would constitute impermissible burden-shifting.  (*See also* Doc. 593 at 106.)

With these clarifications in mind, the Court turns to GoDaddy's specific requests.  First, GoDaddy requests "[d]rafts or redlined versions of the SPA exchanged between, on the one hand, SiteLock, IBS, Unitedweb Holdings, LLC, Unitedweb, Inc. or their deal counsel and, on the other hand, [ABRY], SIH, or their deal counsel."  (Doc. 599 at 3-4.)  The Court agrees with GoDaddy that the drafts of the SPA are relevant for the same reasons the SPA itself is relevant.  Further, this relevance only became apparent after SiteLock's late disclosure of the SPA.

Second, GoDaddy requests "[d]ue diligence materials related to the SPA, including, but not limited to, documents uploaded to the data room used to collect materials during due diligence on the transaction that concern or relate to Sections 1.1, 2.6, 3.9, 3.10, 3.12, 3.15, 3.16.3, 3.20.1, 3.24.1, and 3.24.2 of the SPA and the [SPA] Schedules thereto."  (Doc. 599 at 4, internal citation and quotation marks omitted.)  In its third and fourth requests, GoDaddy requests two categories of correspondence "concerning the transaction that ultimately culminated in the SPA, including, but not limited to, preliminary deal discussions prior to the exchange of drafts of the SPA, but limited to correspondence that

concerns or relates to the subject matters reflected in Sections 1.1, 2.6, 3.9, 3.10, 3.12, 3.15, 3.16.3, 3.20.1, 3.24.1, and 3.24.2 of the SPA and the [SPA] Schedules thereto": (1) "[c]orrespondence between, on the one hand, SiteLock, IBS, Unitedweb Holdings, LLC, Unitedweb, Inc., or their deal counsel and, on the other hand, [ABRY], SIH, or their deal counsel"; and (2) "[i]nternal SiteLock correspondence, meaning correspondence involving SiteLock, IBS, Unitedweb Holdings, LLC, and/or Unitedweb, Inc., excluding privileged communications." (*Id.*)  Fifth, GoDaddy requests "[d]ocuments that Feather or Serani relied upon in making the representations and warranties set forth in Sections 1.1, 2.6, 3.9, 3.10, 3.12, 3.15, 3.16.3, 3.20.1, 3.24.1, and 3.24.2 of the SPA and the Disclosure Schedules thereto." (*Id.*)

As for its second, third, fourth, and fifth requests, GoDaddy contends the requested materials are relevant because "the SPA contains warranties . . . that . . . no one infringed on SiteLock's trademark[] and . . . [that] the Reseller Agreement terminated before April 2018.  These warranties bear directly on SiteLock's claims.  The [requested documents] are relevant for these same reasons and are reasonably calculated to reveal the basis upon which those representations were made." (*Id.* at 6.)  In response, SiteLock again argues that "the 2018 SPA is a fully integrated contract" and thus such "parol evidence" is irrelevant.  (Doc. 610 at 3.)

As a general matter, the Court agrees with GoDaddy that, to the extent the SPA contains relevant representations, the materials underlying those representations (and related correspondence) are also relevant.  In relation to GoDaddy's sanctions motion, the parties debated whether various representations in the SPA were relevant.  (Docs. 567, 578, 582, 593.) In its motion to compel, GoDaddy again explains the perceived relevance of many of these representations.  (*See, e.g.*, Doc. 599 at 3, citing sections 3.9(d), 3.9(r), 3.10.1(j), 3.10.3, 3.20.1, 3.16.3, and 3.24.1.)  On the current record, the Court concludes that the following representations in the SPA meet Rule 26's low bar for relevance:

> **3.9(d) and (r)**:   Section 3.9 provides that, except as disclosed in Schedule 3.9 (or as contemplated by the Reseller Agreement), "neither the Company nor any of its Subsidiaries have," among other things, (d) "outside the Ordinary Course, entered into, materially modified, amended, extended

or terminated, or waived, released, or assigned any rights or Claims under, any Material Contract" or (r) "suffered any Material Adverse Effect." (Doc. 607-1 at 18-19 [Section 3.9(d), (r)].) The termination of "certain provisions" of the Reseller Agreement is listed in subparts (d) and (r) of Schedule 3.9. (Doc. 607-2 at 14-15.)

**3.10.1(j)**:     Section 3.10.1(j) provides that, with several exceptions (including as disclosed in Schedule 3.10.10), except for as disclosed in Schedule 3.10.1 (and several other exceptions not relevant here), "neither the Company nor any of its Subsidiaries is a party to or bound by . . . any Contract, the termination of which or the failure of which to be renewed, would reasonably be expected to have, individually, a Material Adverse Effect." (Doc. 607-1 at 20-21.) SiteLock's agreement with GoDaddy is not listed in Schedule 3.10.1(j). (Doc. 607-2 at 19.)

**3.10.2**:     Section 3.10.2 provides, in relevant part, that except as disclosed on Schedule 3.10.2, "there is no event, occurrence, condition, or act (including the consummation of the transactions contemplated by this Agreement and the Ancillary Agreements) that, with the giving of notice or the passage of time, could become a default or event of default in any material respect under any such Material Contract by any of the parties thereto. The Company has made available to the Purchaser true and complete copies of each written Material Contract and true and complete summaries of all oral Material Contracts." (Doc. 607-1 at 21-22.) Schedule 3.10.2 provides: "The Company believes GoDaddy is in breach of the GoDaddy Agreement for: (i) failing to promote and market the Company products in accordance with its obligations under the GoDaddy Agreement, and (ii) for not paying SiteLock, LLC for its products once GoDaddy has received payment from end users." (Doc. 607-2 at 21.)

**3.10.3**:     Section 3.10.3 provides that, except as disclosed on Schedule 3.10.3, "neither the Company, nor any Subsidiary of the Company, has received any written notice (a) alleging breach of any Material Contract, (b) terminating or threatening to terminate any Material Contract or (c) of intent not to renew a Material Contract." (Doc. 607-1 at 23.) Schedule 3.10.3 identifies "the termination of certain provisions [of] the GoDaddy Agreement." (Doc. 607-2 at 22.)

**3.12**:     Section 3.12 provides that, except as disclosed in Schedule 3.12, "since January 1, 2013, there is no Claim pending or threatened against or affecting the Company or any of its Subsidiaries, or any of their respective properties or assets, and no event has occurred or circumstance exists that could reasonably be expected to give rise to or serve as a basis for any of the foregoing. The Company has made available to the Purchaser true, correct and complete copies of all pleadings, correspondence and other documents relating to each proceeding disclosed on Schedule 3.12 . . . ." (Doc. 607-1 at 22.) Schedule 3.12 lists SiteLock's claim against GoDaddy (as described in Schedule 3.10.2). (Doc. 607-2 at 24.)

**3.16.3(b) and (d)**:     Section 3.16.3 (which falls under Section 3.16, entitled "Intellectual Property") provides that, except as disclosed on Schedule 3.16.3, among other things, (b) "to the knowledge of the Company, no Person is infringing on misappropriating, or using on an unauthorized basis any Company Owned Intellectual Property and no Person is considering or threatening such a Claim" and (d) "neither the Company nor any of its Subsidiaries has entered into any Contract to indemnify any other Person

against any charge of infringement of any Company Owned Intellectual Property other than in the Ordinary Course." (Doc. 607-1 at 24-25.) Schedule 3.16.3 identifies "the GoDaddy Agreement" with respect to subpart (d) but does not include any information with respect to subpart (b). (Doc. 607-2 at 32.) Thus, read together with Schedules 3.16.3(b) and (d), Section 3.16.3 makes two representations relevant to this litigation: First, to IBS's knowledge, GoDaddy was not infringing on SiteLock's trademark. Second, the Reseller Agreement was, at least in IBS's view, a contract "to indemnify any other Person against any charge of infringement of any Company Owned Intellectual Property other than in the Ordinary Course."

**3.20.1**:       Section 3.20.1, which falls under the heading "Relationships; Employee Compensation," includes, among other things, representations about facts, events, or circumstances affecting subsidiaries' relationships with other entities. (Doc. 607-1 at 29.) Schedule 3.20.1 identifies "the termination of certain provisions of the GoDaddy Agreement" as an exception to those representations. (Doc. 607-2 at 42.)

**3.24.1**:       Read together with Section 3.24.1, Schedule 3.24.1 lists "the fifteen (15) largest resellers or distributors and the fifteen (15) largest suppliers of the Company and its Subsidiaries"; GoDaddy is identified as one of the largest resellers from 2015 to February 2018 and as one of the largest suppliers from 2016 to February 2018. (Doc. 607-1 at 31; Doc. 607-2 at 55-58.)

**3.24.2**:       Section 3.24.2 provides that, except as disclosed on Schedule 3.24.2, "since January 1, 2017, no Person listed on Schedule 3.24.1 has terminated its relationship with the Company or any of its Subsidiaries or materially changed the pricing or other terms of its business with the Company or any of its Subsidiaries and no such resellers or supplier has notified the Company or any of its Subsidiaries that it intends to terminate or materially change the pricing or other terms of its business with the Company or any of its Subsidiaries." (Doc. 607-1 at 31.) Schedule 3.24.2 references the termination of certain provisions of the Reseller Agreement. (Doc. 607-2 at 58.)

For ease of reference, the Court will refer to the above-summarized representations as the "Key Representations."

The Court finds that the relevance of the Key Representations was not apparent until the SPA was produced. Although this conclusion applies with more force to certain representations than others—for example, the absence of section (b) in Schedule 3.16.3 is impossible to understand without reference to Section 3.16.3(b), whereas the tables in Schedule 3.24.1 could arguably stand on their own—the Court is satisfied that the SPA, at a minimum, provides helpful context for all of the Key Representations.

With this in mind, the Court turns to GoDaddy's requests for discovery related to "Sections 1.1, 2.6, 3.9, 3.10, 3.12, 3.15, 3.16.3, 3.20.1, 3.24.1, and 3.24.2 of the SPA and

the [SPA] Schedules thereto" and the subject matters "reflected" in those contractual provisions. (Doc. 599 at 4.) As worded, these requests are overbroad in two respects. First, GoDaddy has not established that the following sections of the SPA contain relevant representations: 1.1;[21] 2.6; 3.9(a)-(c), (e)-(q), (s)-(x); 3.10.1(a)-(i), (k)-(u); 3.16.3(a), (c), (e)-(i). Second, although the Court agrees with GoDaddy that 3.9(d), 3.9(r), 3.10.1(j), 3.10.2, 3.10.3, 3.12, 3.20.1, and 3.24.1 contain representations relevant to this litigation, many of those provisions also contain a great deal of irrelevant representations. For example, Schedule 3.9(d) lists four unrelated contractual agreements (between SiteLock and other entities). (Doc. 607-2 at 14.) Because the representations related to those agreements are irrelevant, the due diligence materials and correspondence related to those representations (and their subject matters), as well as the documents Feather and Serani relied upon in making those representations, are irrelevant as well. Accordingly, the Court narrows requests two through five to focus only on the Key Representations in sections 3.9(d), 3.9(r), 3.10.1(j), 3.10.2, 3.10.3, 3.12, 3.20.1, and 3.24.1.

In relation to its fifth request, GoDaddy also argues that materials on which Feather and Serani relied in making the Key Representations are relevant because, among other reasons, Feather and Serani signed the SPA as SiteLock's "agents." (Doc. 604 at 5. *See also id.* [arguing the statements in the SPA should be "imput[ed]" to SiteLock because "they were made to effectuate the sale of SiteLock, and were meant to bind SiteLock"].) Because the Court agrees with GoDaddy that Feather's and Serani's knowledge about the Key Representations is relevant—SiteLock previously acknowledged that Feather and

---

[21] Section 1.1, entitled "Certain Interpretative Matters," does not discuss SiteLock's relationship with GoDaddy (even by implication) and does not have a corresponding Schedule. (Doc. 607-1 at 6.) The section was not discussed at the October 31, 2022 hearing (Doc. 593) and GoDaddy does not explain the relevance of section 1.1 in its motion to compel. (Doc. 599.) However, unlike the other irrelevant sections, GoDaddy did reference 1.1.3 once in its motion for sanctions, asserting: "SiteLock and its 'Knowledge Persons,' including Mr. Feather and Mr. Serani, provided the representations and warranties set forth in the [SPA]" and SPA Schedules. (Doc. 567 at 6, citing section 1.1.3.) To the extent GoDaddy's position is that Feather's and Serani's status as "Knowledge Persons" is relevant to the litigation, it is free to inquire further in their respective depositions. However, GoDaddy has not established the relevance of Section 1.1 for purposes of the document requests.

- 39 -

1    Serani "are essentially the substance of our case" (Doc. 593 at 108)—it is not necessary to

2    address GoDaddy's alternative agency-based arguments.[22]   Likewise, because the Court

3    finds that the SPA-related documents are relevant for the same reasons the SPA itself is

4    relevant, it need not address GoDaddy's argument that the documents are also relevant to

5    SiteLock's standing.  (Doc. 599 at 6.)

6          As for proportionality, SiteLock argues the requested SPA-related documents are

7    "grossly disproportionate to both the needs of the case and the narrow scope of

8    supplemental discovery ordered by this Court."  (Doc. 597 at 8.)  According to SiteLock,

9    "[t]he Court originally contemplated that [Feather's and Serani's] depositions would take

10   place the following weekend during a recess from trial" and "[t]he Court did not

11   contemplate a new multi-month round of broad document discovery focused solely on the

12   drafting of the 2018 SPA."  (*Id.*  *See also* Doc. 610 at 5-6.)  SiteLock also notes that

13   "GoDaddy already has the 2018 SPA itself, the disclosure schedules, and every other

14   document contained in the transaction binder for the 2018 SPA" and "can ask SiteLock's

15   witnesses about these documents at their supplemental depositions and at trial."  (Doc. 597

16   at 8 ["GoDaddy does not need to pore over every draft and piece of correspondence related

17   to the drafting of the 2018 SPA."].)

18         SiteLock's proportionality arguments are unavailing for several reasons.  First,

19   although the Court was initially inclined to simply allow the depositions of Feather and

20   Serani to occur during trial, to require SiteLock to produce the unredacted SPA, and to

21   stick with the trial date of November 1, 2022, the Court also made clear that this suggested

22   remedy was an "imperfect solution" intended to balance the fact that SiteLock "caused this

23   whole problem with the late disclosure" against the "great costs" of a continuance.  (Doc.

24   593 at 106-08.  *See also id.* at 107 ["I know the parties have already put tremendous

25   resources into preparing for trial that is starting tomorrow. . . .  That's something I weigh.

26   I, of course, don't want to do anything that is unfairly prejudicial to GoDaddy by making

---

[22]    The Court is also wary that some of these alternative theories (*e.g.*, that SiteLock should be bound by the statements in the SPA) are substantive arguments buried in a discovery motion.

them litigate without full knowledge of facts.  I'm trying to take that into consideration too. And the best imperfect, admittedly, solution I can come up with is allowing depositions of Feather and Serani, but keeping the trial date as it is. . . .  To the extent that means that that interrupts SiteLock's order of proof, I'm not that sympathetic . . . ."].)  Because SiteLock responded by indicating it would rather continue the trial than proceed on those terms (*id.* at 109), a looming trial date no longer factors into the Court's decision as to the appropriate relief for SiteLock's discovery violation (or into the Court's proportionality analysis under Rule 26(b)(1)).

Turning to Rule 26(b)(1), the proportionality analysis involves "considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit."  As for the importance of the issues at stake, SiteLock describes the documents related to the SPA as "ancillary."  (Doc. 597 at 8.  *See also* Doc. 612 at 4 ["[T]he 'importance of the issue at stake' . . . is minimal at best."].) However, even assuming the SPA is not the "smoking gun" that GoDaddy portrays it to be, it is relevant to the litigation and responsive to at least one of GoDaddy's RFPs.  Given that SiteLock created the need for this supplemental discovery by failing to produce a responsive document, SiteLock's argument that GoDaddy is now "creating a sideshow" (*id.* at 1) is not as persuasive as it might have been had SiteLock complied with its discovery obligations in the first instance.  For the same reason, SiteLock's arguments that "GoDaddy can ask Mr. Feather and Mr. Serani about the bases of [the relevant] representations in their upcoming depositions" (Doc. 610 at 3) and that "the burden and expense of this discovery far outweighs any speculative benefit that it might provide" (Doc. 612 at 4) are unpersuasive.[23]  Finally, as discussed in more detail below, SiteLock also seems to assert

---

[23]    In its reply supporting its motion to enforce the October 31, 2022 order, SiteLock also argues that "the drafting materials that GoDaddy seeks are not 'important to resolving the issue[]' that GoDaddy seeks to investigate: the statements made in the 2018 SPA.'" (Doc. 612 at 4.)  Setting aside the propriety of raising this argument for the first time in a reply, the argument is premised on the assumption that the SPA's relevance arises from the fact that it contains "signed" statements.  Because the Court disagrees with this premise,

1   that many of the requested documents are outside its custody or control.  (Doc. 597 at 8-

2   10; Doc. 610 at 6-10.)   To the extent this representation has any bearing on the

3   proportionality analysis, it cuts against SiteLock because it suggests that the number of

4   SPA-related documents SiteLock would be required to produce in response to GoDaddy's

5   five requests (and the associated cost of the production) would not be particularly high.

### b.   **Possession, Custody, Or Control**

7       SiteLock contends "the Court should limit any production to materials in the

8   possession, custody, and control of SiteLock itself" and "reject GoDaddy's attempt to

9   compel SiteLock to produce documents possessed by third party entities such as IBS,

10   UnitedWeb Inc., [ABRY], and their respective law firms, which are not within SiteLock's

11   possession, custody, or control."  (Doc. 597 at 8-9.)

12       "Control is defined as the legal right to obtain documents upon demand."  *In re*

13   *Citric Acid Litig.*, 191 F.3d 1090, 1107 (9th Cir. 1999) (citation omitted).[24]  *See also id.* at

14   1108 ("Ordering a party to produce documents that it does not have the legal right to obtain

15   will oftentimes be futile, precisely because the party has no certain way of getting those

16   documents.").  "The party seeking production of the documents . . . bears the burden of

17   proving that the opposing party has such control."  *United States v. Int'l Union of*

18   *Petroleum & Indus. Workers, AFL-CIO*, 870 F.2d 1450, 1452 (9th Cir. 1989).[25]

19   the argument fails on the merits.

20   [24]     "Although *Citric Acid* addressed control as used in Civil Rule 45, there is no reason
    why it should be interpreted differently in Civil Rule 34(a)(1), and district courts have so
21   held."  *In re Tavernier*, 2022 WL 5224019, *1 (Bankr. D. Or. 2022).  *See also Forestier v.*
    *City of Vancouver*, 2006 WL 8455194, *2 (W.D. Wash. 2006) ("The legal control test is
22   the standard under both Rule 34 and Rule 45.").

23   [25]     GoDaddy argues that SiteLock must verify, under oath, that SiteLock does not have
    custody or control of some or all of the requested documents *before* the burden of proof
24   shifts to GoDaddy.  (Doc. 599 at 8.)  According to GoDaddy, "SiteLock cannot meet this
    burden because SiteLock has not even searched for the SPA Documents."  (*Id.  See also*
25   Doc. 604 at 14 ["SiteLock did not submit a declaration stating that it does not have a legal
    right to access these documents . . . ."].)  Several district courts have held that a party
26   asserting that it does not have custody or control over requested documents "must state so
    under oath and describe efforts he made to locate responsive documents."  *Bryant v.*
27   *Armstrong*, 285 F.R.D. 596, 603 (S.D. Cal. 2012).  *See also Rogers v. Giurbino*, 2016 WL
    3878163, *4 (S.D. Cal. 2016).  This requirement arises from the general principle that
28   "[w]hen a response to a production of documents is not a production or an objection, but
    an answer, the party must answer under oath."  *Bryant*, 285 F.R.D. at 603 (citation omitted).
    Here, however, the issue is not whether SiteLock has properly responded to GoDaddy's

In an attempt to meet this burden, GoDaddy first argues that SiteLock has demonstrated that it has access to documents possessed by SIH and/or IBS (and their respective deal counsel) by producing such documents in the past.  (Doc. 599 at 9-11.)  For example, SiteLock produced the SPA and the SPA Schedules and was able to obtain "additional SPA documents" from DLA Piper ("deal counsel to SIH") within four days.  (*Id.* at 9.)  SiteLock also produced the Sectigo SPA and an email "ostensibly between Unitedweb and IBS."  (*Id.* at 10-11.)  In response, SiteLock argues that these facts do not establish control because "'[p]ractical ability' is not the standard in the Ninth Circuit; instead, the responding party must have the 'legal right' to obtain those documents."  (Doc. 597 at 9, citation omitted.)  Thus, "the mere fact that ABRY's deal counsel voluntarily provided SiteLock with six emails related to GoDaddy that were uploaded to the 'data room' during due diligence on the 2018 SPA" does not establish that SiteLock has a legal right to the additional documents sought by GoDaddy, which include "ABRY's 'internal correspondence' regarding negotiations over the 2018 SPA."  (*Id.* at 9-10.)  SiteLock also contends that it "has advised GoDaddy that ABRY has declined to provide SiteLock these documents."  (*Id.  See also* Doc. 610 at 8 ["[A]s SiteLock has advised GoDaddy, SiteLock has no legal right to compel SIH to produce these documents."].)

SiteLock has the better of this argument.  In *Citric Acid*, the Ninth Circuit rejected the "practical-ability-to-obtain-documents test," concluding that the "legal control test is

production requests but instead whether GoDaddy's requests, on their face, seek materials outside of SiteLock's legal control.  GoDaddy has the burden of establishing such control. *Int'l Union of Petroleum & Indus. Workers*, 870 F.2d at 1452.  Of course, if after conducting a diligent search and reasonable inquiry in an effort to obtain responsive documents pursuant to this order, SiteLock's position is that no responsive documents exist within its possession, custody, or control, SiteLock will be required to supplement its discovery responses to reflect that result.  Fed. R. Civ. P. 34(b)(2)(C).  In an abundance of caution, the Court further notes that if SiteLock's search efforts reveal that SiteLock has possession or custody of some of the requested documents that SiteLock contends are outside its legal control (such as communications between ABRY and IBS about the SPA, for example), SiteLock is required to produce those documents.  In other words, at this juncture, the Court's analysis is limited to whether SiteLock has control over documents possessed by IBS, SIH, ABRY, Unitedweb, Unitedweb Holdings, and/or the entities' respective deal counsel.  For purposes of that analysis, SiteLock is not required to avow, under oath, that it does not have control over some or all of the requested documents.

the proper standard." 191 F.3d at 1107-08. *See also Matthew Enter., Inc. v. Chrysler Grp. LLC*, 2015 WL 8482256, *3 (N.D. Cal. 2015) ("Like the majority of circuits, the Ninth Circuit has explicitly rejected an invitation to define 'control' in a manner that focuses on the party's practical ability to obtain the requested documents.") (internal quotation marks omitted). Thus, the fact that SiteLock previously obtained certain documents from SIH, IBS, ABRY, and/or the Unitedweb entities does not establish that SiteLock has ongoing legal control over other documents possessed by those entities. *See also Citric Acid*, 191 F.3d at 1108 (the fact that "C&L–Switzerland . . . voluntarily furnished C&L–US with documents and information in the past" did not establish control where C&L–Switzerland could legally refuse to turn over the requested documents).

Next, GoDaddy argues that SiteLock's close relationships with IBS and SIH establish that SiteLock has legal control of documents possessed by those entities. (Doc. 599 at 9-11.)[26] Alternatively, GoDaddy argues that such control should be inferred under either the alter-ego standard or agency principles. (*Id.* at 8-11, footnote omitted.)

Under the definition of "control" in *Citric Acid*, a responding party may have control over a document by virtue of the responding party's control over the entity that has possession of the document. *Hammler v. Hernandez*, 2020 WL 107064, *1 (S.D. Cal. 2020). *See also Int'l Union of Petroleum & Indus. Workers*, 870 F.2d at 1452 ("A corporation must produce documents possessed by a subsidiary that the parent corporation owns or wholly controls."). However, such "[c]ontrol must be firmly placed in reality, not in an esoteric concept such as 'inherent relationship.'" *Int'l Union of Petroleum & Indus.*

---

[26] SiteLock contends that "GoDaddy does not make any argument that SiteLock has 'possession, custody, or control' over documents maintained by UnitedWeb Holdings LLC, UnitedWeb Inc., ABRY, or these non-parties' respective law firms" and thus the Court should "deny GoDaddy's motion to the extent it seeks to compel SiteLock to produce documents maintained by those non-parties." (Doc. 610 at 7 n.4.) However, several of GoDaddy's arguments as to IBS and SIH incorporate arguments about their respective parent companies, which, at least at some point, included Unitedweb and ABRY. (*See, e.g.*, Doc. 599 at 10-11 ["SiteLock was wholly owned by IBS, which, in turn, was majority-owned by Unitedweb and certain SiteLock employees."]; *id.* at 12 ["SiteLock's only representative at mediation was Caitlin Yanchek of [ABRY]/SGH/SIH."].). At any rate, because the Court agrees with SiteLock on the merits as to IBS and SIH, GoDaddy's arguments about Unitedweb and ABRY fail as well.

*Workers*, 870 F.2d at 1453-54 (citation omitted).  "The requisite relationship is one where a party can order the person or entity in actual possession of the documents to release them."  *HDT Bio Corp. v. Emcure Pharms., Ltd.*, 2022 WL 16835758, *7 (W.D. Wash. 2022) (citation omitted).  "Such a position of control is usually the result of a statute, contractual provision, affiliation, or employment."  *Id.*

Here, GoDaddy argues that SiteLock has "control" over documents possessed by IBS because "IBS held itself out as being one and the same with SiteLock," "SiteLock clearly did not view IBS as a separate entity," "there was significant overlap in the ownership and management of SiteLock and IBS," and "there is evidence that SiteLock acted for or controlled IBS." (Doc. 599 at 8-11.  *See also id.* at 12 ["SiteLock's relationship with SIH is just as intertwined."].)  According to GoDaddy, "[c]ourts routinely find legal control where, as here, the party and its non-party affiliate are sufficiently intertwined." (Doc. 604 at 11.)  To support its position, GoDaddy relies on a number of district court cases, including *HDT Bio Corp. v. Emcure Pharms., Ltd.*, 2022 WL 16835758 (W.D. Wash. 2022); *K-fee Sys. GmbH v. Nespresso USA, Inc.*, 2022 WL 2156036 (C.D. Cal. 2022); *QC Labs v. Green Leaf Lab, LLC*, 2019 WL 6797250 (C.D. Cal. 2019); *Almont Ambulatory Surgery Ctr., LLC v. UnitedHealth Grp. Inc.*, 2018 WL 1157752 (C.D. Cal. 2018); *Thales Avionics Inc. v. Matsushita Avionics Sys. Corp.*, 2006 WL 6534230 (C.D. Cal. 2006); *Kyocera Int'l, Inc. v. Nokia, Inc.*, 2005 WL 8173284 (S.D. Cal. 2005); and *Choice-Intersil Microsystems, Inc. v. Agere Sys., Inc.*, 224 F.R.D. 471 (N.D. Cal. 2004).[27] (Doc. 599 at 8-11; Doc. 604 at 11-14.)

In response, SiteLock contends that "GoDaddy's cited cases are inapposite" because "[n]one of them apply the 'legal right' standard required by Ninth Circuit precedent. Instead, they either apply out-of-circuit precedent that the Ninth Circuit has rejected, or do not apply any precedent at all." (Doc. 610 at 7 n.2.  *See also id.* at 9 nn.7, 8.)

The issue of when a subsidiary has "control" over documents possessed by its parent

---

[27]     GoDaddy also references a number of out-of-circuit cases. (*See, e.g.*, Doc. 604 at 11-14.) However, because the definition of "control" for purposes of Rule 34 varies among circuits, the Court does not find these cases particularly persuasive.

corporation has generated some debate among district courts within the Ninth Circuit.  *See, e.g.*, *Quest Integrity USA, LLC v. A.Hak Indus. Servs. US, LLC*, 2016 WL 4533062, *4 (W.D. Wash. 2016) ("Notwithstanding the definition of 'control' set forth in *International Union* and *In re Citric*, the Court notes that courts within the Ninth Circuit (including courts within the same district) have taken inconsistent positions when addressing whether a subsidiary possesses sufficient 'control' of documents or items allegedly in their parent corporation's possession.") (collecting cases).   More specifically, some courts have indicated that facts such as "commonality of ownership" and "significant sharing of business resources" may establish legal control[28] while other courts have required a more specific showing that the subsidiary has the legal right to obtain documents from its parent on demand.[29]

---

[28]    *See, e.g., QC Labs*, 2019 WL 6797250 at *7-8 ("In ruling on Rule 34 motions to compel a corporation to produce documents from another corporation, the courts have defined 'control' to include both the legal right to control the company and the actual ability.  Entities with common ownership and are operated out of the same location, among other indicia of common possession, custody, and control may be required to produce documents held by the commonly owned entities, even if only one is a party to the litigation. . . .  [W]here the relationship is thus such that the agent-subsidiary can secure documents of the principal-agent to meet its own business needs and documents helpful for use in the litigation, the courts will not permit the agent-subsidiary to deny control for purposes of discovery by an opposing party.") (internal citations and quotation marks omitted); *Thales Avionics*, 2006 WL 6534230 at *4-6 (analyzing whether a subsidiary had control over documents possessed by its grandparent company based on "(a) commonality of ownership, (b) exchange or intermingling of directors, officers or employees of the two corporations, (c) exchange of documents between the corporations in the ordinary course of business, (d) any benefit or involvement by the non-party corporation in the transaction, and (e) involvement of the non-party corporation in the litigation") (citation omitted); *Kyocera*, 2005 WL 8173284 at *5 ("Where the relationship concerns whether a subsidiary has the requisite control over a parent corporation to obtain information from the parent for discovery, courts consider 'the degree of ownership and control exercised by the parent over the subsidiary, a showing that the two entities operate[] as one, demonstrated access to documents in the ordinary course of business, and an agency relationship.'") (citation omitted).

[29]    *See, e.g., PlayUp, Inc. v. Mintas*, 2022 WL 4112243, *2 (D. Nev. 2022) ("Courts generally recognize the formal separateness of related companies. . . .  Hence, the party seeking such discovery must meet the heavy burden of showing that the party on whom the discovery was served has the legal right to obtain documents on demand from its affiliated company that actually possesses the documents.  A showing like that made here of a past exchange of documents and some indicia of corporate overlap is plainly insufficient to meet that standard.") (internal citations omitted); *M. G. v. Bodum USA, Inc.*, 2020 WL 1667410, *3 (N.D. Cal. 2020) (disagreeing with the plaintiff's proposition that "control may be established based on the 'close nature' in the actual corporate relationship even where the subsidiary does not have a legal right to demand that the parent furnish the requested discovery materials" because "[s]uch a broad reading is inconsistent with the

- 46 -

As SiteLock notes, the decisions finding control based on the close relationship between a subsidiary and its parent (without a specific finding that the subsidiary has the legal right to obtain documents from its parent on demand) have, at least for the most part, relied on out-of-circuit precedent. *See, e.g.*, *QC Labs*, 2019 WL 6797250 at *5-8 (relying on *Uniden Am. Corp. v. Ericsson Inc.*, 181 F.R.D. 302, 306 (M.D.N.C. 1998), and *Steele Software Sys., Corp. v. DataQuick Info. Sys., Inc.*, 237 F.R.D. 561, 564-65 (D. Md. 2006)); *Almont*, 2018 WL 1157752 at *18-19 (relying on *Uniden*); *Thales Avionics*, 2006 WL 6534230 at *5 (relying on *Uniden*); *Kyocera*, 2005 WL 8173284 at *5 (relying on *Camden Iron & Metal, Inc. v. Marubeni Am. Corp.*, 138 F.R.D. 438 (D.N.J. 1991)); *Choice-Intersil Microsystems*, 224 F.R.D. at 472-73 (relying on *Camden*).  Many of those out-of-circuit cases, in turn, defined "control" more broadly than the Ninth Circuit did in *Citric Acid*. *See, e.g.*, *Uniden*, 181 F.R.D. at 305-06 (defining "control" as including "both the legal right to control the company and the actual ability" and reasoning that although "subsidiary corporations which are wholly owned by the parent have no right to order the parent corporation to turn over documents," "the subsidiary may be required to respond to a Rule 34 request which includes the parent company's documents" based on "some intermingling of directors, officers, or employees, or business relations"); *Steele Software Sys.*, 237 F.R.D. at 564 ("'Control' has been construed broadly by the courts as the legal right, authority, or practical ability to obtain the materials sought on demand."); *Camden*, 138 F.R.D. at 441-42 ("Federal courts construe 'control' very broadly under Rule 34. . . . [I]n parent/subsidiary situations, the determination of control turns upon whether the intracorporate relationship establishes some legal right, authority *or* ability to obtain the requested documents on demand.  Evidence considered by the courts includes the degree of ownership and control exercised by the parent over the subsidiary, a showing that the

---

Ninth Circuit's holding in *In re Citric Acid*, as numerous courts in this district have recognized"); *City of Seattle v. ZyLAB N. Am., LLC*, 2017 WL 4418636, *6 (W.D. Wash. 2017) (under *Citric Acid*, the close relationship between a parent and its subsidiary was not sufficient to demonstrate control in the absence of evidence that the subsidiary had "a contractual or legal relationship with [its parent], such that the former can force the latter to turn over documents in its possession").

two entities operated as one, demonstrated access to documents in the ordinary course of business, and an agency relationship.").

Accordingly, to the extent the cases cited by GoDaddy suggest that a subsidiary may have control over documents possessed by its parent irrespective of whether the subsidiary has the legal right to obtain such documents on demand, the Court declines to follow those decisions. *Accord Bodum*, 2020 WL 1667410 at *3-4 ("The Court declines Plaintiff's invitation to [follow] the proposition that control may be established based on the close nature in the actual corporate relationship even where the subsidiary does not have a legal right to demand that the parent furnish the requested discovery materials. Such a broad reading is inconsistent with the Ninth Circuit's holding in *In re Citric Acid. Litig.*, as numerous courts in this district have recognized.") (cleaned up); *Otos v. WHPacific, Inc.*, 2017 WL 2452008, *2 (W.D. Wash. 2017). Instead, the Court concludes that "the proper test for determining control between a subsidiary and its parent is whether the subsidiary has the legal right to demand production of the documents or things sought from its parent." *Otos*, 2017 WL 2452008 at *2.

With this clarification in mind, the Court turns to the parties' factual arguments regarding the presence or absence of control. GoDaddy identifies the following reasons why SiteLock should be deemed to have legal control over documents possessed by IBS: (1) IBS held itself out as being one and the same with SiteLock and the entities had consolidated financial statements, operations, and cash flows (Doc. 599 at 10); (2) SiteLock did not list IBS on its disclosure statement (*id.*); (3) Feather testified that "IBS' 'only job was owning SiteLock'" (*id.*, emphasis omitted); (4) Feather was "IBS' former President" yet "did not even list IBS on his LinkedIn profile, listing just 'SiteLock' instead" (*id.*, emphasis omitted); (5) before the SPA, SiteLock was wholly owned by IBS (*id.* at 10-11); (6) "IBS and SiteLock had several overlapping officers and directors" (*id.* at 11); (7) "Feather testified . . . that IBS had no employees" (*id.*); (8) "Feather used a SiteLock email address to communicate with Unitedweb about IBS" (*id.*); (9) in the *Gorny* litigation, SIH averred that the SPA was initiated because "the owners of SiteLock decided to sell the

business by selling IBS (which wholly owned SiteLock)" (*id.*); and (10) "IBS bound SiteLock to reseller agreements, signing as d/b/a SiteLock" (*id.* at 11 n.5).  As for SiteLock's relationship with SIH, GoDaddy contends that control exists because "SiteLock produced documents purportedly in SIH's possession" (*i.e.*, the SPA and related documents), assigned its claims to ABRY,[30] and SIH has a continuing interest in this litigation under the LFA.  (*Id.* at 12.)  Also, "SiteLock's only representative at mediation was Caitlin Yanchek of ABRY/SGH/SIH."  (*Id.*)

In response, SiteLock asserts that IBS, SIH, and SiteLock are separate corporate entities and that any control IBS and/or SIH may have over documents possessed by SiteLock does not imply the converse.  (Doc. 610 at 8-10.  *See also* Doc. 597 at 9-10.) More specifically, SiteLock argues that the overlap in functions and ownership between SiteLock and IBS establishes, at most, that SiteLock has the "practical ability" to obtain documents from IBS/SIH, not the legal right to do so.  (Doc. 610 at 8-9 & n.6.)  SiteLock also contends that "[t]he fact that IBS has the power to, and sometimes does, use SiteLock as its public 'd/b/a' (doing business as) name . . . has no bearing on SiteLock's ability to control IBS."  (*Id.*at 10.)  Likewise, SiteLock argues that the fact it produced documents labeled "IBS" is "unremarkable"—"parties frequently receive documents from non-parties in the ordinary course of business and later produce those documents in litigation."  (*Id.*) Finally, SiteLock argues that the fact its *owners* decided to sell SiteLock by selling IBS "says nothing about SiteLock's control over IBS's documents at all."  (*Id.* at 10-11.)  As for SIH (and SGH and ABRY), SiteLock argues that GoDaddy's unsupported assertion that "those entities are supposedly 'driving this action' . . . comes nowhere close to showing SiteLock's 'legal right' to obtain documents from these entities 'upon demand.'"  (Doc. 612 at 7-8.  *See also id.* at 8 n.5 [noting that "[n]one of the signatories to the 2018 SPA assumed the 'liability relating to this lawsuit,' or have 'power of attorney over this lawsuit'"].)

---

[30]     For the reasons discussed in Part I, the record does not support the theory that SiteLock assigned its claims to ABRY.

As an initial matter, the Court disagrees in several ways with the manner in which GoDaddy characterizes the evidence.  First, GoDaddy's contention that IBS "held itself out as SiteLock" is only partially supported by the record.  For example, Doc. 603-1 includes consolidated financial statements from IBS "dba" SiteLock, but also describes IBS and SiteLock as distinct entities: "Innovative Business Services, LLC . . . was formed in Delaware on September 30, 2009 and is the parent company of Site lock, LLC."  (Doc. 603-1 at 10.  *See also id.* at 12 ["As a limited liability company, IBS has elected to be treated as a partnership for federal income tax reporting.  As a single-member limited liability company, [SiteLock] is treated as a disregarded entity for income tax purposes."]; *id.* at 18 [describing Unitedweb as an "entity related to" IBS and SiteLock through "similar ownership"].)  Second, it is not clear, as GoDaddy asserts (Doc. 611 at 8), that SIH's statement in the *Gorny* litigation establishes that "SiteLock's owners exercised enough control over IBS to direct the sale of SiteLock through a sale of IBS."  SIH represented that SiteLock's *owners* decided to execute the sale, not SiteLock itself.  (Doc. 79-2 at 54 ¶ 26 ["In late 2017, the owners of SiteLock decided to sell the business by selling IBS (which wholly owned SiteLock).  ABRY, a private equity firm, expressed an interest in an investment in IBS (and thereby buying SiteLock) to be made by private equity funds affiliated with ABRY."].)  Given that IBS owned SiteLock, and that the SPA transferred IBS's equity to SIH, the assertion that the "owners of SiteLock" decided to sell SiteLock by selling IBS could also be interpreted as merely reflecting the fact that the owners of IBS also owned SiteLock.  Third, as discussed in Part I, the record does not support GoDaddy's assertion that SiteLock "assigned" its claims to ABRY or that ABRY was the only entity present at the May 2021 mediation.

At any rate, applying the legal standard for "control" provided in *Citric Acid*, the Court agrees with SiteLock that, on this record, GoDaddy has not demonstrated that SiteLock has the legal right to obtain documents from IBS or SIH.  As for IBS, the facts at most demonstrate a close corporate relationship between IBS and SiteLock, but such a relationship does not establish that a subsidiary can compel its parent to release documents

or that the subsidiary would have legal recourse if the parent declined. "Legal right suggests an ownership interest, a binding contract, a fiduciary duty, or some other legally enforceable arrangement." *Seegert v. Rexall Sundown, Inc.*, 2019 WL 12044514, *3 (S.D. Cal. 2019) (citations and quotation marks omitted). The fact that IBS wholly owned SiteLock and did business as SiteLock may suggest that IBS controlled SiteLock, but it does not suggest the converse. *Accord Illumina Cambridge Ltd. v. Complete Genomics, Inc.*, 2020 WL 820327, *8 (N.D. Cal. 2020) (noting that, under the *Citric Acid* standard, "a subsidiary generally would not have legal control over documents that a parent possesses"); *Ehrlich*, 2011 WL 3489105 at *1 ("Plaintiff has not established that Defendant BMW NA has legal control over documents in BMW AG's files. BMW NA is owned by a company that is owned by BMW AG. Nothing about this relationship suggests that BMW NA has the power to order BMW AG to turn over documents to BMW NA."); *Hambrecht Wine Grp., L.P. v. Millennium Imp. LLC*, 2006 WL 3302428, *2 (N.D. Cal. 2006) ("[P]laintiff fails to distinguish between a parent's control over a subsidiary, and a subsidiary's control over its parent. Thus, although plaintiff might be able to argue successfully that after the acquisition LVMH had control over Millennium's documents, plaintiff certainly has shown no legal right possessed by Millennium to exert any control over LVMH's documents.").[31] Likewise, Feather's status as the former president of both companies and use of his SiteLock email address to communicate with Unitedweb about IBS does not show that SiteLock has any legal right to obtain responsive documents from IBS upon demand. *See also Micron Tech., Inc. v. Tessera, Inc.*, 2006 WL 1646133, *2 (N.D. Cal. 2006) ("Micron states that SUI is 100% owned by SPIL, and argues that SUI would in the ordinary course of business have access to the documents Micron is seeking. Micron cites the fact that SPIL created SUI to engage as SPIL's sales agent in North America, and the fact that SUI and SPIL have overlapping management teams. . . . Micron

---

[31]     Also, there is evidence that IBS and SiteLock are no longer affiliated. (*See, e.g.*, Doc. 600-6 at 15.) If so, it is not clear how the entities' past relationship bears on SiteLock's current ability to obtain documents from IBS (even if those documents relate to past endeavors).

1   has introduced evidence that SUI and SPIL are closely related companies with some

2   management in common.  This evidence would likely be sufficient under a 'practical

3   ability' standard, but it falls short under the Ninth Circuit's 'legal right' test."); *Genentech,*

4   *Inc. v. Trustees of Univ. of Pa.*, 2011 WL 5373759, *3 (N.D. Cal. 2011) ("The fact that

5   Genentech is wholly owned by Roche, and Roche controls Genentech's Herceptin

6   operations—or has controlled those operations since May 2009—suggests at most that

7   Roche has the legal right to obtain documents pertaining to Genentech.  Penn has not shown

8   that the converse is true.") (footnotes omitted).  Finally, the fact that SiteLock produced

9   documents labeled "IBS" simply demonstrates that SiteLock has received documents from

10  IBS in the past, which does not establish legal control.  *See also Citric Acid*, 191 F.3d at

11  1108.

12          GoDaddy also has not established that SiteLock has legal control over documents

13  possessed by SIH (or ABRY).[32]  Again, the fact that SiteLock was previously able to obtain

14  documents from SIH, such as the SPA and SPA Schedules, does not establish that it has

15  the legal right to obtain other documents.  Indeed, SiteLock's counsel has indicated that

16  ABRY will not voluntarily furnish the requested documents (Doc. 600-6 at 9-10) and

17  GoDaddy has not provided any evidence that SiteLock has legal recourse to challenge

18  ABRY's decision.  GoDaddy's repeated assertion that SIH is "controlling this litigation"

19  (Doc. 599 at 10) fares no better.  To show such control, GoDaddy points to the LFA and

20  the fact that Yanchek attended the mediation.  (Doc. 604 at 11, citing Doc. 594-2 ¶ 2.)

21  However, a former parent's interest in a subsidiary's litigation pursuant to a litigation

22  funding arrangement does not establish that the subsidiary controls documents possessed

23  by its former parent.

24          GoDaddy's agency and alter ego arguments fail for similar reasons.  Even assuming

25

26  _____

    [32]     As with IBS, it is not clear that SiteLock remains affiliated with ABRY.  SiteLock
27  represents that SGH (which was owned by funds affiliated with ABRY) sold SIH to Sectigo
    in 2021.  (Doc. 594 at 4.  *See also* Doc. 594-1 ¶ 4.)  At least on the current record, and
28  assuming that SGH is still owned by ABRY, it appears that SiteLock remains connected
    with ABRY only through the LFA, which does not establish that SiteLock controls ABRY
    for purposes of Rule 34.

that control may be established based on a principal-agent relationship or under the alter ego doctrine, the facts here don't support finding control under either theory. As for the alter ego standard, despite GoDaddy's arguments to the contrary (Doc. 599 at 12; Doc. 604 at 12), the Court does not find that SiteLock has engaged in the sort of "fraud and deceit" or "misuse and abuse of the corporate form" that warrants finding control based on equitable principles. *Better Care Plastic Tech. Co. v. Gredale, LLC*, 2022 WL 2046206, *10 (C.D. Cal. 2022). GoDaddy seeks to analogize this case to *QC Labs*, arguing that "[m]uch like the party in *QC Labs*, SiteLock misled GoDaddy and the Court." (Doc. 604 at 13.) But in *QC Labs*, the court found that the defendant had "intentionally avoided providing information" about the entity in possession of documents, including by having its Rule 30(b)(6) representative give evasive deposition answers. 2019 WL 6797250 at *9. SiteLock's failure to produce the SPA, although a discovery violation, is not comparable. Further, the Court does not find that SiteLock is "try[ing] to hide documents or make discovery of them difficult" by asserting that it does not control documents possessed by IBS, SIH, ABRY, and/or SGH. *Almont*, 2018 WL 1157752 at *18 (citation omitted). As discussed above, the Court largely agrees with SiteLock's arguments on the control issue. GoDaddy also argues that IBS acted as SiteLock's agent with respect to "key contracts" (Doc. 599 at 11) but does not provide any evidence suggesting that IBS did so in relation to the Reseller Agreement. And as for the SPA, GoDaddy does not provide, nor can this Court find, any case suggesting that the mere fact that the owners of IBS sold their interests to SIH, which had the effect of transferring ownership of SiteLock (IBS's subsidiary) to SIH, means that IBS acted as SiteLock's *agent*.[33] Accordingly, GoDaddy has failed to

---

[33] There is conflicting case law as to whether a principal-agent relationship is sufficient to establish legal control under *Citric Acid*. For example, *AFL Telecommunications* relied on a Third Circuit case, *Gerling*, to find control. 2012 WL 2590557 at *2. *See also id.* ("Although it is true that *Citric Acid* adopted the legal control test, it specifically stated that its decision was consistent with decisions in other circuits, including *Gerling* . . . . *Gerling* adopted the legal control test, but provided a more expansive definition than AFL suggests. Specifically, *Gerling* extended the test to a situation 'where the subsidiary was an agent of the parent in the transaction giving rise to the suit and in litigating the suit on the parent's behalf.''). Other district courts have reached conflicting conclusions. *See, e.g., Dugan v. Lloyds TSB Bank, PLC*, 2013 WL 4758055, *2 (N.D. Cal. 2013) (criticizing *AFL Telecommunications* as inconsistent with *Citric Acid* because "there was no evidence that the subsidiary had the legal right to acquire documents

- 53 -

1    establish that SiteLock has control over documents possessed by IBS, SIH, Unitedweb,

2    ABRY, and/or SGH.[34]

3          Finally, as for GoDaddy's assertion that it "will file a motion for leave to issue

4    subpoenas to SIH, IBS, and their respective deal counsel for the SPA Documents" (Doc.

5    599 at 12 n.6), it is not clear that this issue is before the Court.   However, without

6    prejudging the merits of any future motion, the Court notes that it is generally inclined to

7    allow GoDaddy to subpoena third parties to obtain documents related to the SPA (or, at

8    least, documents that touch upon the Key Representations identified above).   Although it

9    is not clear that the SPA is terribly important to this litigation and the Court is wary of

10   further extending the timeline for this case, the Court is also sympathetic to GoDaddy's

11   position—SiteLock created the need for additional discovery by failing to produce a

12   responsive document and, if SiteLock had timely produced the SPA, GoDaddy would have

13   had the opportunity to issue follow-up subpoenas.   Additionally, once GoDaddy became

14   aware of the need to seek additional SPA-related documents, it was forced to confront a

15   confusing maze of issues related to corporate control.   Although the Court has largely

16   resolved those control issues against GoDaddy here, it is important not to lose sight of the

17   bigger picture—had SiteLock timely produced the SPA, as it was required to do, all of

18   these complicated issues could have been resolved in an orderly fashion without imperiling

19   the trial date.   SiteLock only has itself to blame for the delay that working through these

20   issues has produced.

21          …

22          …

23

24   _____

     from its parent on demand"); *Otos,* 2017 WL 2452008 at *2 (same); *Seifi*, 2014 WL
     7187111 at *2 (same).   The Court need not wade into this debate because, even assuming
25   the reasoning in *Gerling* applies, GoDaddy has not established that SiteLock acted as the
     agent of IBS and/or SIH with respect to the Reseller Agreement.

26   [34]     In its response opposing SiteLock's motion, GoDaddy suggests that "if this Court
     is not fully satisfied as to the issue of control, then in the alternative, it could permit
27   discovery of 'agreements or contracts between the entities' that demonstrates a 'right to the
     information, upon request.'"   (Doc. 604 at 14.)   The Court declines this invitation.
28   GoDaddy bears the burden of establishing legal control and has failed to do so.   This failure
     does not warrant further discovery.

3.   Sectigo Documents

GoDaddy also requests the LFA and an unredacted version of the Sectigo SPA. (Doc. 598 at 1; Doc. 599 at 4.)

SiteLock opposes this request on relevance grounds, arguing that the requested documents are not "relevant to any party's claim or defense or responsive to any of GoDaddy's RFPs." (Doc. 597 at 4.) SiteLock further explains: "In February 2021 (after the close of written discovery in this case), Sectigo, Inc. acquired SiteLock's corporate grandparent (SIH). Although SiteLock does not believe these documents are relevant or responsive to any of GoDaddy's RFPs, SiteLock produced them after the October 31 hearing in an abundance of caution and an effort to avoid any further delays." (Doc. 610 at 11. *See also id.*at 14 [arguing the LFA is not relevant to standing].)

The Court agrees with SiteLock that GoDaddy has not established that the LFA or the unredacted Sectigo SPA are relevant. GoDaddy does not even address relevance in any of its motion papers. (Docs. 598, 599, 604, 611.) But even if it had, the Court reopened discovery for the limited purpose of remedying SiteLock's discovery violation. As SiteLock notes, the Sectigo documents were created "after the end of document discovery, after the final date for supplementation of MIDP responses, and after the date limitations that both parties placed on their respective RFP responses." (Doc. 597 at 4.) Thus, GoDaddy's request for the Sectigo documents does not fit within the scope of the Court's October 31, 2022 order.

Moreover, to the extent GoDaddy argues that SiteLock must produce the LFA to establish standing (*see, e.g.*, Doc. 599 at 14-15), the Court disagrees. Even without it, Yanchek's presence at the mediation does not come close to establishing that SiteLock assigned its right to bring the legal claims in this action to ABRY, much less outweighing the evidence to the contrary (*i.e.*, the Feather declaration, the Juall declaration, and the SPA). SiteLock's counsel has represented that he attended the mediation on behalf of SiteLock and that Yanchek attended as a director of SGH because of SGH's continuing interest in the litigation due to the funding agreement. (Doc. 594-2 ¶¶ 1-3.) GoDaddy has

1    not provided any evidence that contradicts this explanation.

2         Accordingly, the Court need not address the parties' work product arguments.

3    GoDaddy's requests for the LFA and an unredacted copy of the Sectigo SPA are denied.

4                        4.    Depositions And Trial Date

5         SiteLock asks the Court to set a new date for trial between March 20, 2023 and July

6    14, 2023 or to "order GoDaddy to provide its availability for trial and then set a new trial

7    date that works for the Court and the parties." (Doc. 597 at 13.) SiteLock also requests an

8    order "compelling GoDaddy to provide its availability" for Feather's and Serani's

9    depositions. (*Id.* at 1.) GoDaddy responds it "is not available for trial from March through

10   September" of 2023. (Doc. 604 at 17.) In reply, SiteLock argues that the Court should

11   either "order GoDaddy to provide its availability for trial within the next six months . . .

12   or, at the very least, substantiate its claims that it is unavailable for trial before October

13   2023." (Doc. 612 at 1.)

14        As for SiteLock's first request, the Court is not available for trial until, at the earliest,

15   November 2023. Accordingly, the Court orders the parties to meet and confer regarding

16   trial availability in November 2023 or from January 2024 onward and then file a joint

17   notice setting forth that availability.

18        As for the depositions of Feather and Serani, the Court agrees with GoDaddy that

19   the document request issues (including any disputes over subpoenas) should be resolved

20   first. Thus, the Court declines at this time to get into the weeds of deposition scheduling.

21   IV.  Costs

22        GoDaddy requests costs. (Doc. 599 at 17.) SiteLock argues that "GoDaddy is

23   incorrect that the Court has already awarded it costs associated with this motion" and

24   "GoDaddy is not otherwise entitled to fees in connection with this motion" because "[t]he

25   documents it seeks are irrelevant, non-responsive, and well beyond the scope of this case

26   and the limited supplemental discovery ordered by this Court." (Doc. 610 at 16.)

27        Rule 37(a)(5)(C) provides that when, as here, a motion to compel is granted in part

28   and denied in part, the court "may, after giving a reasonable opportunity to be heard,

apportion the reasonable expenses for the motion." *See generally W. Mortg. & Realty Co. v. KeyBank Nat'l Ass'n*, 2016 WL 11643651, *1 (D. Idaho 2016) ("Plaintiff cites to Rule 37(a)(5)(A) in its request for fees, but . . . Rule 37(a)(5)(C) is the applicable subsection of the Rule because the motion was not granted in full.  The primary difference between these two subsections is that an award is discretionary under Rule 37(a)(5)(C).  Ultimately, the analysis of Plaintiff's request under subsection 37(a)(5)(A) or 37(a)(5)(C) is the same, and arguments pertaining to the exceptions to Rule 37(a)(5)(A) are equally applicable to the Court's determination of whether attorney fees should be apportioned under Rule 37(a)(5)(C).").

The Court concludes, in its discretion, that cost-shifting would be inappropriate here.  Although GoDaddy has partially prevailed on its request to compel the production of additional documents , SiteLock's positions were (at least for the most part) substantially justified and GoDaddy's production request was denied in various respects.

Accordingly, **IT IS ORDERED** that:

(1) GoDaddy's motion to dismiss (Doc. 579) is **denied**.

(2) SiteLock's motion to enforce the Court's order and set a trial date (Doc. 597) is **granted in part** and **denied in part**, as discussed herein.

(3) GoDaddy's motion to compel (Doc. 598) is **granted in part** and **denied in part**, as discussed herein.

(4) Within one week of the issuance of this order, the parties must meet and confer and then file a joint notice setting forth their trial availability in November 2023 or from January 2024 onward.

Dated this 10th day of May, 2023.

Dominic W. Lanza
United States District Judge

- 57 -